# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| ROBERT WILLIAMS, also known as MICHAEL MILLER, an individual, | ) ) ) | Case No. |
| Plaintiff, | ) ) | |
| | ) | **COMPLAINT** |
| v. | ) ) | |
| WEXFORD HEALTH SOURCES, INC.; GEDION ATNAFU, M.D.; ZOWIE BARNES, M.D.; BOLAJI ONABAJO, M.D.; BERNARD ALENDA; WONDAYE DERESSA; ROBERT GIANGRANDI; AYOKU OKETUNJI; TITLAYO OTUNUGA; JENNIFER POPE; PRISCILLA MOMOH; MARYLAND DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONAL SERVICES; DOE DEFENDANTS 1-50; | ) ) ) ) ) ) ) ) ) ) ) | |
| | | **JURY TRIAL DEMANDED** |
| Defendants. | | |

## COMPLAINT

Plaintiff, ROBERT WILLIAMS, also known as MICHAEL MILLER, an individual and former resident of the state of Maryland, by and through his attorneys, hereby states his Complaint for violation of his federal and state Constitutional rights against the Defendants, WEXFORD HEALTH

SOURCES ("Wexford"); the MARYLAND DEPARTMENT OF PUBLIC

SAFETY AND CORRECTIONAL SERVICES ("DPSCS"); GEDION

ATNAFU, M.D. ("Atnafu"); ZOWIE BARNES, M.D. ("Barnes"); BOLAJI

ONABAJO, M.D. ("Onabajo"); BERNARD ALENDA ("Alenda"); WONDAYE

DERESSA ("Deressa"); ROBERT GIANGRANDI ("Giangrandi"); AYOKU

OKETUNJI ("Oketunji"); TITLAYO OTUNUGA ("Otunuga"); JENNIFER

POPE ("Pope"); PRISCILLA MOMOH ("Momoh"); and certain unknown

Defendants ("Does") as follows:

## INTRODUCTION

1.      Plaintiff, Robert Williams, contracted the Hepatitis C virus

("HCV") while incarcerated in the Maryland Department of Public Safety

and Correctional Services' Jessup Correctional Institute ("JCI").  Due to the

Defendants Wexford Health Sources, Inc. and its employees' failure to

provide complete medical records to Plaintiff and his counsel, the precise

date that Plaintiff contracted HCV is not known.

2.      Robert Williams received no treatment for his HCV while

incarcerated at JCI and developed cirrhosis—severe scarring of the liver—as

a result of the failure to receive treatment.  Again, because of the inadequacy

of Defendants' medical records, the precise date that Plaintiff developed

cirrhosis is not known.

3.      Cirrhosis impairs the ability of the liver to filter toxins from the blood before it enters the heart, and has a host of associated complications, including fatigue, diabetes, psoriasis, changes in mental state, coma, cancer, and life-threatening episodes of internal bleeding.  Plaintiff experienced no fewer than nine internal bleeds during his last year of incarceration.

4.      Defendants refused to provide Plaintiff with any treatment for his condition until he was actively vomiting blood.  By waiting until Plaintiff was on the brink of death before providing treatment, Defendants subjected Plaintiff to conduct that amounted to torture—placing him in severe pain, suffering, and fear for his life each time he experienced an episode of internal bleeding.

5.      Due to Defendants' refusal to provide Plaintiff with any appropriate medical care, Plaintiff experienced significant trauma.  After a bout of internal bleeding left Plaintiff with a bacterial infection, Plaintiff became suicidal and was found by Defendants eating floor tile on Thanksgiving Day 2016.

6.      Defendants continued to refuse Plaintiff medical care despite the obvious signs of serious and permanent damage.  Plaintiff was eventually released from JCI custody directly into the emergency room, nearly comatose, for treatment from internal bleeding.

7.     Because of Defendants' medical negligence and deliberate indifference, Plaintiff suffered not only severe pain, suffering, and fear of impending death during his incarceration, but has also developed medical conditions that will require treatment for the rest of his life, and that prevent him from retaining full-time employment.

8.     Plaintiff brings this suit to recover monetary damages suffered as a result of Defendant's willful and wanton misconduct and intentional violation of his constitutional rights, and for punitive damages to prevent and deter Wexford and its employees from engaging in such conduct in the future.

## JURISDICTION AND VENUE

9.     This is an action for monetary relief for violation of the Eight and Fourteenth Amendment of the United States Constitution pursuant to 42 U.S.C. 1983.

10.     This Court has jurisdiction of Mr. Williams' federal claims pursuant to 28 U.S.C. 1331, and supplemental jurisdiction of Mr. Williams' state law claims under 28 U.S.C. 1367.

11.     This Court is the appropriate venue pursuant to 28 USC 1391(b) because the events and omissions giving rise to the claims occurred in Maryland.  Plaintiff resided in this judicial district at all times relevant to

this Complaint, the majority of Defendants reside in this judicial district, and the events and omissions giving rise to Plaintiffs' claims occurred within this judicial district.

## PARTIES

12.     Plaintiff Robert Williams ("Williams" or "Plaintiff") is a formerly incarcerated individual who was in the custody of the Maryland Department of Public Safety and Correctional Services. Robert Williams was an alias used by Mr. Michael Miller, and is used in this complaint for clarity and consistency with relevant medical records. At all times relevant herein, Mr. Williams was a detainee at JCI, and, as such, JCI had a duty to provide medical care and treatment to Mr. Williams in a manner consistent with applicable and prevailing standards of medical care.

13.     The Maryland Department of Public Safety and Correctional Services ("DPSCS") is an agency of the state of Maryland. The DPSCS is responsible for the adequate health care of all inmates under its custody according to the standard of care. DPSCS is the final decision-making body responsible for approving, ratifying, or creating policies, practices, habits, customs and procedures, and for training and supervision of the agencies, employees and contractors which were deliberately indifferent to the legitimate and serious medical needs of individuals in JCI custody, including

Plaintiff.  As an agency of the state of Maryland, DPSCS acted under color of state law at all times relevant to this Complaint.

14.     Wexford Health Sources, Inc. ("Wexford") is the corporation hired by DPSCS to provide medical services to those who, like Plaintiff, are incarcerated in the state of Maryland.  Under this contract, Wexford has specifically agreed to provide for the health, safety, care and medical treatment of inmates including Plaintiff.  At all times relevant to this Complaint, Wexford was responsible for Plaintiff's medical care.

15.     This agreement to provide medical care includes treatment for HCV, cirrhosis, and resulting complications.  In performing these duties for the state of Maryland, Wexford acted under color of state law at all times relevant to this Complaint.  Wexford is a proper entity to be sued because it is a corporation acting under the color of state law within the meaning of 42 U.S.C. § 1983.

16.     Under its contract with JCI and/or DPSCS, Wexford was acting as the apparent and actual agent, servant and contractor of JCI and/or DPSCS, and was responsible for the care, health, safety and proper medical treatment of all detainees in JCI's facilities, including Plaintiff.  Pursuant to that contract, JCI and/or DPSCS adopted Wexford's policies, practices, habits, customs, procedures, training and supervision as its own, and

Wexford adopted JCI's and/or DPSCS policies, practices, habits, customs, procedures, training and supervision as its own.

17.     Wexford's policies, practices, habits, customs, procedures, training and supervision of staff and contractors, including the individual Defendants obligated to provide health care to Plaintiff herein, were deliberately indifferent to Plaintiff's legitimate and serious medical needs while in JCI custody.

18.     Bolaji Onabajo ("Onabajo") was an attending physician for Plaintiff at JCI, and was responsible for Plaintiff's health, safety, and proper medical treatment.  S/he was an employee and agent of Wexford and/or an agent of the JCI and/or DPSCS, acting within the scope of his/her employment, and under color of state law, at all times relevant to this lawsuit.  Onabajo is sued in his/her individual and official capacity.

19.     Zowie Barnes ("Barnes") was an attending physician for Plaintiff at JCI, and was responsible for Plaintiff's health, safety, and proper medical treatment.  She was an employee and agent of Wexford and/or an agent of the JCI and/or DPSCS, acting within the scope of her employment, and under color of state law, at all times relevant to this lawsuit.  Barnes is sued in her individual and official capacity.

20.     Gedion Atnafu ("Atnafu") was an attending physician for Plaintiff at JCI, and was responsible for Plaintiff's health, safety, and proper medical treatment.  He was an employee and agent of Wexford and/or an agent of the JCI and/or DPSCS, acting within the scope of his employment, and under color of state law, at all times relevant to this lawsuit.  Atnafu is sued in his individual and official capacity.

21.     Ayoku Oketunji ("Oketunji") was an attending physician for Plaintiff at JCI, and was responsible for Plaintiff's health, safety, and proper medical treatment.  She was an employee and agent of Wexford and/or an agent of the JCI and/or DPSCS, acting within the scope of her employment, and under color of state law, at all times relevant to this lawsuit.  Oketunji is sued in her individual and official capacity.

22.     Robert Giangrandi ("Giangrandi") was a physician's assistant for Plaintiff at JCI, and was responsible for Plaintiff's health, safety, and proper medical treatment.  He was an employee and agent of Wexford and/or an agent of the JCI and/or DPSCS, acting within the scope of his employment, and under color of state law, at all times relevant to this lawsuit.  Giangrandi is sued in his individual and official capacity.

23.     Priscilla Momoh ("Momoh") was an attending physician's assistant for Plaintiff at JCI, and was responsible for Plaintiff's health,

safety, and proper medical treatment.  She was an employee and agent of

Wexford and/or an agent of the JCI and/or DPSCS, acting within the scope

of her employment, and under color of state law, at all times relevant to this

lawsuit.  Momoh is sued in her individual and official capacity.

24.     Bernard Alenda ("Alenda") was an attending nurse for Plaintiff

at JCI, and was responsible for Plaintiff's health, safety, and proper medical

treatment.  He was an employee and agent of Wexford and/or an agent of the

JCI and/or DPSCS, acting within the scope of his employment, and under

color of state law, at all times relevant to this lawsuit.  Alenda is sued in his

individual and official capacity.

25.     Jennifer Pope ("Pope") was an attending nurse for Plaintiff at

JCI, and was responsible for Plaintiff's health, safety, and proper medical

treatment.  She was an employee and agent of Wexford and/or an agent of

the JCI and/or DPSCS, acting within the scope of her employment, and

under color of state law, at all times relevant to this lawsuit.  Pope is sued in

her individual and official capacity.

26.     Wondaye Deressa ("Deressa") was an attending nurse for

Plaintiff at JCI, and was responsible for Plaintiff's health, safety, and proper

medical treatment.  S/he was an employee and agent of Wexford and/or an

agent of the JCI and/or DPSCS, acting within the scope of his/her

employment, and under color of state law, at all times relevant to this lawsuit. Deressa is sued in his/her individual and official capacity.

27.   Titlayo Otunuga ("Otunuga") was an attending nurse for Plaintiff at JCI, and was responsible for Plaintiff's health, safety, and proper medical treatment. She was an employee and agent of Wexford and/or an agent of the JCI and/or DPSCS, acting within the scope of her employment, and under color of state law, at all times relevant to this lawsuit. Otunuga is sued in her individual and official capacity.

28.   On information and belief, there are additional medical care providers, including but not limited to the Wexford onsite medical director for JCI, who have negligently and/or maliciously failed to provide Plaintiff with medical care. The names of these providers are currently unknown because Defendants' refusal to provide Plaintiff with the entirety of his medical records. Plaintiff will amend his Complaint to state these individuals' true identities once such information becomes available.

29.   Together, Wexford and the Defendants identified in Paragraphs 18 through 28 will be referred to as the "Medical Defendants".

30.   On information and belief, there are unknown custody officers employed by the DPSCS at JCI that have negligently or maliciously refused to accurately report Plaintiff's symptoms to JCI medical staff, or that refused

to properly intervene when they witnessed Plaintiff's life-threatening medical condition go untreated by JCI medical staff. Plaintiff will amend his Complaint to state these individuals' true identities once information becomes available. These unknown defendants will be referred to in this Complaint as the "Custody Defendants".

## FACTS

31.    HCV is a serious medical condition that poses a substantial risk of serious harm. HCV attacks the proper functioning of the liver and will cause cirrhosis if left untreated, although the rate at which cirrhosis develops varies among individuals. Because cirrhosis describes an advanced stage of liver malfunction and scarring preventing the liver from properly filtering toxins in the blood, cirrhosis is itself a serious medical condition that presents multiple substantial and severe risks of serious harm and death. The standard of care in providing treatment for HCV includes monitoring the progression at which the patient is developing cirrhosis, or decompensated liver.

32.    One symptom associated with severe cirrhosis is swollen or ruptured veins near the esophagus and upper gastrointestinal ("GI") tract. Because the scarring associated with cirrhosis prevents blood flow to the liver, the blood that is unable to enter the liver through the stomach's

primary vein seeks an alternate route through the smaller veins in the esophagus and upper GI tract. This causes the smaller veins to swell and rupture from the elevated amount of pressure. This condition is medically referred to as "esophageal varices."

33.    Each episode of ruptured esophageal varices is a serious medical condition that poses a substantial risk of serious bodily harm, such as internal bleeding, which causes intense pain and discomfort, and will cause death if not treated. In addition to the emergency treatment of placing miniscule rubber bands around the ruptured varices by endoscopy ("banding ligation"), the medical standard of care requires follow-up endoscopies to ensure that the varices have healed, and that any missing bands are replaced.

34.    In or about 2013, prescription drugs to treat HCV became available that have an approximately 90-95% cure rate and few, if any, side effects. Since that time, multiple prescription drugs besides the originals— Harvoni and Sovaldi—have been found by medical professionals to produce similar cure rates and have a similar absence of side effects. These drugs have been demonstrated to prevent the onset of cirrhosis, and to reduce the severity of its symptoms in individuals who have already developed it.

35.    The current standard of medical care requires that HCV be treated with at least some combination of anti-viral prescription drugs described above.

36.    The current standard of medical care requires that any medical professional having a continuing relationship with a patient that has experienced ruptured esophageal varices refer that patient to a liver specialist or other professional who can perform a follow-up endoscopy to monitor the efficacy of the banding ligation, and potentially to perform follow-up banding ligations to ensure that the original rupture heals.

37.    On information and belief, Plaintiff experienced his first episode of ruptured esophageal varices in January of 2014, and was transferred to an outside medical provider for emergency treatment.

38.    Despite Medical Defendants full knowledge of Plaintiff's condition, their role in providing Plaintiff with continuing care, and the serious associated risks with ruptured esophageal varices, Plaintiff was never referred to any medical provider for a follow-up endoscopy during the entirety of 2014 and 2015.

39.    Medical Defendants Barnes, Momoh, and Deressa all participated in Plaintiff's longitudinal care during 2015 and the first months

of 2016, but none of them referred Plaintiff to a liver specialist or other professional for follow-up endoscopy, as required by the standard of care.

40.     In March of 2016, the Defendants observed Plaintiff vomiting blood.   After determining that he was bleeding internally, the Medical Defendants sent Plaintiff to the Bon Secours Hospital emergency room for banding ligation.

41.     During Plaintiff's March 2016 stay at Bon Secours, a doctor working at that hospital noted that Plaintiff had severe cirrhosis, and recommended him for treatment with Harvoni, a prescription drug used to treat HCV and cirrhosis.

42.     At this time, Defendant Atnafu observed that Plaintiff's liver damage had reached at least "Class B" on the Childs-Pugh classification scale.  A score in Class B of the scale indicates that a patient's liver has fully decompensated.

43.     Atnafu noted that Plaintiff would be considered for HCV treatment by the Medical Defendants upon his return from the Bon Secours Hospital ("BSH") emergency room.

44.     Plaintiff was seen by Defendant Alenda on the day of his return to JCI, but no comments or referrals were made to provide Plaintiff with: 1) follow-up endoscopy for his emergency banding ligation; 2) follow-up on

Atnafu's recognition of Plaintiff's fully decompensated liver; nor 3) follow-up on the outside physician's recommendation that Plaintiff receive treatment for HCV.

45.    Without any follow-up endoscopy or referral, Defendants witnessed Plaintiff vomiting blood again in April, and transferred him to the emergency room at Baltimore Washington Medical Center ("BWMC") with a fever of 103.2 and a platelet count of 16.

46.    A platelet count indicates the amount of coagulants available to help form clots to prevent bleeding.  An average adult maintains a platelet count of between 150,000 and 200,000.

47.    After receiving yet another emergency banding ligation, Plaintiff was transferred to BSH for further observation.  During this visit, doctors working for BSH began to note concern that Plaintiff had contracted bacterial peritonitis, which is an infection of the lining of the stomach and intestine, and is frequently connected with ruptured esophageal varices.

48.    Plaintiff was released back to JCI for treatment for bacterial peritonitis.  At no point during Plaintiff's stay at JCI between April and June of 2016 was he scheduled for a follow-up to the emergency banding ligation he had received in April of 2016.  The standard of care requires that a patient be scheduled for follow-up within two weeks.  During this time, Defendants

Alenda and Momoh each observed Plaintiff directly for treatment of Hepatitis C, cirrhosis, and ruptured esophageal varices, giving rise to a duty to refer for follow-up endoscopies and at least consider treatment for HCV as required by the standard of care.

49.     In June of 2016, Plaintiff again began vomiting blood, and was ordered to the emergency room for yet another emergency banding ligation. During this visit at the BWMC emergency room, Plaintiff received two full blood transfusions.

50.     Upon his return to JCI, Plaintiff was cleared to return to regular housing by Defendant Alenda with no referral for endoscopy or other treatment for HCV, cirrhosis, or ruptured esophageal varices.

51.     Plaintiff was subsequently seen by Defendant Otunuga in the context of treatment for ruptured esophageal varices, cirrhosis, and HCV, but Defendant Otunuga provided no referral for follow-up endoscopy or treatment for HCV.

52.     In late June of 2016, Plaintiff again reported that he was vomiting blood, but the Medical Defendants refused to admit him for either emergency banding ligation, follow-up banding ligation, or any other medical care whatsoever.  The Medical Defendants, particularly Defendant Alenda, claimed that Plaintiff was "malingering," and refused to admit him

for further observation until either a medical provider or a custody officer personally witnessed Plaintiff vomiting or defecating blood.

53.     In July of 2016, Plaintiff flooded his cell with toilet water in an attempt to be seen by JCI medical care providers.

54.     Plaintiff was transferred to the JCI infirmary and seen by Defendant Momoh, but no follow up endoscopy for ruptured esophageal varices was scheduled, and no notes in Plaintiff's medical records indicate that a follow-up endoscopy or referral was even considered.

55.     In August of 2016, Plaintiff again began to vomit blood, and was rushed to the emergency room at BWMC for yet another emergency banding ligation.

56.     Plaintiff returned four days later and was admitted to JCI general housing by Defendant Alenda, but was again not referred for follow-up endoscopy to prevent another episode of deadly internal bleeding, nor was any treatment for HCV or cirrhosis scheduled or considered.

57.     Plaintiff was seen by Defendant Onabajo in October of 2016, but no care for ruptured esophageal varices, cirrhosis, or HCV was provided or considered.

58.     Plaintiff was seen by Defendant Pope on or about November 2, 2016 specifically for care related to HCV, cirrhosis, esophageal varices, and

internal GI bleeding, but no appropriate care was provided for any of these serious medical conditions.

59.    A few days later, Plaintiff again began vomiting blood, was found unresponsive to verbal stimuli by Defendant Otunuga, began to exhibit symptoms of a coma, and had a fever of 102.2.  Plaintiff was, again, rushed to the emergency room for another banding ligation.  At this point, Defendant Otunuga noted that Plaintiff had begun experiencing an "altered mental status."

60.    Upon his return four days later, Plaintiff was released to general housing by Defendant Giangrandi without any mention of a follow up endoscopy, treatment for cirrhosis, or treatment for HCV.   Additionally, Plaintiff had contracted another bacterial infection during his visit to the BWMC emergency room, which was directly related to Plaintiff's frequent and recurrent episodes of internal bleeding.

61.    Plaintiff was admitted to the JCI infirmary later in November of 2016 for treatment of the bacterial infection, and for monitoring of an abscess in his lumbar spine.  During this time, Plaintiff was given opioid pain killers to manage the severe pain he was experiencing.

62.    Due to his decompensated liver, Plaintiff's body could not tolerate the pain killers that he had been originally prescribed. The Medical

Defendants decreased Plaintiff's prescription for pain medication because of his cirrhosis, despite the fact that Plaintiff was experiencing persistent pain. The Medical Defendants refused to increase Plaintiff's prescription for pain medication despite his repeated and desperate requests that they do so.

63.    During his November, 2016 stay in the JCI infirmary, Plaintiff became suicidal, and began experiencing significant mental trauma as a result of his body's inability to remove toxins from his blood.  The excessive amount of toxins in Plaintiff's blood stream traveled to his brain, and caused severe damage to Plaintiff's mind and character.

64.    On Thanksgiving Day, 2016, Plaintiff was discovered by the Medical Defendants eating tile in the JCI Infirmary.

65.    On the day after Thanksgiving, Plaintiff ate a lidocaine patch he had been prescribed, attempting to increase the effectiveness of pain medication.

66.    After being denied appropriate pain medication by the Medical Defendants, Plaintiff attempted to remove his intravenous lines, stumbled out of his infirmary bed, and passed out on the floor.

67.    Plaintiff was transferred to the psychiatric ward while completely unconscious.  Plaintiff awoke in what was essentially solitary confinement wearing only a hospital robe.

68.     Plaintiff became extremely disturbed and threatened to pull a light switch out of the wall in order to take his own life.   After about 24 hours of intense rage and suicidal ideation inside the "naked cell" on the day after Thanksgiving, Plaintiff was admitted back into the JCI infirmary for monitoring of his bacterial infection and spinal abscess.   During this entire time, Plaintiff received no follow-up treatment for his previous episode of ruptured esophageal varices, his cirrhosis, or his infection with HCV.

69.     Plaintiff experienced another episode of blood in his stool in early December 2016, and was transferred to an outside emergency room for treatment.

70.     No emergency banding ligation was performed at this time because the outside hospital did not detect ruptured esophageal varices requiring emergency care.   Plaintiff was returned to the Medical Defendants' primary care.

71.     Upon his return to JCI, Plaintiff was seen by Defendant Oketunji specifically in relation to his ruptured esophageal varices, but no follow-up endoscopy or referral was provided, scheduled, or considered.

72.     Over the course of the next four months, Plaintiff was finally evaluated for treatment of his HCV infection by unknown Medical Defendants, but which, on information and belief, included Wexford's onsite

JCI medical director.  Despite the fact that Plaintiff had already visited the emergency room multiple times since first being identified as at least Class B and with a fully decompensated liver, Plaintiff was denied treatment for HCV.  The Medical Defendants also failed to provide, schedule, or consider a follow-up with a liver specialist to monitor and/or secure Plaintiff's last emergency banding ligation.

73.    While awaiting treatment for HCV, cirrhosis, and ruptured esophageal varices during this time, Plaintiff was seen by Oketunji and Otunuga, but neither provided any treatment for these conditions.

74.    In March of 2017, Plaintiff was again discovered vomiting blood by Defendant Oketunji, and was again transferred to the BSH for an emergency banding ligation.

75.    Four days later, Plaintiff was readmitted to JCI and returned to regular housing by Defendant Giangrandi.  Again, no follow-up for Plaintiff's emergency banding ligation was scheduled or considered. Plaintiff was also denied any treatment for HCV and cirrhosis.

76.    The next week, Plaintiff reported blood in his mouth again, and was concerned that he was having another episode of internal bleeding. Plaintiff notified the Medical Defendants, particularly Defendant Otunuga, who—again—informed him that they would not provide him with any

treatment until they or the Custody Defendants personally witnessed Plaintiff vomit or defecate blood.  The Medical Defendants and Custody Defendants told Plaintiff to bring a cup with him next time it happened.

77.    The following week, the day before Plaintiff was scheduled to be released from his incarceration at JCI, Plaintiff was again discovered vomiting blood by Defendant Alenda, and had become completely unresponsive to verbal stimuli.

78.    Plaintiff was released from JCI custody and the care of the Medical Defendants, and directly into the BSH emergency room for banding ligation, on March 23, 2017.

## CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION

### Medical Malpractice (against Medical Defendants)

79.    Plaintiff hereby incorporates and re-alleges each and every preceding paragraph of this Complaint as if set forth in full herein.

80.    Plaintiff has filed a certificate of qualified expert and an election to waive arbitration with the Maryland Health Care Arbitration and Dispute Resolution Office as required by Md. Code Courts & Judicial Proceedings § 3-2A-01 *et seq*.

81.     After the acceptance of new prescription drugs to treat HCV by the Food and Drug Administration in or about 2013, the American Association for the Study of Liver Diseases (AASLD) has issued recommendations that individuals with chronic HCV, such as Mr. Williams, be treated with anti-viral drugs irrespective of the stage of their disease or of the prognosis for their progression through stages of HCV.

82.     The Center for Disease Control (CDC) has issued its own guidelines that state that the guidelines issued by the AASLD are the standard of care for the treatment of HCV.

83.     The current standard of medical care requires the treatment of individuals with HCV to include at least some combination of anti-viral prescription drug therapy.

84.     As of 2017, there were at least six options for prescription drug treatment, including Harvonia, Viekira-Pak, Technivie, Zepatier, Pegasys, and Solvadi.

85.     Plaintiff received no treatment for HCV according to the standard of care while incarcerated at JCI, at which time the Medical Defendants were responsible for his primary care.

86.     The Medical Provider Defendants' breach of the standard of care has caused Plaintiff to suffer life-long cirrhosis, severe bodily injury,

multiple episodes of ruptured esophageal varices, unnecessary pain and suffering as a result of his multiple emergency surgeries, unnecessary pain and suffering as a result of his body's inability to process the appropriate amount of pain medication, as well as severe depression, and suicidal ideation as a result of his irreversible physical damage.

87.   The standard of care for treatment of esophageal varices that have ruptured and includes both emergency banding ligation and follow-up referral to a liver specialist to monitor the results of the surgery and perform any supporting surgery that may be required.  This follow-up is required to be performed within two weeks after emergency banding ligation.

88.   Without the follow-up endoscopy, the patient is left in a situation where another life-threatening episode of internal bleeding is highly likely.  Plaintiff experienced an extreme amount of pain, stress, discomfort, and fear for his life with each episode of ruptured varices and emergency banding ligation.

89.   The Medical Provider Defendants breached the standard of care by refusing to provide Plaintiff with any follow-up treatment whatsoever for the emergency banding ligation procedures he received.

90.    The Medical Provider Defendants breached the standard of care by refusing to refer Plaintiff to a specialist who could provide Plaintiff with appropriate follow-up endoscopy treatment for emergency banding ligation.

91.    Each subsequent emergency banding ligation was completely unnecessary, and could have been avoided had the Medical Defendants met the standard of care for treatment of burst esophageal varices.

92.    These subsequent emergency procedures caused Plaintiff to contract a bacterial infection, which also caused him severe pain and suffering, and contributed to his attempts to take his own life.

93.    Instead of providing Plaintiff with appropriate medical care for his ruptured esophageal varices, cirrhosis, and HCV, the Medical Defendants kept Plaintiff on the brink of death for over a year.

94.    The full scope of the Medical Defendants' breach of the applicable standard of care is not currently known due to their failure to provide Plaintiff with full, complete, and accurate medical records.  On information and belief, the Medical Defendants have fraudulently refused to provide Plaintiff with complete and accurate medical records in order to prevent him from discovering the full extent of their wrongful conduct.

95.     The Medical Defendants' negligent disregard for Mr. Williams' objectively serious and clear HCV, full cirrhosis, and serious internal bleeding caused Plaintiff permanent damage from which he will not recover.

96.     Plaintiff is entitled to punitive damages against each of the Medical Defendants to this claim, in that their actions were made maliciously, willfully, and with a reckless and wanton disregard of Plaintiff's life and well-being.

## SECOND CAUSE OF ACTION

## 42 U.S.C. § 1983 – Against All Defendants

### Deprivation of Eighth Amendment Right to Medical Care

97.     Plaintiff hereby incorporates and re-alleges each and every preceding paragraph of this Complaint as if set forth in full herein.

98.      Each of the Defendants had and have full objective knowledge of the fact that HCV, cirrhosis, and ruptured esophageal varices present serious medical needs with substantial risks of severe and serious medical injury if left untreated, as described in this Complaint.

99.     Plaintiff had a clearly established right under the Eighth and Fourteenth Amendments to be free from deliberate indifference to his serious medical needs, including treatment for HCV, cirrhosis, and internal bleeding from ruptured esophageal varices.

100.   42 U.S.C. § 1983 provides that:

"Every person, who under color of any statute, ordinance,

regulation, custom or usage of any state or territory or the District of

Columbia subjects or causes to be subjected to any citizen of the

United States or other person within the jurisdiction thereof to the

deprivation of any rights, privileges or immunities secured by the

constitution and law shall be liable to the party injured in an action at

law, suit in equity, or other appropriate proceeding for redress . . .."

101.   Each of the Defendants to this claim failed to provide Plaintiff

with treatment for his objectively serious medical condition despite their

subjective knowledge that a failure to treat these conditions presents a

substantial risk of causing severe damage to the internal organs and death.

102.   Each of the Defendants to this claim were made aware of Mr.

Plaintiff's HCV infection, cirrhosis, and repeated internal bleeding by

observing it themselves, and by being informed of it by Plaintiff, other

detainees in the facility, JCI correctional officers, and other employees and

personnel of Wexford.

103.   The right to be free from cruel and unusual punishment was

well-established at all times relevant to this Complaint, and each of the

Defendants were aware that failure to provide medical care for a serious

medical need with a substantial risk of bodily harm clearly violated Plaintiff's constitutional rights and was not reasonable under the circumstances.

104.   The acts and omissions of Defendants intentionally deprived Plaintiff of his constitutional rights and were contributing proximate causes of his injuries.

105.   On information and belief, each of the Defendants to this claim acted pursuant to the specific directions of supervisory personnel at all times while ignoring Plaintiff's need for emergency medical treatment.

106.   Each of these supervisory personnel had actual or constructive knowledge that Defendants' denial of care posed a pervasive and unreasonable risk of causing Plaintiff's death, serious bodily injury, or severe pain and suffering.

107.   On information and belief, each of these supervisors' response to their knowledge of Defendants' acts and omissions was inadequate, and amounted to approval and adoption of these same acts and omissions.

108.   Each of these supervisors' failures to appropriately respond to their knowledge of Defendants' acts and omissions were contributory causes to Plaintiff's injuries described herein.

109.   In addition, Defendants reached an agreement among themselves and others known and unknown to deprive Plaintiff of his constitutional rights and to protect one another from liability for depriving Plaintiff of his rights.

110.   In furtherance of this conspiracy, each of the co-conspirators committed overt acts and was otherwise a willful participant in joint activity.

111.   Moreover, as described fully above, Defendants each had a reasonable opportunity to prevent the violation of Plaintiff's rights at issue in this Complaint had they been so inclined, but they each failed to do so.

112.   As a direct result of Defendants' unlawful conduct, Plaintiff has suffered tremendous pain, injuries, anguish, suffering, and, emotional distress.

113.   Plaintiff is entitled to attorney's fees and costs pursuant to 42 U.S.C. § 1988, as well as pre-judgment interest and costs as allowable by federal law.

114.   Plaintiff is entitled to punitive damages against each of the Defendants to this claim, in that their actions were made maliciously, willfully, and with a reckless and wanton disregard of Plaintiff's life and constitutional rights.

## THIRD CAUSE OF ACTION

## Violation of 42 U.S.C. § 1983 – Against Wexford and DPSCS

### Policy & Practice of Denial of Medical Care

115.   Plaintiff hereby incorporates and re-alleges each and every

preceding paragraph of this Complaint as if set forth in full herein.

116.   During Plaintiff's detention at JCI and for a period of time prior

thereto, Wexford and DPSCS had notice of a widespread practice by its

employees and agents at JCI under which detainees with HCV and cirrhosis

were routinely denied access to proper or sufficient medication and medical

attention.  It was common to observe detainees of JCI with clear symptoms

HCV and cirrhosis who frequently requested medical care and medication,

but whose requests were routinely denied or complete ignored.  On

information and belief, a significant portion of these denials of medical care

resulted in serious bodily injury.

117.   Specifically, a widespread practice existed at JCI under which

employees and agents of Wexford and DPSCS commonly failed or refused

to: (1) communicate the medical needs of inmates among correctional

officers and medical staff; (2) respond to detainees who requested treatment

for HCV and cirrhosis despite objectively serious symptoms; and (3)

properly treat detainees with HCV and cirrhosis.

118.   These widespread practices were allowed to flourish because
Wexford and DPSCS directly encouraged them, and were thereby the
moving force behind the misconduct alleged in this Complaint, and included
failing to adequately train, supervise, and control medical personnel and
correctional officers, and failing to adequately punish and discipline prior
instances of similar misconduct, thus directly encouraging future abuses
such as those affecting Plaintiff.

119.   Wexford and DPSCS are sued herein for maintaining these
policies, practices, customs, failures to train, failures to supervise, and for
ratifying conduct regarding treatment of detainees displaying symptoms of
the serious medical needs described in this complaint, all of which amount to
deliberate indifference.  As the entity hiring Wexford to satisfy its
obligations to provide medical care to detainees incarcerated at JCI, all
actions of Wexford are attributable to DPSCS.

120.   Plaintiff's injuries were caused by employees and contractors of
Wexford and DPSCS, including but not limited to the individually named
Defendants, who acted pursuant to these Defendants' policies and practices
while engaging in the misconduct described in this Complaint.

121.   DPSCS conducts regular audits of Wexford's provision of
health care services in JCI.  DPSCS supervisory personnel review and

examine inmate complaints, medical records, and autopsies.  During these audits, DPSCS supervisory personnel personally observe the policies, practices and customs regarding the provision of health care related to HCV, cirrhosis, and ruptured esophageal varices at JCI by Wexford and Wexford's employees, including the Medical Defendants.

122.   Given DPSCS supervisory personnel's knowledge of the quality assurance information regarding treatment for HCV, their failure to take any corrective action constitutes ratification of the policies that caused the violation of Plaintiff's constitutional rights.

123.   Defendants Wexford and DPSCS were on notice that its policies practices, customs, failures to train, failures to supervise, and ratifications would result or had resulted in a pattern of failing to provide adequate services, amounting to deliberate indifference to the Plaintiff's serious medical needs for the reasons stated above.

124.   Wexford and DPSCS knew that potentially serious or fatal consequences could and would be caused by their policies, practices, customs, failures to train, and failures to supervise, as stated below.

*First - Limiting Treatment for HCV to Individuals with Class C Cirrhosis*

125.   Wexford maintains a policy, practice and custom regarding treatment of detainees infected with HCV whereby only detainees with

cirrhosis at a "Class C" level on the Childs-Pugh scale will be treated for

HCV in any fashion, regardless of the severity of the symptoms they may

objectively exhibit or the patient's risk of death or permanent injury from the

refusal to provide treatment.  The existence of this policy is known from

Wexford correspondence to inmates housed in the DPSCS.

126.   This policy amounts to deliberate indifference of Plaintiff's and

other detainees' serious medical needs because, by refusing to treat detainees

until their liver has irretrievably decompensated, the policy guarantees

serious medical injury.  HCV is objectively known to the Medical

Defendants to be a serious medical condition that has a substantial risk of

permanent injury, and the decision to abide by the policy is undertaken with

subjective knowledge that the substantial risks of permanent injury

associated with untreated HCV will likely occur.

127.   On information and belief, Wexford trains its employees to

refuse treatment for inmates with HCV unless they have Class C cirrhosis.

This training amounts to deliberate indifference of Plaintiff's and other

inmates' serious medical needs because, by refusing to treat detainees until

their liver has irretrievably decompensated, the policy guarantees serious

medical injury.  The decision to train employees in this fashion is undertaken

with objective knowledge of the fact that HCV is a serious medical

condition, and with subjective knowledge that the substantial risks of

permanent injury associated with untreated HCV will likely occur if the

training is followed.

128.   On information and belief, Wexford supervises its employees to

deny treatment for HCV to anyone without Class C cirrhosis. The decision

to supervise employees in this fashion was undertaken with objective

knowledge of the substantial risks of untreated HCV, and with the subjective

knowledge that the substantial risks of permanent injury associated with

untreated HCV will likely occur under this supervision, which amounts to

deliberate indifference to the serious medical needs of Plaintiff and other

inmates.

129.   On information and belief, Wexford ratifies the conduct of its

employees who deny treatment for HCV to inmates without Class C

cirrhosis through review and approval of these employees' performance, and

through the decision to continue the employment of individuals who fail to

provide this treatment.  Such ratification amounts to deliberate indifference

to the serious medical needs of inmates, including Plaintiff, because the

decision to ratify employees' conduct in this fashion was undertaken with

objective knowledge of the substantial risks of untreated HCV, and with the

subjective knowledge that the substantial risks of permanent injury

associated with untreated HCV will likely occur and continue given

ratification of the offending conduct.

*Second - Ignoring and Under-Reporting Symptoms of Class C Cirrhosis*

130.   On information and belief, Wexford maintains a policy,

practice and custom requiring employees to ignore or under-report

symptoms of cirrhosis and decompensated liver, thus classifying fewer

detainees with Class C cirrhosis.  The existence of this policy is inferred

from the fact that Plaintiff was identified with Class B cirrhosis as a result of

an episode of internal bleeding in March, 2016, and experienced no fewer

than six subsequent emergency banding ligations without ever being re-

classified or considered for treatment upon his return to the Medical

Defendants' primary care.  Each episode of life-threatening internal bleeding

is an objective indicator that a patient's liver is fully decompensated.

131.   This policy and practice of ignoring and under-reporting

amounts to deliberate indifference because cirrhosis and decompensated

liver are objectively known by the Medical Defendants to be a life-

threatening and serious medical need of inmates, including Plaintiff, and the

decision to abide by Wexford's policy and refuse to provide appropriate care

is undertaken with subjective knowledge that the substantial risks of

permanent injury associated with improperly diagnosed and treated cirrhosis will likely occur if the policy is followed.

132.   On information and belief, Wexford medical staff are trained to ignore or under-report symptoms of cirrhosis and decompensated liver, thus classifying fewer detainees under the last and most pronounced stage of cirrhosis.  This training to ignore and under-report symptoms of cirrhosis amounts to deliberate indifference because cirrhosis and decompensated liver are objectively known by the Medical Defendants to be a life-threatening and serious medical need of inmates, including Plaintiff, and the decision to abide by Wexford's training and refuse to provide appropriate care is undertaken with subjective knowledge that the substantial risks of permanent injury associated with improperly diagnosed and treated cirrhosis will likely occur if the training is followed.

133.   On information and belief, Wexford supervises its employees to ignore or under-report symptoms of cirrhosis and decompensated liver, amounting to deliberate indifference to the serious medical needs of inmates, including Plaintiff, because the decision to supervise employees in this fashion is undertaken with the objective knowledge of the substantial risks of ignored or under-reported cirrhosis and decompensated liver, and with the subjective knowledge that the substantial risks of permanent injury

associated with improperly diagnosed and treated cirrhosis will likely occur under the supervision.

134.   On information and belief, Wexford ratifies the conduct of its employees who ignore or under-report symptoms of cirrhosis and decompensated liver through review and approval of these employees' performance, and through the decision to continue the employment of individuals who ignore and under-report such symptoms of JCI detainees. Such ratification amounts to deliberate indifference to the serious medical needs of detainees, including Plaintiff, because the decision to ratify employees' conduct in this fashion is undertaken with the objective knowledge of the substantial risks of ignored or under-reported cirrhosis and decompensated liver, and with the subjective knowledge that the substantial risks of permanent injury associated with improperly diagnosed and treated cirrhosis will likely occur and continue given ratification of the offending conduct.

*Third - Refusing Follow-Up Treatment for Ruptured Esophageal Varices*

135.   On information and belief, Wexford maintains a policy, practice and custom of refusing to refer individuals with ruptured esophageal varices for follow-up endoscopies or referral to liver specialists.  The existence of this policy is inferred from the fact that no Medical Defendant

providing primary longitudinal care to Plaintiff ever entered any note or record indicating that a follow-up endoscopy or referral to a liver specialist for was performed or ever considered for Plaintiff.  Wexford's policy in this regard amounts to deliberate indifference because esophageal varices is objectively known by the Medical Defendants to be a life-threatening and serious medical need of detainees, including Plaintiff, and the decision to abide by the policy and refuse to provide appropriate care is undertaken with subjective knowledge of the consequences that present a substantial risk of that patient's death.

136.   On information and belief, Wexford medical staff are trained to refuse to refer individuals with ruptured esophageal varices for follow-up endoscopies.  This training amounts to deliberate indifference to the serious medical need of detainees, including Plaintiff, because esophageal varices are objectively known by the Medical Defendants to be a life-threatening condition, and the decision to abide by Wexford's training and refuse to provide appropriate care is undertaken with subjective knowledge that the substantial risks of permanent injury and death associated with improperly treated esophageal varices will likely occur if the training is followed.

137.   On information and belief, Wexford supervises its employees to refuse to refer individuals with ruptured esophageal varices for follow-up

endoscopies, amounting to deliberate indifference to the serious medical

needs of detainees, including Plaintiff, because the decision to supervise

employees in this fashion is undertaken with the objective knowledge of the

substantial risks of untreated ruptured esophageal varices, and with the

subjective knowledge that the substantial risks of permanent injury and

death associated with improperly treated esophageal varices will likely occur

a result of the supervision.

138.   On information and belief, Wexford ratifies the conduct of its

employees who refuse to treat or refer individuals with ruptured esophageal

varices for follow-up endoscopies through review and approval of these

employees' performance, and through the decision to continue the

employment of individuals who refuse to treat ruptured esophageal varices

appropriately.  Such ratification amounts to deliberate indifference to the

serious medical needs of detainees, including Plaintiff, because the decision

to ratify employees' conduct in this fashion is undertaken with the objective

knowledge of the substantial risks of ruptured esophageal varices that go

untreated, and with the subjective knowledge that the substantial risks of

permanent injury and death associated with improperly treated esophageal

varices will likely occur and continue given ratification of the offending

conduct.

139.   As a direct result of Defendants' unlawful conduct, Mr. Williams suffered tremendous pain, injuries, anguish, suffering, and emotional distress.

140.   Plaintiff is further entitled to attorney's fees and costs pursuant to 42 U.S.C. § 1988, as well as pre-judgment interest and costs as allowable by federal law.

141.   Plaintiff is entitled to punitive damages against each of the Defendants to this claim, in that their actions were made maliciously, willfully, and with a reckless and wanton disregard of Plaintiff's life and constitutional rights.

## FOURTH CLAIM FOR RELIEF

## Deprivation of Rights Stated By Article 24 and 25 of the Maryland Declaration of Rights – Against All Defendants

142.   Plaintiff hereby incorporates and re-alleges each and every preceding paragraph of this Complaint as if set forth in full herein.

143.   Each of the Defendants named in this Fourth Claim for Relief, either individually or through their agents and/or employees, deprived Plaintiff of his rights to be free from cruel and unusual punishment through Article 25 of the Maryland Declaration of Rights, and of his right to due

process through Article 24 due to their collective failures, which caused him

unnecessary injuries which were not included in his sentence.

144.   As a direct result of the Defendants' unlawful conduct, Plaintiff

suffered tremendous pain, injuries, anguish, suffering, and emotional

distress.

145.   Plaintiff is further entitled to attorney's fees and costs, as well

as pre-judgment interest and costs as allowable under the Maryland

Declaration of Rights.

146.   Plaintiff is entitled to punitive damages these Defendants' in

that their actions were made maliciously, willfully, and with a reckless and

wanton disregard of Plaintiff's life and constitutional rights.

**FIFTH CLAIM FOR RELIEF**

**Intentional Infliction of Emotional Distress (Against All Defendants)**

147.   Plaintiff hereby incorporates and re-alleges each and every

preceding paragraph of this Complaint as if set forth in full herein.

148.   Each of the Defendants named herein knew of the severe

injuries, pain and suffering that result from multiple emergency procedures

to correct life-threatening episodes of ruptured esophageal varices.

149.   Each of the Defendants named herein knew of the severe injuries, pain and suffering that result from failing to refer a patient for treatment for ruptured esophageal varices.

150.   Each of the Defendants named herein intentionally denied Plaintiff medical care with full knowledge of the consequences of their actions.

151.   Each of the Defendants' actions in denying Plaintiff medical care were extreme, outrageous and unusually unreasonable given the fact that Plaintiff had been living with recurrent ruptured esophageal varices for years, including repeated complaints of vomiting and defecating blood, abnormal fevers, and changes in mental state.

152.   Each of the Defendants' refusals to report Plaintiff's condition, to provide treatment, or to refer for proper treatment were extreme, outrageous, and unusually unreasonable given that each of the Defendants were aware that Plaintiff had recurring ruptured esophageal for varices over a year, which included symptoms such as repeated episodes of vomiting and defecating blood, abnormal fevers, and changes in mental state.

153.   As a result of Defendants' conduct, Plaintiff suffered extreme and severe emotional distress for the time during which he was denied medical care.

## SIXTH CLAIM FOR RELIEF

### *Respondeat Superior* (Against Wexford and DPSCS)

154.   Plaintiff hereby incorporates and re-alleges each and every preceding paragraph of this Complaint as if set forth in full herein.

155.   In committing the acts alleged in the preceding paragraphs, the individual Custody Defendants were employees and agents of DPSCS, and the individual Medical Defendants were employees and agents of Wexford, each of whom acted at all times within the scope of their employment.

156.   Both Wexford and the DPSC are liable as principal for the torts of its agents, and is therefore liable under a theory of *respondeat superior* for all claims other than those stated under 42 U.S.C. § 1983.

## SEVENTH CLAIM FOR RELIEF

### Indemnification (Against Wexford and DPSCS)

157.   Plaintiff hereby incorporates and re-alleges each and every preceding paragraph of this Complaint as if set forth in full herein.

158.   Maryland law provides that public entities are directed to pay any tort judgment for which employees are liable within the scope of their employment.

159.   Defendants are or were employees of Wexford, JCI, and/or DPSCS, who acted in the scope of their employment in committing the

misconduct described herein.

160.   Wexford is liable as principal for all torts committed by its agents.

161.   WHEREFORE, Plaintiff, Robert Williams, respectfully request that this Court enter a judgment in their favor and against Defendants WEXFORD HEALTH SOURCES, INC., the DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONAL SERVICES, ZOWIE BARNES, BOLAJI ONABAJO, PRISCILLA MOMOH, JENNIFER POPE, BERNARD ALENDA, GEDION ATNAFU, WONDAYE DERESSA, ROBERT GIANGRANDI, AYOKU OKETUNJI, TITLAYO OTUNUGA, and DOE DEFENDANTS 1-50, in their individual and official capacities, awarding compensatory damages, attorneys' fees and costs against each Defendant, punitive damages against Wexford and each of the individual Defendants, and any other relief this Court deems just and appropriate.

## JURY DEMAND

Plaintiff, Robert Williams, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court grant the following relief:

1.     Compensatory damages in the amount of $10,000,000.00;

2.    Punitive damages in the amount of $10,000,000.00;

3.    For attorneys' fees under 42 U.S.C. § 1988; and

4.    For such other and further relief as this Court may deem appropriate.


                                     /s/  Masai McDougall  /s/
                                    Masai McDougall, Esq.
                                    Fareed Nassor Hayat, Esq.
                                    Roland Brooks, Esq.
                                    THE PEOPLE'S LAW FIRM, LLC
                                    200 E. Lexington Avenue
                                    Suite 1111
                                    Baltimore, MD 21202
                                    masai.mcdougall@
                                    thepeopleslawfirm.net