**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **ROBERT WILLIAMS** | * | |
| **Plaintiff** | * | |
| **v.** | * | **Case No.: 1:19-cv-00033-CCB** |
| **WEXFORD HEALTH SOURCES, INC.,** *et al.* | * | |
| **Defendants** | * | |

---

<u>**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS**</u>

Defendants Wexford Health Sources, Inc. ("Wexford"), Gedion Atnafu, M.D., Zowie Barnes, M.D., Bolaji Onabajo, M.D., Bernard Alenda, P.A., Wondaye Deressa, CFNP, Robert Giangrandi, P.A., Priscilla Momoh, P.A., Ayoku Oketunji, M.D., Titilayo Otunuga, CFNP, and Jennifer Pope, CFNP (collectively the "Medical Defendants"), by and through their attorneys, Joseph B. Chazen, Gina M. Smith, Samuel T. Wolf, and Meyers, Rodbell & Rosenbaum, P.A., file this Memorandum in Support of their Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6) and state:

**I.     FACTS ALLEGED IN THE COMPLAINT**

For purposes of this Rule 12(b)(6) motion to dismiss for failure to state a claim, the Court must assume that the following factual allegations are true.

Plaintiff Robert Williams is a former Maryland inmate who was incarcerated at Jessup Correctional Institution during the time relevant to the complaint. ECF 1 at ¶¶ 1, 12. Defendant Wexford Health Sources, Inc. is a corporation that was under contract with the State of Maryland to provide health care services to Maryland inmates during the time relevant to the complaint. *Id.*

at ¶ 14. The individual Medical Defendants were employed by Wexford and participated in Williams' health care during his incarceration at JCI. *Id.* at ¶¶ 18-27.

During his incarceration, Williams contracted the Hepatitis C virus ("HCV"). HCV affects the liver and, if left untreated, causes cirrhosis, which "describes an advanced stage of liver malfunction and scarring" and prevents "the liver from properly filtering toxins in the blood." *Id.* at ¶ 31. Severe cirrhosis, "or decompensated liver," is associated with "swollen or ruptured veins near the esophagus and upper gastrointestinal ('GI') tract." *Id.* at ¶ 32. Because liver scarring prevents blood from flowing normally into the liver through the portal vein, blood seeks an alternate route through smaller veins in the esophagus and upper GI tract. *Id.* These smaller veins swell and rupture from elevated blood pressure, which is a condition called esophageal varices. *Id.* Esophageal varices present a risk of internal bleeding—causing intense pain and discomfort—"and will cause death if not treated." *Id.* at ¶ 33. Esophageal varices are treated emergently through endoscopic banding ligation, which involves "placing miniscule rubber bands around the ruptured varices." *Id.* The "current standard of medical care requires that any medical professional having a continuing relationship with a patient that has experience ruptured esophageal varices refer that patient to a liver specialist or other professional who can perform a follow-up endoscopy to monitor the efficacy of the banding ligation, and potentially to perform follow-up banding ligations to ensure that the original rupture heals." *Id.* at ¶ 36.

Prescription drugs to treat HCV became available in 2013. *Id.* at ¶ 34. Those drugs have a 90-95% success rate in curing HCV. *Id.* Multiple additional drugs have entered the market since then, with similar cure rates and generally few side effects. *Id.* Administering these drugs can "prevent the onset of cirrhosis [and] reduce the severity of its symptoms in individuals who have

already developed" cirrhosis. *Id.* The "current standard of care requires that HCV be treated with at least some combination of anti-viral prescription drugs." *Id.* a ¶ 35.

Williams first had an episode of ruptured esophageal varices in January of 2014. *Id.* at ¶ 37. He was transferred to an outside facility for emergency treatment. *Id.* Prison medical staff did not refer Williams to any medical provider for a follow-up endoscopy during the entirety of 2014 and 2015.[1] *Id.* at ¶ 38. Defendants Zowie Barnes, M.D., Priscilla Momoh P.A., and Wondaye Deressa, P.A. "participated in [Williams'] longitudinal care during 2015 and the first months of 2016, but none of them referred [him] to a liver specialist or other professional for follow-up endoscopy, as required by the standard of care." *Id.* at ¶ 39.

In March 2016, unspecified "Defendants" observed Williams vomiting blood. *Id.* at ¶ 40. Unspecified "Medical Defendants sent" Williams to the emergency room at Bon Secours Hospital ("BSH") for banding ligation.[2] *Id.* While Williams was at BSH, a physician noted that he had "severe cirrhosis" and recommended that his HCV be treated with Harvoni. *Id.* at ¶ 41.

While Williams was at BSH in March 2016, Defendant Gedion Atnafu, M.D. noted that Williams' "liver damage had reached at least 'Class B' on the Childs-Pugh classification scale," indicating that his liver had "fully decompensated." *Id.* at ¶ 42. Dr. Atnafu noted that the Medical Defendants would consider Williams for HCV treatment upon his return from BSH to the prison. *Id.* at ¶ 43.

---

[1] Williams must be including this information for background only, since these events are well outside the limitations period.

[2] As used throughout the complaint, the term "Medical Defendants" denotes not only the Medical Defendants who are identified and are parties to this present motion, but also "additional medical care providers . . . who have . . . failed to provide Plaintiff with medical care." ECF 1 at ¶ 28.

On the day he returned to JCI after his discharge from BSH, Williams was seen by Defendant Bernard Alenda, P.A. At that encounter, Alenda did not make any comment about Williams needing any: (1) follow-up endoscopy after the emergency banding ligation; (2) follow-up regarding Dr. Atnafu's "recognition of [Williams'] fully decompensated liver"; or (3) follow-up on the BSH physician's recommendation for HCV treatment with Harvoni. *Id.* at ¶ 44. Alenda did not make any referral for any of those areas of follow-up care. *Id.*

In April 2016, unspecified "Defendants" again witnessed Williams vomiting blood, and Williams was transferred to the emergency room at Baltimore Washington Medical Center ("BWMC"). *Id.* at ¶ 45. At the time, Williams had a 103.2 degree fever and his platelet count was 16[,000], when it should have been between 150,000 to 200,000. *Id.* at ¶¶ 45-46. After undergoing another emergency banding ligation, Williams was transferred to BSH for further observation. *Id.* at ¶ 47. BSH physicians were concerned that Williams had contracted bacterial peritonitis, an infection of the lining of the stomach and intestine that is frequently associated with ruptured esophageal varices. *Id.*

BSH discharged Williams, and he was returned to JCI for treatment for bacterial peritonitis. *Id.* at ¶ 48. From April to June 2016, Williams was never "scheduled for a follow-up to the emergency banding ligation he had received in April 2016," despite the standard of care requiring "that a patient be scheduled for follow-up within two weeks." *Id.* Alenda and Momoh "each observed [Williams] directly for treatment of [HCV], cirrhosis, and ruptured esophageal varices" during this time. *Id.*

In June 2016, Williams again vomited blood and was sent to BWMC for emergency banding ligation. *Id.* at ¶ 49. During this emergency room visit, Williams received two blood transfusions. *Id.*

When he was returned to JCI, Williams was cleared to return to regular housing by Alenda, and Alenda did not refer Williams for a follow-up endoscopy or any other treatment for HCV, cirrhosis, or ruptured esophageal varices. *Id.* at ¶ 50. Later, Williams was seen by Defendant Titilayo Otunuga, CFNP for his ruptured esophageal varices, cirrhosis, and HCV, but Otunuga did not refer Williams for a follow-up endoscopy or HCV treatment. *Id.* at ¶ 51.

In late June 2016, Williams again reported vomiting blood. Unspecified Medical Defendants refused to send Williams for emergency banding ligation or any other medical care. *Id.* at ¶ 52. Alenda claimed that Williams was malingering and did not admit him (to an unspecified facility) for further observation till a medical provider or custody officer personally witnessed Williams vomiting or defecating blood. *Id.*

In July 2016, Williams flooded his cell with toilet water in order to be seen by JCI medical providers. *Id.* at ¶ 53. As a result, Williams was transferred to the infirmary where he was seen by PA Momoh. *Id.* at ¶ 54. Momoh did not refer Williams for a follow-up endoscopy for ruptured esophageal varices, and there is no indication from Williams' medical records that a follow-up endoscopy was considered. *Id.*

Williams vomited blood in August 2016. ¶ 55. He was sent to the emergency room at BWMC where he underwent another emergency banding ligation. *Id.* Four days later, he returned to JCI and was discharged to general housing by Alenda. *Id.* at ¶ 56. Alenda did not refer Williams for a follow-up endoscopy or for HCV treatment. *Id.*

Williams was seen by Defendant Bolaji Onabajo, M.D. in October 2016. *Id.* at ¶ 57. Dr. Onabajo did not provide care for Williams' esophageal varices, cirrhosis, or HCV. *Id.*

On November 2, 2016, Williams was seen by Jennifer Pope, CFNP for care of his HCV, cirrhosis, esophageal varices, and internal GI bleeding. *Id.* at ¶ 58. "[N]o appropriate care" was provided for these conditions, however. *Id.*

A few days later, Williams again vomited blood. *Id.* at ¶ 59. Nurse Practitioner Otunuga found Williams unresponsive to verbal stimuli. *Id.* He exhibited symptoms of a coma and had a fever of 102.2. *Id.* Otunuga noted that Williams had "altered mental status." *Id.* Williams was sent to the emergency room for another banding ligation procedure. *Id.* While he was at BWMC, Williams contracted another bacterial infection directly related his internal bleeding. *Id.* at ¶ 60.

Williams returned to JCI four days later, and Defendant Robert Giangrandi, P.A. released Williams to general housing. *Id.* Giangrandi did not mention anything about a follow-up endoscopy, treatment for cirrhosis, or treatment for HCV. *Id.*

Later in November 2016, Williams was admitted to the infirmary at JCI for treatment of the bacterial infection and for monitoring of an abscess in his lumbar spine. *Id.* at ¶ 61. His pain was managed using opioids. *Id.* Williams' body could not tolerate the pain killers due to his decompensated liver. *Id.* at ¶ 62. The Medical Defendants therefore decreased his dosage of pain medication because of his cirrhosis, even though he was experiencing persistent pain. *Id.* The Medical Defendants refused to increase Williams' dose despite repeated requests to do so. *Id.* In the infirmary, Williams became suicidal "and began experiencing significant mental trauma as a result of his body's inability to remove toxins from his blood." *Id.* at ¶ 63. The toxins in his blood "caused severe damage to [Williams'] mind and character." *Id.*

On Thanksgiving Day in 2016, unspecified Medical Defendants discovered Williams eating tile in the infirmary. *Id.* at ¶ 64. The next day, Williams ate a lidocaine patch, attempting to increase its effectiveness. *Id.* at ¶ 65. Because he was denied pain medication, Williams tried to

remove his IV lines, stumbled out of his infirmary bed, and passed out on the floor. *Id.* at ¶ 66. He was transferred to the psychiatric ward while unconscious. *Id.* at ¶ 67. He awoke alone wearing only a hospital robe. *Id.* He became extremely disturbed and threatened to pull a light switch out of the wall in order to kill himself. *Id.* at ¶ 68. After 24 hours in the psychiatric observation cell, Williams was admitted back into the infirmary for monitoring of his infection and spinal abscess. *Id.* During his time in the infirmary in November 2016, Williams did not receive follow-up treatment for his prior episode of ruptured esophageal varices, cirrhosis, or HCV. *Id.*

In early December 2016, Williams experienced an episode of blood in his stool. *Id.* at ¶ 69. He was transferred to an emergency room, where he did *not* undergo banding ligation because the hospital could not detect any ruptured esophageal varices at that time. *Id* at ¶¶ 69-70. He was returned to the prison. *Id.* When he arrived back at JCI, he was seen by Defendant Ayoku Oketunji, M.D., who did not refer Williams for any follow-up endoscopy. *Id.* at ¶ 71.

Williams was finally considered for HCV treatment by multiple "unknown Medical Defendants," including "Wexford's onsite JCI medical director." *Id.* at ¶ 72. Despite having "visited the emergency room multiple times since first being identified as at least Class B and with a fully decompensated liver," Williams was not provided with treatment to cure his HCV. *Id.* The unspecified "Medical Defendants" did not refer Williams for a follow-up with a liver specialist to monitor or "secure" Williams' last emergency banding ligation. *Id.*

In March 2017, Dr. Oketunji discovered Williams vomiting blood and ordered that he be transferred to BSH for emergency banding ligation. *Id.* at ¶ 74. Four days later, Williams returned to JCI and was discharged to regular housing by PA Giangrandi. *Id.* at ¶ 75. Williams was not provided with a referral for a follow-up related to his banding ligation, and he was denied treatment for his HCV and cirrhosis. *Id.*

A week later, Williams reported "blood in his mouth." *Id.* at ¶ 76. He notified Nurse Practitioner Otunuga who "informed him that they would not provide him with any treatment until" a medical provider or corrections officer witnessed him vomit or defecate blood. *Id.* Williams was told to bring a cup with him the next time he vomited or defecated blood. *Id.*

A week later, the day before Williams was scheduled to be released from prison, Alenda discovered him vomiting blood. *Id.* at ¶ 77. Williams was "completely unresponsive to verbal stimuli." *Id.* He was transferred to the emergency room at BSH for emergency banding ligation, and was released from custody there. *Id.* at ¶ 78.

## II.   STANDARD OF REVIEW

A Rule 12(b)(6) motion to dismiss for failure to state a claim "tests the legal sufficiency of the complaint." *Birmingham v. PNC Bank, N.A.*, 846 F.3d 88, 92 (4th Cir. 2017). The Court should dismiss an action if the complaint does not "state[] a plausible claim for relief." *Id.* (citations omitted). A complaint "must contain sufficient factual allegations, taken as true, 'to raise a right to relief above the speculative level' and 'nudge [the] claims across the line from conceivable to plausible.'" *Id.* (alteration in original, citations omitted). This "facial plausibility standard requires pleading of 'factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* (citations omitted). A plaintiff must "demonstrate more than a sheer possibility that a defendant has acted unlawfully," and "a complaint is insufficient if it relies upon naked assertions and unadorned conclusory allegations devoid of factual enhancement." *Id.* (internal quotation marks and citation omitted).

## III.   ARGUMENT

Several counts of Williams' complaint fail to state a claim against some or all of the Medical Defendants:

- Count 2 fails to state a claim as to Wexford under any theory, and fails to state a claim against the individual Medical Defendants under theories of supervisory liability or co-conspirator liability.

- Count 3 fails to state a *Monell* claim against Wexford. Williams fills that count with nothing more than conclusory catchphrases and jargon, parroting the elements of a *Monell* claim without making any factual allegations.

- Count 4 fails to state a claim against all Medical Defendants. Williams contends that the Medical Defendants violated his rights under Articles 24 and 25 of the Maryland Declaration of Rights. Article 24, however, is a due process provision that—assuming Williams is attempting to draw an analogy to the application of Fourteenth Amendment due process principles to deliberate indifference claims by pre-conviction detainees—has no application to Williams who was a convicted inmate. Article 25 does not apply to this case either. While it prohibits cruel and unusual punishment, it only prohibits the "Courts" from inflicting cruel and unusual punishment.

- Count 5 fails to state a claim against all Medical Defendants for intentional infliction of emotional distress. At most the complaint alleges a deviation from standards of care. There is no allegation of extreme or outrageous conduct. There is no allegation that Williams suffered a severely disabling emotional response to any Medical Defendant's actions.

- Count 7 fails to state a claim against Wexford for "indemnification." There is no legal basis for Wexford to be required to indemnify any other defendant.

Additionally, for the counts and portions thereof that survive this motion to dismiss: (1) Williams cannot recover for any portion of his claim that accrued before December 31, 2015 due to the statute of limitations, three years before he initiated this action by filing a claim in Maryland's Health Care Alternative Dispute Resolution Office ("HCADRO"); and (2) Williams fails to allege a factual basis to allow the imposition of punitive damages.

### A.   Count 2 fails to state a claim against Wexford under any theory, and fails to state a claim against the individual Medical Defendants for supervisory or co-conspirator liability

In Count 2, Williams asserts that all Defendants are liable to him under a theory that they were deliberately indifferent to his serious medical needs, in violation of his Eighth Amendment right to be free from cruel and unusual punishment. The language of Count 2 suggests that he seeks to hold all of the Medical Defendants liable under theories of supervisory liability and co-

conspirator liability and that he seeks to hold Wexford liable under a theory of *respondeat superior*. Williams does not state a claim for liability under any of these three theories.

*Respondeat superior* liability simply does not apply to any claim under 42 U.S.C. § 1983. *Monell v. Dept. of Social Servs.*, 436 U.S. 658, 690-92 (1978). *See also Powell v. Shopco Laurel Co.*, 678 F.2d 504, 506 (4th Cir. 1983) (holding that *Monell*'s holding applies equally to the liability of private corporations acting under the color of state law). Thus, Wexford cannot be held liable vicariously for its employees' conduct.

The complaint states no basis to hold Wexford—or anyone else—liable under a theory of supervisory liability. A claim for supervisory liability under 42 U.S.C. § 1983 requires a plaintiff to allege three elements:

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge as so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practice; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (internal quotation marks and citations omitted). Williams' complaint asserts in conclusory fashion that "each of the Defendants to this claim acted pursuant to the specific directions of supervisory personnel," that these "supervisory personnel had actual or constructive knowledge" that the denial of care posed an unreasonable risk to Williams; and that "each of these supervisors' response . . . was inadequate" and "were contributory causes to [Williams'] injuries." ECF 1 at ¶¶ 105-108. While the complaint invokes the jargon of supervisory liability, it does not allege a single fact against Wexford or any of the other Medical Defendants to apply supervisory liability to them. The complaint contains nothing more than "threadbare recitals of [the] elements" of a supervisory liability claim, without any allegations of

fact. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Parroting the elements of a claim is insufficient to state a claim, and the "doors of discovery" do not unlock "for a plaintiff"—like Williams— "armed with nothing more than conclusions." *Id.* at 678-79. Williams does not state a claim against anyone for supervisory liability.

Likewise, Williams fails to state a claim for co-conspirator liability against any medical defendant. "Allegations of parallel conduct and a bare assertion of a conspiracy are not enough for a claim to proceed." *Thomas v. The Salvation Army Southern Territory*, 841 F.3d 632, 637 (4th Cir. 2016) (internal quotation marks and citations omitted). Instead, to plead a conspiracy claim under § 1983, a plaintiff must allege facts showing that the defendants "acted jointly in concert and that some overt act was done in furtherance of the conspiracy which resulted in the deprivation of a constitutional right." *Penley v. McDowell County Bd. of Educ.*, 876 F.3d 646, 658 (4th Cir. 2017). Williams again fails to allege any facts to show a plausible entitlement to relief; rather, he again only parrots the terminology used in conspiracy claims and recites the elements of a claim for conspiracy.[3] That is insufficient, and Williams fails to state a claim against any Medical Defendant for co-conspirator liability.

---

[3] The complaint states:

> 109.    In addition, Defendants reached an agreement among themselves and others known and unknown to deprive Plaintiff of his constitutional rights and to protect one another from liability for depriving Plaintiff of his rights.
>
> 110.    In furtherance of this conspiracy, each of the co-conspirators committed overt acts and was otherwise a willful participant in joint activity.
>
> 111.    Moreover, as described fully above, Defendants each had a reasonable opportunity to prevent the violation of Plaintiff's rights at issue in this Complaint had they been so inclined, but they each failed to do so.

The Court should: (1) dismiss Count 2 in its entirety as to Wexford; (2) dismiss any claim for supervisory and co-conspirator liability in Count 2 against all Medical Defendants.

**B.      Count 3 fails to state a *Monell* claim against Wexford**

 Because *respondeat superior* has no application in § 1983 claims, Wexford can be held liable for its employees' alleged deliberate indifference to Williams' medical needs only if the employees' conduct was caused by Wexford's policies or customs. *Monell*, *supra*, 436 U.S. at 690-92. Williams spends 26 paragraphs over 10 pages of his complaint doing nothing more than formulaically reciting the elements of a *Monell* claim without once alleging a single fact in support of his bald conclusions. Throughout Count 3, Williams generally concludes that Wexford had policies, practices, and customs to deny HCV treatment to inmates, ignore symptoms of Class C cirrhosis, and refuse follow-up care after banding ligation for ruptured esophageal varices. While he expends a great deal of effort parroting the elements of a *Monell* claim repeatedly throughout Count 3, Williams never alleges facts that would show the existence of the asserted policies, practices, and customs. The only factual allegations in the compliant pertain solely to the care Williams' received. The complaint does not allege a single fact about how any other inmate was treated for HCV. Count 3 does not contain any factual allegation that could elevate Williams' assertion of *Monell* liability from the purely speculative to the level of plausibility. Count 3 fails to state a claim, and the Court must dismiss it.

**C.      Count 4 fails to state a claim for a deprivation of rights under Articles 24 and 25 of the Maryland Declaration of Rights**

---

ECF 1 at ¶¶ 109-111.

In Count 4, Williams asserts that all Defendants should be held liable to him under Articles 24 and 25 of the Maryland Declaration of Rights. Neither of those Maryland constitutional provisions applies to this case, and Count 4 must be dismissed for failure to state a claim.

Williams cannot present a claim under Article 24 of the Maryland Declaration of Rights, because that due process provision simply cannot apply to the facts alleged in the complaint. Article 24 states:

> That no man ought to be taken or imprisoned or disseized of is freehold, liberties or privileges, or outlawed, or exiled, or, in any manner destroyed, or deprived of his life, liberty, or property, but by the judgment of his peers, or by the Law of the land.

It is unclear why Williams would seek vindication under a due process provision. There is nothing in the text of that provision that would seem to provide Williams with a cause of action. It is conceivable that Williams seeks to draw an analogy to federal deliberate indifference claims brought by pretrial detainees, which arise out of the Fourteenth Amendment's due process clause. *See Young v. City of Mount Ranier*, 238 F.3d 567, 575 (4th Cir. 2001) (explaining that deliberate indifference to a pretrial detainee violates the due process clause). While Williams uses the terms "detainee" and "inmate" loosely and interchangeably, it is clear from the entirety of his complaint that Williams was a convicted criminal sentenced as an inmate to the Division of Correction at a penitentiary, Jessup Correctional Institution. As such, his federal right would derive from the Eighth Amendment, not the Fourteenth Amendment. There is no basis for a State-law due process claim, and Williams fails to state a claim under Article 24.

Williams also fails to state a claim under Article 25 of the Declaration of Rights. That provision states:

> That excessive bail ought not to be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted, by the Courts of Law.

Although Article 25 prohibits cruel and unusual punishment, its language is much narrower in scope than the Eighth Amendment to the United States Constitution. The Eighth Amendment is a blanket prohibition against "cruel and unusual punishments," no matter who inflicts them. Article 25, on the other hand, prohibits only "the Courts of Law" from inflicting cruel and unusual punishments. The Medical Defendants are not a court of law. Article 25 does not apply to them and cannot provide Williams with a cause of action.

Though not cited by Williams, Maryland's Declaration of Rights does contain a second article prohibiting cruel and unusual punishment, but it also does not apply to the facts of this case. Article 16 states:

> That sanguinary Laws ought to be avoided as far as it is consistent with the safety of the State; and no Law to inflict cruel and unusual pains and penalties ought to be made in any case, or any time, hereafter.

That provision is also much narrower in scope than the Eighth Amendment and clearly applies only to the General Assembly. The Medical Defendants do not make laws. Article 16 of the Declaration Rights does not afford Williams a cause of action.

Furthermore, even if Article 25 or Article 16 of the Declaration of Rights were identical to the Eighth Amendment, the Medical Defendants are a private contractor and its employees, who are not subject to and cannot violate the Declaration of Rights. Liability can be imposed against private contractors who provide health care to inmates for violations of *federally* protected rights because 42 U.S.C. § 1983 provides for liability against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State" who deprives a person of "rights, privileges, or immunities secured by the Constitution and laws." There is no Maryland-law analogue that would make the Medical Defendants liable for alleged violations of Williams' rights

secured by the Declaration of Rights. To the contrary, "only government agents can commit" violations of the Declaration of Rights. *DiPino v. Davis*, 354 Md. 18, 51 (1999). "A private entity . . . cannot be liable for a violation of the Maryland Declaration of Rights." *Estate of Jones v. NMS Health Care of Hyattsville, LLC*, 903 F. Supp. 2d 323, 329 (D. Md. 2012). Since the Medical Defendants are not government officials or agents, none of them can violate the provisions of the Maryland Declaration of Rights.

The Court should dismiss Count 4 because the Maryland Declaration of Rights does not provide Williams with a cause of action against the Medical Defendants.

**D.     Count 5 fails to state a claim for intentional infliction of emotional distress**

The Court should dismiss Count 5 for failure to state a Maryland-law claim for intentional infliction of emotional distress. Williams fails to factually allege two essential elements: extreme and outrageous conduct by any Medical Defendant and a severely disabling response by the plaintiff.

When it originally recognized intentional infliction of emotional distress, Maryland's Court of Appeals was careful to explain how limited the tort is and just how extreme and outrageous conduct must be in order to sustain the cause of action. A defendant's conduct must be "so outrageous in character, and so extreme in degree as to go beyond all possible bounds of decency, as to be regarded as atrocious, and utterly intolerable in civilized society." *Harris v. Jones*, 281 Md. 560, 567 (1977). *See also Kentucky Fried Chicken Nat'l Mgmt. Co. v. Weathersby*, 326 Md. 663, 670 (1992) ("[T]he tort is to be used sparingly and only for opprobrious behavior that includes truly outrageous conduct"; the defendant's behavior must have been "abominable"). A defendant's conduct "should not be considered in a sterile setting, detached from the surroundings in which it occurred." *Harris*, 281 Md. at 568. The Court must decide as a question

of law whether a "defendant's conduct may reasonably be regarded as extreme and outrageous." *Id.* at 569.

Tellingly, Maryland's Court of Appeals has never affirmed on the merits a verdict or judgment entered in a plaintiff's favor in an intentional infliction of emotional distress claim. In *Batson v. Shifflett*, 325 Md. 684 (1992), the Court of Appeals observed that it had held that an intentional infliction of emotional distress claim would survive a motion to dismiss or motion for summary judgment only three times, "and only in cases which involved truly egregious acts." *Id.* at 735 (citing *Figueiredo-Torres v. Nickel*, 321 Md. 642 (1991) (a psychologist carried on a sexual affair with the plaintiff's wife while he was treating the couple as a marriage counselor); *B.N. v. K.K.*, 312 Md. 135 (1988) (a physician-defendant did not tell the nurse-plaintiff that he had herpes before they had sex); *Young v. Hartford Accident & Indemnity*, 303 Md. 182 (1985) (a defendant worker's compensation insurer's alleged sole purpose in requiring the plaintiff to submit to an IME was to force the plaintiff to drop her claim or commit suicide)). Twenty-seven years later, the Court of Appeals has never held that any other intentional infliction of emotional distress claim should survive even a preliminary dispositive motion, nor has the Court of Appeals ever relaxed its definition of the type of extremely outrageous conduct required for liability.

Looking at the factual allegations of Count 5 and his complaint as a whole, Williams' pleading falls woefully short of alleging extreme and outrageous conduct. At most, Williams asserts a claim for medical malpractice. Importantly, Count 5 is confined only to his allegation that each time he was sent to the hospital for emergency banding ligation of his esophageal varices, he was not then sent for a follow-up endoscopy within two weeks as he contends the standard of care required. His allegation is that when he suffered from GI bleeding, he *was* sent emergently to the hospital. In this regard, he faults the Medical Defendants only for their alleged failure to comply

with the standard of care's requirement that certain follow-up care be provided. The complaint simply does not allege that any Medical Defendant engaged in any extreme or outrageous conduct.

The complaint also fails to allege the type of harm that the tort requires. As "a necessary element to any recovery," a plaintiff must allege and later prove that he has suffered "a *severely* disabling emotional response to the defendant's conduct." *Harris*, *supra*, 281 Md. at 570 (emphasis in original). The tort requires distress "of such substantial quantity or enduring quality that no reasonable person in a civilized society should be expected to endure it." *Id.* at 572 (quoting *Fletcher v. Western Nat'l Life Ins. Co.*, 10 Cal. App. 3d 376, 397 (1970)). Williams does not allege that he suffered that type of severely disabling emotional response to the Medical Defendants' alleged failure to send him for follow-up endoscopies after each banding ligation procedure.

While the complaint does allege some facts hinting at emotional distress, those facts are entirely unrelated to whether Williams received follow-up endoscopies after each banding ligation procedure. The complaint alleges that Williams became suicidal in November 2016, but that was allegedly the result of toxins building up in his blood due to his fully decompensated liver. ECF at ¶ 63. His being suicidal had nothing to do with the care he received for esophageal varices. Williams also alleges that he ate a lidocaine patch and then became disturbed and threated to kill himself with a light switch he ripped from the wall later in November 2016; but that was the result of his being given a lower dose of pain medication than he desired because, he alleges, his fully decompensated liver could not tolerate the higher dose. *Id.* at ¶¶ 64-68.  Again, that allegedly had nothing to do with his treatment for esophageal varices; his behavior was the result of being denied pain medication he desired but could not have tolerated.

Because Williams does not allege extreme or outrageous conduct on the part of the Defendants or that he suffered a severely disabling emotional response to the Defendants' alleged conduct, Count 5 must be dismissed for failure to state a claim.

**E.      Count 7 fails to state a claim against Wexford for indemnification**

In Count 7 of his complaint, Williams seeks to impose liability against Wexford under some theory of indemnification. Williams fails to state a claim against Wexford because Williams has no conceivable right to be indemnified by Wexford. Williams has no contract with Wexford under which Wexford would be required to indemnify Williams. There is no federal or State common-law basis for Wexford to be required to indemnify Williams. Nor is there any basis for Williams to claim that Wexford must indemnify Wexford's employees and agents,[4] and even if there were, such a right would not be enforceable by Williams.

**F.      All portions of Williams' claim that accrued before December 31, 2015 are time-barred on their face**

The Court should dismiss all portions of Williams' claims that accrued before December 31, 2015. Such portions of his claims are time-barred on their face by the two applicable statutes of limitations.

Williams' claims are subject to two statutes of limitations, both of which are three years. Williams' claims under 42 U.S.C. § 1983 are subject to the three-year, general personal injury limitations period specified by Md. Cts. & Jud. Proc. Code Ann. § 5-101. *Owens v. Baltimore City State's Attorney's Office*, 767 F.3d 379, 404 (4th Cir. 2014). Regardless of the label he applies,

---

[4] Williams asserts in paragraph 160 of his complaint that "Wexford is liable as principle for all torts committed by its agents." That is a gross misstatement of the law. Under *respondeat superior*, Wexford would be liable for torts committed by its *servants* (as opposed to the broader term, agents) acting within the scope of their employment. And even where a principal is liable for its servant's conduct under *respondeat superior*, it is the *principal* that would have the right to be indemnified by its tortfeasor employee.

Williams' State-law claims are all for "medical injury."[5] Thus, Williams was required to initiate a claim in Maryland's Health Care Alternative Dispute Resolution Office ("HCADRO") within the earlier of: "(1) Five years of the time the injury was committed; or (2) Three years of the date the injury was discovered." Md. Cts. & Jud. Proc. Code Ann. § 5-109.

Williams first filed this action as a claim for medical negligence in HCADRO on December 31, 2018. It is obvious from the face of Williams' complaint that any claim he makes regarding conduct occurring before December 31, 2015 is time-barred on its face. As of December 31, 2015, Williams alleges that he had a chronic HCV infection, he had suffered from cirrhosis of the liver and esophageal varices since at least 2014, and he knew that he had not received either antiviral treatment for HCV or the serial endoscopies to monitor his esophageal varices that he contends were required. Williams cannot recover in this action for any conduct occurring before December 31, 2015.

### G.      Williams does not allege a factual basis to support his demand for punitive damages

The Court should dismiss Williams' demand for an award of punitive damages for failure to state a claim. Williams does not allege a factual basis to support an award of punitive damages. In order to state a claim for punitive damages in a § 1983 claim, a plaintiff must allege facts showing that "the defendant's conduct was motivated by 'evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others. *Cain v. Rock*, 67 F. Supp. 2d 544, 553-54 (D. Md. 1999) (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)). Similarly, to state a claim for punitive damages for the Maryland-law claims, a plaintiff "must allege, in detail, facts that, if proven true, would support the conclusion that the act complained of was done with 'actual

---

[5] A "medical injury" is an "injury arising or resulting from the rendering or failure to health care." Md. Cts. & Jud. Proc. Code Ann. § 3-2A-01(g).

malice.'" *Scott v. Jenkins*, 345 Md. 21, 37 (1997). Actual malice, in this context, means that the defendant's conduct must be "characterized by evil motive, intent to injure, ill will, or fraud." *Id.* at 31 (quoting *Owens-Illinois, Inc. v. Zenobia*, 325 Md. 420, 460 (1992)).

The first four counts of the complaint include a paragraph stating, with insignificant variations: "Plaintiff is entitled to punitive damages against each of the Defendants to this claim, in that their actions were made maliciously, willfully, and with a reckless and wanton disregard of Plaintiff's life and constitutional rights." ECF 1 at ¶114. *See id.* at ¶¶ 96, 141, 146. These, however, are bare conclusions, not statements of fact, and the Court must ignore them when considering this motion to dismiss. The complaint is entirely devoid of any factual allegation supporting a conclusion that any Medical Defendant had an evil motive or intent, had a reckless or callous indifference to Williams' federally protected rights, or that any Defendant acted out of an intent to injure, ill will, or fraud. As such, the Court should dismiss Williams' demand for punitive damages.

## IV.    CONCLUSION

For the reasons discussed above, the Court should enter an order:

(1)    Limiting the scope of Counts 1 and 6 (and any other surviving claim) to only those acts allegedly occurring on or after December 31, 2015;

(2)    Dismissing Count 2 in its entirety as to Wexford;

(3)    Dismissing any supervisory and co-conspirator liability claims in Count 2 as to all of the Medical Defendants;

(4)    Dismissing Count 3 as to Wexford;

(5)    Dismissing Count 4 as to all Medical Defendants;

(6)    Dismissing Count 5 as to all Medical Defendants;

(7)    Dismissing Count 7 as to Wexford; and

(8)    Dismissing Williams' demand for punitive damages.

Respectfully submitted,

**MEYERS, RODBELL & ROSENBAUM, P.A.**

/s/ Joseph B. Chazen
Joseph B. Chazen, #03154
jchazen@mrrlaw.net

/s/ Gina M. Smith
Gina M. Smith, #22425
gsmith@mrrlaw.net

/s/ Samuel T. Wolf
Samuel T. Wolf, #17533
swolf@mrrlaw.net
6801 Kenilworth Avenue, Suite 400
Riverdale, Maryland 20737
(301) 699-5800
(301) 779-5746 Facsimile
*Attorneys for Medical Defendants*