## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| ROBERT WILLIAMS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:19-cv-00033-CCB |
| | ) | |
| WEXFORD HEALTH SOURCES, INC., et al. | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS

Plaintiff, Robert Williams, hereby submits his Opposition to Defendants' Gedion Atnafu, Zowie Barnes, Bolaji Onabajo, Bernard Alenda, Wondaye Deressa, Robert Giangrandi, Priscilla Momoh, Ayoku Oketunji, Titilayo Otunuga, Jennifer Pope (the "Individual Defendants") and Wexford Health Sources, Inc. ("Wexford" and, collectively, the "Wexford Defendants")'s Motion to Dismiss.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    Relevant Facts

Defendants do not contest the sufficiency of Plaintiff's claims against them for medical malpractice or the Individual Defendants' violations of the Eighth Amendment under 42 U.S.C. § 1983. As such, Plaintiff recites only the facts contained in the Complaint that are relevant to Defendant's arguments in the instant Motion.[1]

---

[1] Which are: 1) the Wexford Defendants are not liable for violation of Art. 24 & 25 of the MD Decl. of Rights because they are private individuals and entities; 2) Plaintiff has not adequately alleged the existence of a policy under *Monell*; 3) Plaintiff's allegations do not rise to intentional infliction of emotional distress; 4) indemnification is unwarranted; and 5) the statute of limitations prohibits recovery for acts occurring three years before Plaintiff filed his claim with the Maryland Health Care Alternative Dispute Resolution Office.

The Maryland Department of Public Safety and Correctional Services ("DPSCS") is responsible for the health care of all individuals incarcerated or detained within its facilities. *Compl.* ¶ 13. Defendant Wexford Health Sources, Inc. entered a contract with DPSCS wherein Wexford has agreed to satisfy DPSCS' public duty to provide health care to inmates, and both entities acted at all times under color of state law. *Id.* ¶¶ 14-15. The responsibility to provide health care to incarcerated individuals includes the duty to provide treatment according to the prevailing standard of medical care. *Id.* ¶ 15.

The standard of care for medical professionals treating Hepatitis C includes at least some combination of anti-viral prescription drug therapy. *Id.* ¶ 83. Plaintiff, however, received no treatment for Hepatitis C while incarcerated at JCI, *Id.* ¶ 85, and there is only one indication that any of the Defendants ever considered him for such treatment, *Id.* ¶ 43, when Defendant Atnafu made a note to follow up on an outside physician's recommendation that Plaintiff be considered for anti-viral prescription. Because Plaintiff has not received complete medical records from Wexford, the contractor responsible for his medical care while he was incarcerated at JCI, he is unsure of the time when his liver disease first reached a point where anti-viral prescription drug therapy was required under the applicable standard of care, and when his liver disease reached a point that the failure to provide such treatment amounted to deliberate indifference. *Id.* ¶ 94.

Plaintiff's Hepatitis C has led to a condition of late-stage liver disease known as esophageal varices. *Id.* ¶¶ 2-3. The standard of medical care for treating ruptured esophageal varices includes both emergency surgery to treat the immediate episode of internal bleeding, and subsequent referral to a specialist for monitoring and/or follow-up

surgery within two weeks to ensure the original rupture has healed. *Id.* ¶ 87. The Individual Defendants are all licensed medical professionals who are aware of the standard of care. *Id.* ¶¶ 18-27. Despite their knowledge, none of them referred Plaintiff to a specialist for monitoring and/or follow-up surgery, even though Plaintiff received emergency surgery to prevent his death from internal bleeding at least eight times within one year. *See, e.g., Id.* ¶ 39 (Barnes, Momoh, Deressa), ¶ 44 (Alenda), ¶ 48 (Alenda, Momoh), ¶ 50 (Alenda), ¶ 51 (Otunuga), ¶ 56 (Alenda), ¶ 57 (Onabajo), ¶ 58 (Pope), ¶ 60 (Giangrandi), ¶ 71 (Oketunji), ¶ 75 (Giangrandi). Recurring episodes of life-threatening internal bleeding are highly likely in the absence of follow-up treatment. *Id.* 88. Because Plaintiff was denied access to his medical records during his incarceration, he is not fully aware of the scope of the Wexford Defendants' failure to meet the standard of care in treating his esophageal varices, or when their obligation to treat him was first triggered. *Id.* ¶ 94.

       After receiving an emergency surgery in November of 2016, Plaintiff contracted a bacterial infection and developed an abscess in his lumbar spine. *Id.* ¶ 61. Because of Plaintiff's significantly advanced liver disease, his body was unable to tolerate the amount of pain medication prescribed to address these issues. Before receiving this emergency surgery, Defendant Otunuga observed that Plaintiff had begun exhibiting an "altered mental status," indicating the severe damage that had been done to his liver because of the Wexford Defendants' lack of treatment. *Id.* ¶ 59. Upon returning to JCI after his emergency surgery in November of 2016, Plaintiff began experiencing significant mental trauma as a result of his body's inability to filter toxins from his blood. *Id.* ¶ 63. As a result, Plaintiff became suicidal and was discovered eating floor tile, a

lidocaine patch, and attempted to pull a light switch out of a wall. *Id.* ¶¶ 5, 63-68.

Plaintiff's requests for treatment were denied by the JCI onsite medical director within a

matter of months after this incident. *Id.* ¶ 72.

Because not a single trained medical provider met the standard of care for treating

either his Hepatitis C or his esophageal varices, Plaintiff alleges on information and belief

that each Defendant acted pursuant to the specific directions of Wexford supervisory

personnel. *Id.* ¶ 105. Based on information that these supervisors are also well-trained in

the applicable standards of care, Plaintiff alleges that each of these supervisory personnel

knew that denying Plaintiff medical care posed an unreasonable risk of causing Plaintiff's

death and failed to respond appropriately, which caused his injuries. *Id.* ¶¶ 106-108.

Further, based on the reasonable assumption that the Individual Defendants followed the

directions of their supervisors, Plaintiff alleges that the Individual and Doe Defendants

entered an agreement among themselves to deliberately ignore the unreasonable risk of

harm to Plaintiff that resulted from denying him medical care. *Id.* ¶ 109. In acting

pursuant to this agreement, each committed overt acts in furtherance of denying Plaintiff

medical care and each had an opportunity to prevent the ongoing violation of Plaintiff's

constitutional rights. *Id.* ¶ 111.

Other than these instructions from supervisors, Plaintiff points to three

Wexford/DPSCS policies which were moving forces in causing his severe pain,

suffering, repeated fear of death, and significant morbidity associated with his advanced-

stage liver disease. First, Plaintiff is aware of a specific policy that prohibits anti-viral

therapy for any individual in DPSCS custody whose cirrhosis has not yet reached "Class

C" on the Childs-Pugh scale, meaning that their liver has irretrievably decompensated. *Id.*

¶ 125-126. Plaintiff knows of this policy from correspondence from Wexford to other

inmates in DPSCS facilities. *Id*. ¶ 125. Plaintiff alleges that Wexford trains and

supervises its employees to follow this policy, ratifies the actions of its employees taken

pursuant to this policy, and has permitted the operation of this policy despite knowledge

of the significant risk of serious medical injury and the fact that failures to treat the

conditions at issue were widespread within DPSCS facilities. *Id.* ¶¶ 116-117, 123-124,

126-129.

Second, the history of the Wexford Defendants' failures to treat Plaintiff supports

the existence of a formal or informal policy at JCI whereby individuals with a fully

decompensated liver are classified as "Class B" on the Childs-Pugh scale, even though

they exhibit symptoms that would justify their classification as "Class C." *Id.* ¶ 130. For

example, an episode of ruptured esophageal varices is objective evidence of a fully

decompensated liver. *Ibid*. Plaintiff relies on the fact that he underwent eight emergency

surgeries to treat ruptured esophageal varices as support for the existence of this policy.

*Id*. Again, Plaintiff alleges that Wexford trains and supervises its employees to follow

this policy, ratifies the actions of its employees taken pursuant to this policy, and has

permitted the operation of this policy despite its knowledge of the significant risk of

serious medical injury. *Id.* ¶¶ 131-134.

Third, Plaintiff infers the existence of a policy at JCI whereby individuals with

ruptured esophageal varices are not referred to specialists to determine the need for

follow-up surgeries. Plaintiff relies on the fact that the Individual Defendants are each

medically trained and know the applicable standard of care, but failed to ever refer him to

a specialist to determine his need for a follow-up procedure. *Id.* ¶ 135. Plaintiff believes

that the Individual Defendants were each trained to refuse Plaintiff care according to the standard, were supervised to refuse Plaintiff such care, that the Individual Defendants' refusal to provide Plaintiff with care according to the standard was ratified by Wexford, and that Wexford has permitted the operation of this policy despite its knowledge of the significant risk of serious medical injury. *Id.* ¶¶ 136-138.

## II. Standard of Review

The purpose of Defendants' motion to dismiss is to "test the sufficiency" of Plaintiff's Complaint, and not to "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Peprah v. Williams* 2019 U.S. Dist. LEXIS 8061, *5 (D. Md. Jan. 15, 2019). A Complaint is legally sufficient if it "contains a short and plain statement of the claim showing that the pleader is entitled to relief," and that its claim is "plausible on its face." *Ibid.* (citing *Ashcroft v. Iqbal* 556 U.S. 662, 678 (2009). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ibid*. The plaintiff is not required to forecast evidence to prove the elements of the claim, but must allege sufficient facts to establish each element. *Ibid.* (citing *Goss v. Bank of Am., N.A.*, 917 F.Supp.2d 445, 449 (D.Md. 2013) (quoting *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012)), *aff'd sub nom., Goss v. Bank of Am., NA*, 546 F.App'x 165 (4th Cir. 2013). All inferences reasonably drawn from the pleadings must be construed in favor of the Plaintiff on a motion brought under Fed. R. Civ. P. 12(b)(6). *Lambeth v. Bd. of Comm'rs of Davidson City*, 407 F.3d 266, 268 (4th Cir. 2005).

Defendants do not challenge the legal sufficiency of Plaintiff's claims for medical malpractice or for violation of his Eighth Amendment rights by the Individual

Defendants. Instead, Defendants focus on Plaintiff's failures to adequately allege the

existence of a policy promulgated by Wexford Health Sources, Inc. that is responsible for

his injuries pursuant to *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 694 (1978).

**III.    Argument**

a.    *Plaintiff Has Identified Three Specific Policies Responsible for His Injuries*.

   In order to state a claim for relief against a municipality or entity under 42 U.S.C.

§ 1983, a Plaintiff must first allege that he suffered a constitutional injury as a result of an

official policy. All *§ 1983* Monell claims have three elements: "(1) identifying the

specific 'policy' or 'custom'; (2) fairly attributing the policy and fault for its creation to

the municipality; and (3) finding the necessary 'affirmative link' between the identified

policy or custom and specific violation." *Spell v. McDaniel,* 824 F.2d 1380, 1389 (4th

Cir. 1987); accord *Jones v. Chapman,* 2015 U.S. Dist. LEXIS 96562, 2015 WL 4509871,

at *35 (D.Md. July 24, 2015) (citing *Spell v. McDaniel* "[A] municipality is liable when a

policy or custom is fairly attributable to the municipality as its own, and is . . . the

moving force behind the particular constitutional violation.").

   As described above, Plaintiff has identified at least three separate policies

promulgated or permitted by Wexford at JCI that caused the Individual Defendants to

refuse him care: 1) a refusal to treat Hepatitis C until a patient's liver is no longer capable

of effectively recovering from the disease; 2) a refusal to accurately describe a patient's

symptoms of liver disease intended to delay any potential treatment for Hepatitis C; and

3) a refusal to refer patients with ruptured esophageal varices to specialists to ensure that

they do not experience a second (or eighth) episode of life-threatening internal bleeding.

*Compl.* ¶¶ 125, 130, 135. Importantly, Plaintiff is aware of the first policy by

correspondence from Wexford sent to other DPSCS inmates. *Id.* 125; compare with Memorandum in Support of Defendants' Motion to Dismiss ("Def. Mot."), p. 12 ("The complaint does not allege a single fact about how any other treatment was treated for HCV."). Plaintiff infers the existence of the other two policies given the fact that there is absolutely no indication that these aspects of the applicable standard of medical care were even considered by any Individual Defendant—all of whom are licensed medical professionals.

Second, Plaintiff attributes these policies to Wexford in four different ways: 1) implementation by supervisory personnel; 2) training to follow the policies; 3) ratification of employees' conduct who act pursuant to the policies; and 4) lack of action to correct the policies despite knowledge of the injuries that would result.

i. *A Wexford Policy-Maker Denied Plaintiff Treatment Pursuant to the Policies*

In order to establish entity liability on the basis of a supervisor's actions, Plaintiff must allege that the existence of an identified policy is the result of the decision of asupervisor or individual with policy-making or final authority. *Monell*, 436 U.S. at 694; *Pembaur v. City of Cincinnati,* 475 U.S. 469, 482-483 (1986). The issue of what constitutes policy-making authority is a matter of state law, and in this case, Maryland corporate law. *Pembaur,* 475 U.S. at 483.

Plaintiff does not know the identity of each policy-maker without the benefit of discovery, but is aware of at least one individual with presumptive "final," or policy-making authority, for Wexford's operation at JCI—the onsite medical director. This currently unknown individual denied Plaintiff both anti-viral prescription drug therapy for Hepatitis C, and denied a specialist referral for Plaintiff's esophageal varices *after* his

suicidal episode in November of 2016. *Compl.* ¶ 72. Reading all inferences from the fact

in Plaintiff's favor on motion to dismiss, it is reasonable to assume that the JCI onsite

medical director has final authority to override or follow a policy with respect to the

approval or denial of particular treatments for a specific inmate such as Plaintiff.

*Lambeth,* 407 F.3d at 268. This policy-maker's action attributes injuries suffered as a

result of the policy to Wexford as an entity. *Monell*, *supra*, at 694. Additional policy-

maker Doe Defendants will be named in Plaintiff's Complaint as they are discovered.

ii. *The Individual Defendants Were Trained by Supervisors to Follow the Policies*

Although Plaintiff's claim of training is more properly characterized as an

affirmative effort on Wexford's behalf to train its employees to refuse treatment for

Hepatitis C and esophageal varices, the framework for analyzing a claim of "failure to

train" is instructive. To state a claim for failure to train a plaintiff must plead "facts

revealing: (1) the nature of the training, (2) that the training was a 'deliberate or

conscious' choice by the municipality, and (3) that the officer's conduct resulted from said

training." *Jones v. Chapman,* 2015 U.S. Dist. LEXIS 96562, at *49 (citing *Lewis v.

Simms*, 2012 U.S. Dist. LEXIS 9052, 2012 WL 254024, at *3 (D. Md. Jan. 26, 2012)).

Here, Plaintiff has stated the nature of the training, *i.e.*, that each of the Individual

Defendants received specific training to refuse treatment for Hepatitis C until a

patient/inmate were classified with "Class C" liver decompensation, inaccurately record

the severity of a patient/inmate's symptoms so as to keep them in "Class B" status to

delay anti-viral prescription drug therapy, and refuse to schedule follow-up specialist

referrals after life-threatening episodes of internal bleeding. *Compl.* ¶¶ 127, 132, 136.

Plaintiff has also alleged that these training programs amount to deliberate indifference to

the serious medical needs patient/inmates, and that the decision to train accordingly is made by supervisors who have a subjective knowledge that severe bodily injury is likely if the policy is followed. *Ibid.* Again, each of the Individual Defendants and Doe supervisor Defendants are trained medical professionals fully aware of the standard of care, *Id.* ¶¶ 18-28; 38. The fact that every single one of these Defendants deviated so far from that standard warrants at least an inference that their conduct was taken pursuant to Wexford policy. *Id.* ¶ 139.

iii.  *Wexford Policy-Makers Ratified the Individual Defendants' Conduct*

Entity liability may also be established under a theory of ratification, which provides that "[i]f the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final." *St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988). The analysis is nearly identical to that governing Plaintiff's allegations of training to affirmatively follow constitutionally deficient policies, for each time a medical provider employed by Wexford is trained to follow one of the three policies by a supervisor, that training includes an implicit approval of prior conduct in concordance with the training. In this case, Plaintiff is able to show an additional instance of ratification wherein the JCI onsite director is believed to have personally reviewed Plaintiff's case and denied treatment for all conditions as each of the Individual Defendants did. *Compl.* ¶ 72.

iv.  *Wexford's Inaction and Failure to Correct The Policies Is Another Moving Force*

Finally, Plaintiff has articulated a theory attributing the three policies to Wexford amounting to failure to act, or "condonation." Under this theory of liability, an entity "violates § 1983 if municipal policymakers fail 'to put a stop to or correct a widespread

pattern of unconstitutional conduct.'" *Owens v. Balt. City State's Attys. Office*, 767 F.3d

379, 402 (4ᵗʰ Cir. 2014) (citing *Spell*, 824 F.2d at 1389). To establish this theory, a

plaintiff must point to a "persistent and widespread practice[] of municipal officials, the

'duration and frequency' of which indicate that policymakers (1) had actual or

constructive knowledge of the conduct, and (2) failed to correct it due to their

'deliberate indifference.'" *Id*. at 402-403. Both knowledge and indifference can be

inferred from the "extent" of employees' misconduct. *Id*. at 403. Here, again, Plaintiff

need not rely on mere inference, because he has pointed to specific correspondence from

Wexford articulating the reason that another DPSCS inmate was denied treatment for

Hepatitis C. *Compl.* ¶ 125. Similarly, Plaintiff has specifically illustrated how Wexford's

supervisory personnel's failure to correct the policy amounts to deliberate indifference to

the affected patient/inmates' serious medical need.[2] Plaintiff has more than met his

burden of providing specific and detailed allegations of an unconstitutional pattern or

practice, created by Wexford, that was the moving force in causing his injuries. *Owens*,

767 F.3d at 403 ("Although prevailing on the merits of a *Monell* claim is difficult, simply

alleging such a claim is, by definition, easier.").

Should this Court find that the existence of any of the policies described above

requires further factual support, Plaintiff requests leave to amend his complaint to state

such facts, as there are myriad indicators of Wexford's failure to provide constitutionally

appropriate medical care to inmates at DPSCS facilities such as multiple lawsuits, audits

by state and federal authorities, other inmates who claim to have been denied treatment

---

[2] *Id*. ¶¶ 116-117 (the Wexford Defendants commonly observed inmates with HCV and cirrhosis who were refused treatment and failed to respond to repeated requests for appropriate treatment); ¶ 121 (regular audits of DPSCS facilities were conducted by Wexford and others which revealed the extent of the lack of treatment for HCV); ¶¶ 123-124 (Wexford knew that potentially serious or fatal consequences would result if the policy was not corrected).

for Hepatitis C who have contacted Plaintiff since filing this Complaint, and Wexford's loss of the DPSCS contract due in part to findings from these litigations, audits, and failures to treat described above.

b.    _Plaintiff Has Presented Sufficient Facts to Plead Co-Conspirator Liability_

While Defendants' arguments regarding supervisory liability are addressed above, Plaintiff's allegations of a civil conspiracy do not fit under the _Monell_ framework, as they are intended to establish co-conspirator liability for each Defendant who is found to have taken acts to assist the medical malpractice or constitutional violation of the others. Under Maryland law, civil conspiracy serves to extend liability to co-conspirators once the plaintiff has established some other tortious wrong. _See, e.g., Hoffman v. Stamper_, 155 Md. App. 247, 843 A.2d 153, 178-79 (Md. Ct. Spec. App. 2004) (_reversed on other grounds by Hoffman v. Stamper_, 385 Md. 1 (Md. Ct. App. 2005). Because conspirators "do not voluntarily proclaim their purposes," a conspiracy is typically established by circumstantial evidence consisting of "inferences drawn from the nature of the acts complained of, the individual and collective interests of the alleged conspirators, the situation and relations of the parties, their motives and all surrounding circumstances preceding and attending the culmination of the common design." _Daugherty v. Kessler_, 264 Md. 281, 292, 286 A.2d 95 (1972); _Western Md. Dairy v. Chenoweth_, 180 Md. 236, 243 (1942).

Because a "concurrence of action by the co-conspirators on a material point is sufficient to allow the jury to presume the concurrence of sentiment and, therefore, a conspiracy," the sum total of Plaintiff's allegations must be taken into account when analyzing whether he has adequately stated a basis for co-conspirator liability. _Hoffman_,

155 Md. App. at 290. Plaintiff has, first, alleged that every single Individual Defendant is a licensed medical professional who knows the standard of care when treating Hepatitis C and esophageal varices. *Compl.* ¶¶ 18-28; 38. Second, every single Individual Defendant ignored this standard and refused to provide appropriate care until he was about to die from internal bleeding. *Id.* ¶ 4. Third, the Individual Defendants failed to even make a note indicating that they considered care according to the prevailing medical standard. *Id.* ¶¶ ¶ 39, 44, 48, 50, 51, 56-58, 60, 71, 75. Finally, besides the overt allegations of conspiratorial conduct (*see, e.g., Id.* ¶¶ 109-111), Plaintiff has alleged that each of the Individual Defendants acted pursuant to instructions of supervisors, or pursuant to training—each of which would also amount to an agreement. *See, e.g., Id.* ¶¶ 105, 127. Simply put, the primary point of Plaintiff's Complaint is that the Defendants engaged in a conspiracy to deny him appropriate care, that this agreement amounted to deliberate indifference, and that they tried to conceal its existence from Plaintiff.[3] The elements of a civil conspiracy are amply met herein.

c.      *Plaintiff's Complaint Establishes The Rare Case of Emotional Distress*

Although Defendants are relief for the tort of intentional infliction of emotional distress is rarely granted under Maryland law, Plaintiff submits that a review of the first eight Paragraphs of his Complaint are all that is necessary in order to discern the truly medieval treatment that Plaintiff received at Wexford's hands.

First, Plaintiff contracts Hepatitis C, which, untreated, causes severe damage to his liver. *Compl.* ¶ 2. Second, his advanced liver disease causes him to vomit and defecate blood, which leads to an initial episode of internal bleeding in March of 2016 from which Plaintiff could have died. *Id.* ¶ 3. Instead of preventing another episode of

---

[3] On this last point, see *Compl.* ¶ 94.

life-threatening internal bleeding, Defendants allow Plaintiff to experience the same condition *eight more times*. *Id.* ¶ 3-4. After about the sixth brush with death, Plaintiff suffers severe mental trauma and tries to take his own life. *Id.* ¶ 5. Despite his obvious decompensation, Defendants refuse him further care, which causes *two more* life-threatening internal bleeds. *Id.* ¶¶ 6, 74, 77. Plaintiff is eventually released from Wexford care into the emergency room, nearly comatose. *Id.* ¶ 6. The standard for determining whether a Plaintiff has alleged a claim for IIED is whether the conduct "go[es] beyond all possible bounds of decency," as to "be regarded as atrocious, and utterly intolerable in a civilized community." *Coner v. Williams*, 2019 U.S. Dist. LEXIS 23193, *11-12 (D. Md. Feb. 12, 2019) (analyzing *plaintiff's* claim for summary judgment on intentional infliction of emotional distress against police officer who slapped her disabled son twice while handcuffed in the hospital, causing her son to lose hearing in one ear).

Defendants interpretation of Plaintiff's allegations as limited to their failure to provide follow-up banding ligation ignores the point that each failure subjected Plaintiff to another episode in which he believed he was going to die, and very well could have even with the emergency surgery. Compare with *Def. Mot.*, p. 16 ("Williams' pleading falls woefully short of alleging extreme and outrageous conduct."). These repeated and continuing life-threatening emergencies resulted in other related conditions—a bacterial infection and a spinal abscess—which caused Plaintiff a severely debilitating emotional response: attempted suicide. *Compl.* ¶ 63; *Lipenga v. Kambalame*, 219 F. Supp. 3d 517, 528 (D. Md. 2016) (noting that hospitalization, anxiety, and depression were satisfactory manifestations of emotional distress to state a claim under Maryland law). Accordingly, Defendants' "at least we didn't let him die" argument completely misses the point. *Def.*

*Mot.*, p. 16 ("when he suffered from GI bleeding, he *was* sent emergently to the hospital."). Defendants' repeated refusal to provide appropriate care—whether for Hepatitis C or esophageal varices—combined in such a way that Plaintiff was both on the brink of death because of lack of specialist follow-up, and without sufficient pain medication to deal with the associated pain because of his liver's inability to filter toxins. *Compl.* ¶ 62. Notably, this condition caused severe damage to Plaintiff's mind and character. *Id.* ¶ 63; *Arsham v. Mayor & City Council of Balt.*, 85 F. Supp. 3d 841, 850 (D. Md. 2015) ("[L]iability for the tort of intentional infliction of emotional distress should be imposed sparingly, and its balm reserved for those wounds that are truly severe and incapable of healing themselves.")

d.    *The Wexford Defendants Are Liable for Violations of the MD Decl. of Rights*

The Wexford Defendants next contend that they cannot be held liable for violations of the Maryland Declaration of Rights because they are a private contractor. Of course, because any agent of the government "can comit these kinds of Constitutional transgressions," *DiPino v. Davis,* 354 Md. 18, 50-51 (1999), claims for relief against private entities and individuals have been upheld in a number of occasions. (*See, e.g., Bost v. Wexford Health Sources, Inc.* 2017 U.S. Dist. LEXIS 122477, *123 (D. Md. 2017) (denying summary judgment on claims for violation of Article 24 and 25 against Wexford as contractor for DPSCS). Further, Defendants provide no authority for the argument that the *in pari materia* interpretation of Article 24 and 25 of the Declaration of rights removes a private individual or entity acting under color of state law from the scope of an action for damages arising from violations of the state Constitution. *Bost,* 2017 U.S. Dist. LEXIS, at * 118 (the "analysis under Article 24 is, for all intents and

purposes, duplicative of the analysis for the Fourteenth Amendment"); *Evans v. State*, 396 Md. 256, 327 (2006) ("We have consistently construed [Article 16, 24, and 25] as being *in pari materia* with their Federal counterparts").

As discussed above, Plaintiff has alleged an Eighth Amendment violation against the Individual Defendants (which is not contested) and has set forth specific allegations of the existence of a policy perpetuated by Wexford that amounts to deliberate indifference. Plaintiff's claim for violation of Article 25 must therefore also proceed, as Plaintiff has alleged that Wexford was satisfying a state or public function pursuant to its contract with DPSCS. *Compl.* ¶¶ 13-16.

Yet, Plaintiff's allegations also contain an important issue of due process and Fourteenth Amendment liberty denied by the Defendants through the practice of refusing Plaintiff access to his medical records. Importantly, this interest is protected by state statute. Md. Health-General Code Ann. § 4-309. Action by a state agent that alters or extinguishes this right is within the purview of the Fourteenth Amendment due process clause. *Paul v. Davis*, 424 U.S. 693, 711 (1976).

"There is no iron curtain drawn between the Constitution and the prisons of this country." *Wolff v. McDonnell*, 418 U.S. 539, 555-556 (1974). In the proper context, prisoners may also claim the protections of the Due Process Clause, and may not be deprived of life, liberty, or property without due process of law. *Id.* at 556. (citations omitted). Accordingly, to the extent Plaintiff is entitled to relief for Defendants' failure to provide him with accurate and complete medical records, his claim may be stated under Article 24 of the Maryland Declaration of Rights.

*e.*     *Defendants' Statute of Limitations Argument Is Premature*

Finally, Wexford seeks to limit the scope of Plaintiff's Complaint to acts

occurring from Dec. 31, 2015 forward. The applicable limitations period for causes of

action brought under Section 1983 is derived from state law. *Wilkins v. Montgomery*, 751

F.3d 214, 223 (4th Cir. 2014). Under Maryland law, the limitations for claims based on

medical malpractice is three years from the discovery of the wrongful act, or five years

from the commission of the act itself. Md. Code Cts. & Jud. Proc. § 5-109(a). A 12(b)(6)

motion to dismiss based on an affirmative defense such as the application of a statute of

limitations is typically only appropriate when all facts necessary to the defense appear on

the face of the complaint. *Goodman v. PraxAir, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007).

Here, contrary to Defendants' argument, there is no indication as to when Plaintiff

became aware of the fact that Defendants' conduct constituted medical malpractice, or

when he became aware that their malpractice crossed the line into deliberate indifference.

For instance, there is no indication that Plaintiff was aware of the applicable standard of

care until filing his Complaint. Thus, there is currently no basis to establish a limitation

period other than the five-year restriction contained in Md. Code Cts. & Jud. Proc. § 5-

109(a)(i). Furthermore, additional instances of malpractice or deliberate indifference may

be discovered through formal exchange of documents and interrogatories, which may

justify inclusion of incidents prior to those currently articulated in the Complaint.

**IV.    Conclusion**

For the foregoing reasons, the Defendants' Motion to Dismiss must be denied as

to all causes of action except for indemnification, which Plaintiff acknowledges is more

appropriately stated against the DPSCS. If the Court finds that a particular cause of action

requires additional factual support, Plaintiff respectfully requests leave to so amend his

Complaint.

Respectfully submitted,

  /s/  Masai McDougall  /s/
Masai McDougall, Esq.
THE PEOPLE'S LAW FIRM, LLC
200 E. Lexington St., Ste 1111
Baltimore, MD 21202
masai.mcdougall@
thepeopleslawfirm.net