**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

ANGELA CHARETTE, as personal      \*
representative of THE ESTATE OF      \*
MICHAEL MILLER      \*
     \*
       v.      \*      Civil Action No. CCB-19-0033
     \*
WEXFORD HEALTH SOURCES,      \*
INC., *et al.*      \*
     \*
          \*\*\*\*\*

**MEMORANDUM**

       This is a medical malpractice and civil rights action concerning the alleged mistreatment of Michael Miller's various medical conditions while he was incarcerated in state prison. The complaint was originally brought by Miller in January 2019. Following Miller's death in August 2019, Angela Charette, the personal representative of Miller's estate, was substituted as the plaintiff. The operative complaint alleges that the defendants, Wexford Health Sources, Inc. ("Wexford") and various medical professionals it employed,[1] treated Miller's Hepatitis B, Hepatitis C, liver disease, and other ailments in a manner that fell below the standard of care and was constitutionally deficient. The defendants have filed three separate motions to dismiss some, but not all, of the claims against them. (*See* ECF 57, 58, 61). Each motion is now fully briefed and no oral argument is necessary. *See* Local Rule 105(6). For the reasons discussed herein, the motion to dismiss (ECF 61) will be granted and the other two motions (ECF 57, 58) will be granted in part and denied in part.

---

[1] The court will refer to the employees named in this action collectively as the "medical defendants."

## FACTS AND PROCEDURAL HISTORY

According to the complaint, on Thanksgiving Day in 2016, Michael Miller was found eating tile off the floor of his cell at Jessup Correctional Institute ("JCI"). (ECF 56, Second Am. Compl. ("SAC") ¶ 5). This followed numerous bouts of internal bleeding related to his untreated hepatitis infection, which caused him to vomit and defecate blood and left him with a bacterial infection and a spinal abscess. (*Id.* ¶ 4). How Miller's condition deteriorated to this point implicates the somewhat complicated history of the medical care he received over the six years prior to that Thanksgiving Day while he was incarcerated in the custody of the Maryland Department of Public Safety and Correctional Services ("DPSCS"). (*Id.* ¶¶ 1, 12).

At the times relevant to this complaint, DPSCS contracted with Wexford to provide health care to its inmates. (*Id.* ¶¶ 13–15). Wexford in turn employed all of the other named defendants, including: Bolaji Onabajo, MD; Zowie Barnes, MD; Gedion Atnafu, MD; Ayoku Oketunji, MD; Robert Giangrandi, PA; Priscilla Momoh, PA; Bernard Alenda, CFNP; Jennifer Pope, CFNP; Wondaye Deressa, CFNP; Titilayo Otunuga, CFNP; Keshaun Temesgen, MD; Melaku Ayalew, MD; and Kenneth Lee, MD. (*Id.* ¶¶ 16–29).

In 2010, while at JCI, Miller tested positive for Hepatitis B ("HBV") and Hepatitis C ("HCV"). (*Id.* ¶ 38). Both HBV and HCV are "serious medical conditions" that "attack the proper functioning of the liver." (*Id.* ¶ 31). If left untreated, HBV and HCV will cause cirrhosis, "an advanced stage of liver malfunction" characterized by scarring which prevents the liver from properly filtering toxins in the blood and which presents "severe risks of serious harm and death." (*Id.*). Prescription anti-viral drugs have been available to treat HBV and HCV since 2012 and 2013, respectively. (*Id.* ¶¶ 35–36). These drugs help to prevent the onset of cirrhosis, and, once it has presented, they help slow its progression. (*Id.* ¶ 35). The standard of care for treating HBV and

HCV involves testing individuals suspected to have either infection, monitoring both the progress of the infection and the progression of the patient's liver decompensation, and treating the patient with some combination of anti-viral medication. (*Id.* ¶¶ 31, 37).

One symptom associated with severe cirrhosis is esophageal varices, which is "swollen or ruptured veins near the esophagus and upper gastrointestinal tract." (*Id.* ¶ 32). Esophageal varices can result in internal bleeding and poses a substantial risk of serious bodily harm. (*Id.* ¶ 33). The standard of care for treating esophageal varices is to perform banding ligation—the placement of miniscule rubber bands around the ruptured varices by endoscopy—and to refer the patient to a liver specialist for follow-up endoscopies to assess healing and to determine whether there are missing bands that need to be replaced. (*Id.* ¶¶ 33–34).

When Miller first tested positive for HBV and HCV in 2010, he was given an HBV booster vaccination but he was not treated for HCV at that time. (*Id.* ¶ 38). Two years later, when Wexford assumed responsibility for his care, he again tested positive for HBV and HCV, though he alleges those test results were not shared with him. (*Id.* ¶¶ 39, 187). Miller's HBV and HCV tests revealed a low viral load count, indicating that his conditions were chronic rather than acute. (*Id.* ¶ 39). Chronic HBV is "more dangerous" than the more-common acute HBV, and typically requires prescription drug treatment. (*Id.* ¶ 40).

Between 2013 and 2015, Miller had recurring episodes of gastrointestinal bleeding and exhibited symptoms of cirrhosis. (*Id.* ¶ 43). During this time, Miller had been transferred from JCI to a correctional facility in New Mexico. He was transferred back to JCI in August 2015, where he remained until his release from custody on March 23, 2017. (*Id.* ¶¶ 43, 45, 106). Even though Miller was in custody in New Mexico during this period of time, Wexford remained responsible

for reviewing and approving his medical care. (*Id.* ¶¶ 43). Wexford approved one visit to an outside specialist to monitor Miller's esophageal varices during this time period. (*Id.* ¶ 44).

Charette alleges that Wexford maintains a policy and practice of interpreting "guidelines for treatment of HBV to indicate treatment only in the presence of detectable viral loads, despite the fact that this is not the sole indicator for treatment." (*Id.* ¶ 167). Between October 2015 and March 2016, the medical defendants "indicated in writing" that Miller was restricted from visiting the emergency room and instructed that he was to be monitored for active bleeding. (*Id.* ¶ 139). Charette alleges that Wexford supervisors and individuals with policymaking authority instructed the medical defendants not to refer Miller for follow-up treatment with an outside specialist. (*Id.* ¶ 140). Even after some of Wexford's medical providers requested referrals, Oketunji, Temesgen, and Lee failed to provide Miller with treatment for HBV or HCV. (*Id.* ¶ 146).

The defendants were aware that Miller had recurring ruptured esophageal varices, as indicated by his "repeated episodes of vomiting and defecating blood, abnormal fevers, and changes in mental state," and yet they denied him medical care and refused to report his condition or refer him for outside treatment. (*Id.* ¶¶ 181–82). As a result, he experienced pain and suffering and severe emotional distress due to his "multiple emergency procedures to correct life-threatening episodes of ruptured esophageal varices." (*Id.* ¶¶ 178, 183).

Wexford had notice of a "widespread practice wherein the company and its employees failed to keep records that could reliably track patient medical history." (*Id.* ¶ 149). Wexford's training and supervision of employees "was inadequate to alert its medical providers as to how accurate documentation could be maintained and retrieved within Wexford's systems." (*Id.* ¶ 165). From October 2015 to May 2016, Wexford's deficient practices caused "Miller's history of HBV infection" to "all but disappear[]" from their records. (*Id.* ¶ 154). And Ayalew's May 2016 request

for a referral was never submitted for approval. (*Id.* ¶ 155). Charette alleges that Wexford's failure to maintain reliable records caused Miller to receive chronic care only for the HCV infection and not the HBV infection. (*Id.* ¶¶ 158, 163).

Charette also alleges that this inadequate system for maintaining medical records served to "actively conceal[]" Miller's chronic HBV infection from him as "Wexford and its employees responsible for maintaining this record-keeping system" refused to improve the system with the intent that patients in Wexford's care be deprived of information necessary to bring claims to court. (*Id.* ¶ 192–93). Additionally, Charette alleges that the defendants did not inform Miller of his chronic HBV infection or of the fact that this infection was responsible for significant damage to his liver. (*Id.* ¶¶ 188–89).

On the basis of the foregoing factual allegations, Miller filed a complaint on January 3, 2019. (ECF 1). After the defendants filed a motion to dismiss, Miller moved to amend his complaint and attached a proposed first amended complaint. (ECF 33). Shortly thereafter, on August 14, 2019, Miller died, (*see* ECF 35), and Angela Charette, the personal representative of his estate, was substituted as the plaintiff to prosecute claims for the benefit of and on behalf of Miller's estate, (*see* ECF 38, 41). Charette filed a motion to amend the complaint on November 12, 2019, which the defendants opposed. (ECF 47). The court granted Charette's motion on April 8, 2020. (*See* ECF 54, Memorandum; ECF 55, Order). On April 23, 2020, the defendants moved to dismiss some of the claims against them.[2] (ECF 57). Finally, on August 3, 2020, the defendants filed another partial motion to dismiss for failure to comply with the Maryland Health Care

---

[2] This motion was filed on behalf of all the defendants except Melaku Ayalew, who subsequently filed a motion to dismiss incorporating all of the arguments raised by his codefendants. (*See* ECF 58).

Malpractice Claims Act. (ECF 61). All of the motions have been fully briefed and are now ready for resolution.

## STANDARD OF REVIEW

To survive a motion to dismiss, the factual allegations of a complaint "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). "To satisfy this standard, a plaintiff need not 'forecast' evidence sufficient to prove the elements of the claim. However, the complaint must allege sufficient facts to establish those elements." *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (citation omitted). "Thus, while a plaintiff does not need to demonstrate in a complaint that the right to relief is 'probable,' the complaint must advance the plaintiff's claim 'across the line from conceivable to plausible.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). Additionally, although courts "must view the facts alleged in the light most favorable to the plaintiff," they "will not accept 'legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments'" in deciding whether a case should survive a motion to dismiss. *U.S. ex rel. Nathan v. Takeda Pharm. North Am., Inc.*, 707 F.3d 451, 455 (4th Cir. 2013) (quoting *Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 365 (4th Cir. 2012)).

"If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3). A motion to dismiss for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) should be granted only if the "material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Evans v. B.F. Perkins Co.*, 155 F.3d 642, 647 (4th Cir. 1999) (internal quotation marks and citation omitted). The plaintiff bears the burden of proving that subject matter

jurisdiction exists. *Piney Run Pres. Ass'n v. Cty. Comm'rs of Carrol Cty.*, 523 F.3d 453, 459 (4th Cir. 2008). When considering a Rule 12(b)(1) motion, the court should "regard the pleadings as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Evans*, 166 F.3d at 647 (internal quotation marks and citation omitted).

## DISCUSSION

The defendants have filed partial motions to dismiss, challenging some of Charette's claims for: cruel and unusual punishment under the Eighth Amendment to the United States Constitution and Article 25 of the Maryland Declaration of Rights; intentional infliction of emotional distress; and denial of the right to petition under the Fourteenth Amendment and Article 24 of the Maryland Declaration of Rights. They also assert that many of Charette's claims are time barred. Finally, they argue that any state law claims related to Hepatitis B and all state law claims against defendants Temesgen, Lee, and Ayalew are barred for failure to comply with Maryland's Health Care Malpractice Claims Act. The court will address these various challenges in turn.

### I.  Cruel and Unusual Punishment

Charette claims that the defendants knew of Miller's medical conditions and understood the serious risks they posed, and that their refusal of treatment under those conditions constitutes deliberate indifference. She argues that this conduct violates the prohibition against cruel and unusual punishment enshrined in the Eighth Amendment to the United States Constitution and in Article 25 of the Maryland Declaration of Rights.

#### A.  Eighth Amendment

The defendants have moved to dismiss the Eighth Amendment claims in their entirety as to Wexford and, insofar as they are based on supervisory or co-conspirator liability, as to all other

defendants. In her opposition, Charette does not address the issue of the defendants' supervisory or co-conspirator liability.[3] The court will therefore focus on Wexford's liability.

Title 42 U.S.C. § 1983 provides a cause of action for a plaintiff to hold liable any person acting under color of law who deprives him or her of rights secured by the Constitution. To state a claim under Section 1983, a plaintiff must allege "the violation of a right secured by the Constitution and laws of the United States," and "that the alleged deprivation was committed by a person acting under color of state law." *Loftus v. Bobzien*, 848 F.3d 278, 284–85 (4th Cir. 2017) (internal quotation marks omitted). "It is well settled that a private entity may, in certain cases, act under color of law within the meaning of § 1983 and therefore be exposed to liability." *Riddick v. Watson*, ___ F. Supp. 3d ___, 2020 WL 6939730, at * 7 (E.D. Va. Nov. 25, 2020) (citing *Conner v. Donnelly*, 42 F.3d 220, 223–24 (4th Cir. 1994)). A private entity typically acts under color of state law when it provides medical services to prison inmates. *See Conner*, 42 F.3d at 223–24; *see also West v. Atkins*, 487 U.S. 42, 56–57 (1988).

For the purposes of a Section 1983 claim, a private entity's conduct is evaluated under the same standards as those that govern municipal liability. *See Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 728 (4th Cir. 1999); *see also Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694 (1978) (no *respondeat superior* liability for local governments under Section 1983); *Powell v. Shopco Laurel Co.*, 678 F.2d 504, 506 (4th Cir. 1982) (confirming *Monell* applies to private corporations

---

[3] This may be because the SAC seeks to hold supervisors directly rather than vicariously liable for, among other things, the instructions they gave to defendants under their supervision to not refer Miller for specialist care. (*See* ECF 56 ¶¶ 54, 116). As for conspiracy, the causes of action enumerated in the complaint do not appear to rely on such a theory, even though the body of the SAC does contain a vague and conclusory reference to a conspiracy to deprive Miller of his rights. (ECF 56 ¶¶ 136–37). To the extent this is an attempt to hold the defendants liable for the acts of their purported co-conspirators, the SAC does not contain sufficient factual allegations to support the claim.

acting under color of state law). To state a claim against a private entity a plaintiff must (1) identify a specific policy or custom; (2) show that the policy or custom is fairly attributable to the acts or omissions of the entity or its policy-makers; and (3) allege an affirmative link between the policy and the specific denial of care. *Spell v. McDaniel*, 824 F.2d 1380, 1389 (4th Cir. 1987); *see also Jordan by Jordan v. Jackson*, 15 F.3d 333, 338 (4th Cir. 1994) (stating the same standard for municipalities). Under Fourth Circuit precedent, an official policy or custom can arise through: (1) an express policy; (2) the decisions of a person with final policymaking authority; (3) an omission that manifests deliberate indifference to the rights of citizens; or (4) a practice that is so persistent and widespread as to constitute a custom or usage with the force of law. *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003).

In this case, Charette advances three theories for liability. The first is that Wexford had a custom or practice (and possibly, subject to discovery, an express written policy) of disregarding the standard of care and refusing treatment for HBV. This custom may be inferred, Charette argues, from the selective testing history ordered by the defendants, who tested only for a viral load— which does not indicate that an individual has cleared an HBV infection. (ECF 56 ¶ 42). Wexford maintains that a policy may not, as a matter of law, be inferred solely from the circumstances of Miller's own medical care. (ECF 60, Reply at 4).

The court agrees with Wexford. In *Spell v. McDaniel*, the United States Court of Appeals for the Fourth Circuit was called upon to determine whether the unconstitutional conduct of police officers was "sufficiently traceable in origin to any fault of municipal policymakers to warrant treating the conduct as a reflection of 'municipal policy' in the *Monell* sense." 824 F.2d at 1390. The court noted that neither "the existence of a policy or custom nor the necessary causal connection" between the policy and the constitutional injury "can be established by proof alone of

the single violation charged." *Id.* at 1388; *see also City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24 (1985) ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy. . . ."). Accordingly, the fact that Charette alleges Wexford selectively administered tests as to Miller alone is not sufficient to infer a policy or custom on which to base *Monell* liability.

The second theory is that Oketunji, Temesgen, and Lee exercised the final-decision making power conferred on them by Wexford to decide that Miller would not receive treatment for his conditions. (ECF 56 ¶¶ 20, 27–28). The complaint alleges that Wexford's policy governing referrals was to require physicians to submit a consultation request through Wexford's electronic health record system and that all requests were the responsibility of these three defendants to approve or deny; they could only approve a request if all three consented, effectively giving them the power to deny care on behalf of Wexford. (*Id.* ¶¶ 67, 69, 82–83, 142). Wexford contends that though these defendants possessed operational authority, they lacked the policymaking authority necessary to establish corporate goals or programs required to establish *Monell* liability. (ECF 60, Reply at 4).

On this point, the court again agrees with Wexford. As explained previously, a private entity acting under color of law may be held liable under Section 1983 if the alleged injury was caused by an identifiable municipal policy or custom. *See Riddick v. Sch. Bd. of City of Portsmouth*, 238 F.3d 518, 522 (4th Cir. 2000). A government policy or custom "need not have received formal approval through the [entity's] official decisionmaking channels to subject the [entity] to liability," *id.*, as some actions taken by officials "may fairly be said to represent official policy," *Monell*, 436 U.S. at 694. However, "not every decision" made by officials "automatically

subjects the [entity] to § 1983 liability"; rather, liability attaches "only where the decisionmaker possesses final authority to establish [an entity's] policy with respect to the action ordered." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986). But the fact that an official "has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion." *Id.* at 481–82. An official policy typically refers to "formal rules or understandings" which are "intended to, and do, establish fixed plans of action to be followed under similar circumstances," and which are distinct from "episodic exercises of discretion in the operational details of government." *Semple v. City of Moundsville*, 195 F.3d 708, 712 (4th Cr. 1999) (internal quotation marks omitted) (citing *Pembaur*, 475 U.S. at 480, and *Spell*, 824 F.2d at 1386). In *Pembaur*, the Supreme Court offered the following distinction as an example:

> [T]he County Sheriff may have discretion to hire and fire employees without also being the county official responsible for establishing county employment policy. If this were the case, the Sheriff's decisions respecting employment would not give rise to municipal liability, although similar decisions with respect to law enforcement practices, over which the Sheriff *is* the official policymaker, *would* give rise to municipal liability.

475 U.S. at 483 n.12.

In this case, the actions of Oketunji, Temesgen, and Lee appear to concern episodic exercises of discretion in the operational details of the organization and not a formal rule or understanding intended to establish a fixed plan of action for the future. The complaint alleges that these doctors reviewed requests from other Wexford employees to determine whether to provide referrals or escalation of care. (ECF 56 ¶¶ 67–69). This is an exercise of discretionary and operational authority more akin to a county sheriff deciding which officers to hire or fire than it is to a county sheriff deciding the law enforcement practices which officers under his or her command will implement. Charette's reliance on *Semple v. City of Moundsville*, 195 F.3d 708 (4th Cir. 1999) is unavailing. Though the Fourth Circuit Court of Appeals in that case did note that a

single decision regarding a course of action in response to particular circumstances could lead to municipal liability, its language was constrained by the caveat that "[t]hese principles are limited . . . because municipal liability attaches only when the decision maker is the municipality's governing body, a municipal agency, or an official possessing final authority to create official policy." *Id.* at 712. *See also Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 664 (7th Cir. 2016) (Wexford not subject to *Monell* liability where the doctor who "had the final say on [the plaintiff's] treatment plan" was the final "decision-maker" but not the "final policymaker").

Finally, the third theory concerns Wexford's allegedly deficient document management practices. Charette alleges that this practice led to lapses in Miller's care and was so persistent and widespread that Wexford must have had knowledge of it and failed to correct it due to their deliberate indifference. (ECF 56 ¶ 163). Wexford maintains that Charette has failed to identify any specific problems with its record keeping practices, any basis on which to reasonably conclude that any deficiencies constituted a custom or practice, and any explanation of how the practices resulted in the deprivations of Miller's rights. (ECF 57-1, Mot. to Dismiss at 17).

On this point the court also agrees with Wexford. It is "no easy task" to establish *Monell* liability by relying on an entity's omissions. *Owens v. Balt. City State's Attorneys Office*, 767 F.3d 379, 402 (4th Cir. 2014*); see also Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999) ("A plaintiff's theory is most likely to slip into that forbidden realm [of seeking to hold a municipality responsible on a *respondeat superior* basis] when she alleges municipal omission—either a policy of deliberate indifference or the condonation of an unconstitutional custom."). To succeed, a plaintiff must allege there was a persistent and widespread practice of municipal officials, the duration and frequency of which indicate that policymakers (1) had actual or constructive knowledge of the conduct, and (2) failed to correct it due to their deliberate indifference. *Owens*,

767 F.3d at 402. Both knowledge and indifference may be inferred from the extent of employees' misconduct, though "[s]poradic or isolated" violations of rights will not give rise to *Monell* liability, as only "widespread of flagrant" violations will suffice. *Id.* (internal quotation marks omitted).

Here, Charette alleges that Wexford "had notice of a widespread practice wherein the company and its employees failed to keep records that could reliably track patient medical history." (ECF 56 ¶ 149). She further states that on multiple occasions Wexford providers "noted that Miller had no documented history, or that certain medication history had been lost, or that he had returned from an outside provider 'with no paperwork.'" (*Id.* ¶ 153). Charette provides examples of this "practice or custom of maintaining a deficient record-keeping system," (*id.* ¶ 155), alleging that a May 2016 request for referral was never submitted for approval, (*id.*), that test results were never disclosed to Miller or to outside providers performing emergency medical procedures, (*id.* ¶¶ 159–160), that over a period of a year and a half Wexford providers referenced that Miller had a history of HBV infection but "listed only Miller's history with HCV" (presumably in his records), (*id.* ¶ 157), and that Miller was consequently only scheduled for care related to HCV and not HBV, (*id.* ¶ 158). Charette contends that these failures occurred with "subjective knowledge that such failure or refusal would result in care detrimental to patients with serious medical needs" and that "Wexford's failure to keep adequate records and to train employees to review a patient's entire medical history was a moving force" in the failure to treat Miller's HBV. (*Id.* ¶¶ 162–63).

Though these allegations contemplate the elements necessary to state a *Monell* claim, this list of allegations generally lacks the factual support necessary to establish a widespread custom or practice such that Wexford would be aware of its existence; at most, these are sporadic episodes. *See Owens*, 767 F.3d at 402. It is not plausible to conclude that because one referral was never

submitted for approval and because one test was not documented or disclosed to a patient or his outside providers, Wexford must have had actual or constructive knowledge of some deficient recordkeeping practice. A plaintiff need not forecast evidence sufficient to prove his claim, but she needs to allege sufficient facts to establish that her claims are plausible. *Walters*, 684 F.3d at 439. Charette has not done so here.

Accordingly, the court will dismiss the Eighth Amendment *Monell* claim against Wexford and any supervisory liability claims. The Eighth Amendment claims premised on the direct liability of the individual defendants remain.

### B.  Maryland Declaration of Rights, Article 25

The defendants have moved to dismiss the Article 25 claims on the grounds that Article 25 applies only to actions taken by the judiciary or other government actors. Article 25 provides "[t]hat excessive bail ought not to be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted, by the Courts of Law." The Maryland courts have consistently construed Article 25 *in pari materia* with the Eighth Amendment to the Constitution. *See Holly v. State*, 241 Md. App. 349, 369 (2019); *Evans v. State*, 396 Md. 256, 327 (2006). At the same time, Maryland's courts have held that Maryland's "[c]onstitutional provisions have the [] narrow focus of protecting citizens from certain unlawful acts committed by government officials." *DiPino v. Davis*, 354 Md. 18, 50–51 (1999).

The Maryland courts have recognized that its constitutional provisions apply to the actions of "public officials" and "government agents," such as police officers, doctors employed by the state of Maryland, and state wardens. *See Manikhi v. Mass Transit Admin.*, 360 Md. 333, 363 (2000) (collecting cases). In *Loya v. Wexford Health Sources, Inc.*, a judge of this court confronted a deliberate indifference claim raised under both the Eighth Amendment and Article 25 against

Wexford and several of its medical providers. No. GJH-19-1646, 2020 WL 1158575, at * 4 (D. Md. Mar. 9, 2020).[4] The court held that while an Eighth Amendment claim could be premised on a private actor's conduct performed under color of state law, Article 25 does not contemplate "that same cause of action" and "only protects individuals from violations by government officials." *Id.* Because the defendants in that case were "not government officials, but rather private actors who are contracted to treat individuals incarcerated in DPSCS correctional facilities, Plaintiff has no claim against them under Maryland law." *Id.* Other judges have reached a similar conclusion when confronted with claims against private entities and their employees, as opposed to claims against public officials or government agents. *See Estate of Jones v. NMS Health Care of Hyattsville, LLC*, 903 F. Supp. 2d 323, 328–29 (D. Md. 2012) (private entity not liable for violation of Maryland Declaration of Rights).

In this case, Wexford and its employees are neither public officials nor government agents; they are a private entity and its private employees. While Charette argues they are agents of the state, she points to no case law which would give this court reason to depart from the precedent of *Jones* and the reasoning of *Loya*.[5] In *Widegon v. Eastern Shore Hospital Center*, the principal case relied upon by Charette, the Maryland Court of Appeals did conclude that doctors could be

---

[4] Unpublished opinions are cited for the soundness of their reasoning and not for their precedential value.

[5] And nothing in *Ex parte Virginia*, 100 U.S. 339 (1879) or *Jackson v. Metro. Edison Co.*, 419 U.S. 345 (1974) is to the contrary. The cited portion of *Ex parte Virginia* concerns the powers of the federal government vis-à-vis the states. 100 U.S. at 346. And *Jackson*, which concerns a plaintiff's allegations that a utility company extensively regulated by the state of Pennsylvania was a state actor, notes that the Supreme Court has "found state action present in the exercise by a private entity of powers traditionally exclusively reserved to the State"—such as holding elections and operating company towns—but went on to look to state law to determine whether the furnishing of utility services is either a state function or a municipal duty. 419 U.S. at 352–53. Charette has identified no case law indicating that private healthcare companies contracting with a state prison are government agents.

government agents susceptible to an action arising under Article 25, but—as Charette concedes and as the court in *Loya* explained, *see* 2020 WL 1158575 at *4—those doctors were employed directly by the State of Maryland and not by a private entity. 300 Md. 520, 523–24, 536–38 (1984). And while it is true that many of Maryland's constitutional provisions, including Article 25, are interpreted *in pari materia* with the federal constitution, Maryland's Constitution is "obviously independent [of the federal constitution] and capable of divergent application," *Frankel v. Bd. of Regents*, 361 Md. 298, 313 (2000), and decisions applying federal constitutional provisions are "no more than persuasive authorities" to the resolution of state constitutional questions, *Dua v. Comcast Cable of Md., Inc.*, 370 Md. 604, 623 (2002). Accordingly, the court will dismiss Charette's Article 25 claims against all defendants.

## II.      Intentional Infliction of Emotional Distress

Charette claims that the defendants are liable for intentional infliction of emotional distress for denying Miller medical care after his repeated complaints of vomiting and defecating blood. The defendants have moved to dismiss this claim on the grounds that the complaint contains no allegations either of extreme and outrageous conduct or of a disabling emotional response.

Under Maryland law, to prevail on a claim for intentional infliction of emotional distress a plaintiff must establish: (1) the defendant engaged in intentional or reckless conduct; (2) the conduct was extreme or outrageous; (3) the wrongful conduct caused the emotional distress; and (4) the emotional distress was severe. *Batson v. Shiflett*, 325 Md. 684, 733 (1992); *see also Lipenga v. Kambalame*, 219 F. Supp. 3d 517, 528 (D. Md. 2016). This cause of action "is to be used sparingly and only for opprobrious behavior that includes truly outrageous conduct," *Kentucky Fried Chicken Nat'l Mgmt. Co. v. Weathersby*, 326 Md. 663, 670 (1992), and claims for intentional infliction of emotional distress are "rarely viable," *Respess v. Travelers Cas. &*

*Sur. Co. of Am.*, 770 F. Supp. 2d 751, 757 (D. Md. 2011); *see also Manikhi v. Mass. Transit Admin.*, 360 Md. 333, 367 (2000). Indeed, extreme and outrageous conduct is only that which exceeds "all possible bounds of decency, and [is] to be regarded as atrocious, and utterly intolerable in a civilized community." *Lasater v. Guttman*, 194 Md. App. 431, 448 (Ct. Spec. App. Md. 2010); *see, e.g.*, *Figueiredo-Torres v. Nickel*, 321 Md. 642, 655 (1991) (extreme and outrageous conduct where defendant psychologist advised his plaintiff patient to be distant from the plaintiff's wife while the defendant engaged in sexual relations with her during the time he was counseling the couple); *B.N. v. K.K.*, 312 Md. 135, 144 (1988) (extreme and outrageous conduct where defendant physician, with the knowledge he had transmittable herpes, engaged in sexual relations with the plaintiff and infected the plaintiff with herpes). To satisfy the fourth element, a party must plausibly allege that he or she "suffered a *severely* disabling emotional response" to the conduct, such that no reasonable person "could be expected to endure it." *Lipenga*, 219 F. Supp. 3d at 528 (internal quotation marks omitted) (emphasis in original).

In this case, assuming that Miller's suicidal ideation and episode of eating tile off the prison floor are sufficient to plausibly allege a severely disabling emotional response, Charette has nevertheless failed to plausibly allege any extreme or outrageous conduct. The allegations in the complaint overwhelmingly sound in medical malpractice, alleging repeatedly that the defendants violated the standard of care by not referring Miller for follow-up treatment despite their knowledge that failure to treat HBV and HCV would cause continuing liver damage. (*See, e.g., id.* ¶¶ 51, 66, 84, 116–123). And in the count specifically alleging intentional infliction of emotional distress, Charette states in conclusory terms that the defendants "intentionally denied Miller medical care with full knowledge of the consequences of their actions." (*Id.* ¶ 180; *see also id.* ¶¶ 177–183). On the facts alleged, the court cannot conclude that the denial of medical

care plausibly exceeded "all possible bounds of decency" or that it is "to be regarded as atrocious, and utterly intolerable in a civilized community."[6] *Lasater*, 194 Md. App. at 448. Additionally, the fact that Charette alleges each of the fourteen defendants named in this action engaged in extreme and outrageous behavior, without pointing to the specific actions of any single defendant, also suggests that Charette has failed to plausibly allege facts satisfying the causation element of an intentional infliction of emotional distress claim. Accordingly, the court will dismiss the intentional infliction of emotional distress claims against all defendants.

### III.   Access to Courts

Charette also claims—in the alternative, in the event that the statute of limitations bars her other claims—that Wexford and the unnamed Doe defendants violated Miller's legal rights under the Fourteenth Amendment and Article 24 of the Maryland Declaration of Rights to seek redress of his grievances arising from the denial of medical care.

#### A.  Fourteenth Amendment

The defendants have moved to dismiss this claim because it does not allege that any of their actions actually frustrated or impeded Miller's ability to file his HBV-related claims. Prisoners are entitled to "a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts." *Bounds v. Smith*, 430 U.S. 817, 825 (1977). A deprivation of an inmate's right of access to the courts is actionable only when the inmate is able

---

[6] Charette relies on this court's prior opinion in *Coner v. Williams*, No. CCB-17-0366, 2019 WL 568679 (D. Md. Feb. 12, 2019) for the proposition that this court has recognized claims for intentional infliction of emotional distress premised on far less distressing allegations than those alleged in Charette's complaint. But in *Coner*, this court addressed the plaintiff's motion for summary judgment and held only that there was a genuine dispute of material fact over whether an officer's act of slapping the plaintiff's child while he was handcuffed in the hospital rose to the requisite level of extreme conduct; it did not hold that the officer's actions were in fact extreme and outrageous. *Id.* at *4. Furthermore, in that case the specific actions of an individual defendant were clearly alleged. *Id.* at *1–2.

to demonstrate actual injury from the deprivation. *Lewis v. Casey*, 518 U.S. 343, 349 (1996). This does not guarantee inmates the ability to litigate every imaginable claim, but it does require that they be given the tools necessary to "attack their sentences, directly or collaterally" and "to challenge the conditions of their confinement." *Id.* at 355. In *Lewis*, the Supreme Court renounced any language from its earlier decision in *Bounds* which "appear[s] to suggest that the State must enable the prisoner to *discover* grievances[.]" *Id.* at 354 (emphasis in original). Instead, the state may not deny access to courts, by, for example, actively interfering with inmates' attempts to prepare or file legal documents, or by refusing to waive filing or transcript fees for the indigent. *See id.* at 350 (collecting cases). The state also may not conceal information which is crucial to a person's ability to access the courts with the purpose of frustrating that right. *See Crowder v. Sinyard*, 884 F.2d 804, 812 (5th Cir. 1989); *In re Cincinnati Radiation Litigation*, 874 F. Supp. 796, 823 (S.D. Ohio 1995).

As explained in Section I.A, *supra*, Charette has failed to plausibly allege a basis for *Monell* liability against Wexford and the court will dismiss the Fourteenth Amendment claim against Wexford on that basis. As for the Doe defendants, if any of Charette's claims are later found to be time-barred—an argument the court does not reach at this stage, *see infra* Section IV—the court may then need to consider the allegations that Miller's HBV status was concealed from him and omitted from his medical records, (ECF 56 ¶¶ 53, 188–89, 195), and that this resulted in his not having the information needed to properly access the judicial system and make a claim relating to his allegedly deficient medical care, (*id.* ¶ 185, 193). Consequently, the court will not at this time dismiss the Fourteenth Amendment access to courts claim against the Doe defendants. Whether that claim is viable will be considered, if necessary, at a later point in the proceedings. The court notes, however, that where a plaintiff has had ample time to identify a Doe defendant but gives no

indication she has made any effort to uncover the defendant's name in discovery, the plaintiff cannot maintain a suit against that defendant. *See Farmer v. Wilson*, No. 2:14-cv-13256, 2014 WL 4629591, at *2 (S.D.W. Va. Sept. 15, 2014) (citing *Valade v. City of New York*, 949 F. Supp. 2d 519, 531 (S.D.N.Y. 2013)). If Charette fails to identify the unnamed Doe defendants by the close of discovery, the Fourteenth Amendment claims against them may be subject to dismissal.

### B. Maryland Declaration of Rights, Article 24

The defendants have moved to dismiss this claim on the grounds that a private corporation cannot be held liable under Article 24. They also argue that this claim fails on the merits since no denial of access to courts is plausibly alleged. The court will dismiss the Article 24 claims against the defendants for the same reason as explained with respect to the Article 25 claims: the defendants are a private entity and its private employees and are not public officials or government agents. *See supra* section I.B. Consequently, they cannot be held liable under Article 24.

### IV.  Statute of Limitations

The defendants further contend that many of Charette's claims are time-barred under the applicable statutes of limitations. Because the court has already determined that Charette has failed to state a claim on several counts, the court will consider the statute of limitations argument only with respect to the remaining medical malpractice claims and Eighth Amendment claims. Notably, a statute of limitations defense must be raised by the defendant, who bears the burden of establishing it; dismissal is appropriate only when all facts necessary to the defense appear on the face of the complaint. *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007).

An action rising under 42 U.S.C. § 1983 borrows the statute of limitations from the most analogous state law cause of action, which is a personal injury suit. *Owens*, 767 F.3d at 388; *see also Owens v. Okure*, 488 U.S. 235, 249–50 (1989). That means that Maryland's three-year

limitations period under Section 5-101 of the Courts and Judicial Proceedings Article applies. *See Owens*, 767 F.3d at 388. Under that provision, a civil action must be filed within three years from the date it accrues. Md. Code Ann., Cts. & Jud. Proc., § 5-101. Under Maryland's discovery rule, "the cause of action accrues only when the claimant knows or should know of the wrong." *Lumsden v. Design Tech Builders, Inc.*, 358 Md. 435, 444 (2000). A plaintiff knows or reasonably should have known of a wrong if (1) she had sufficient actual knowledge to put her on inquiry notice of a defendant's wrongs and (2) a reasonably diligent inquiry would have disclosed that there was a causal connection between the plaintiff's injuries and the defendant's wrongdoing. *See Georgia-Pacific Corp. v. Benjamin*, 394 Md. 59, 89–90 (2006) (articulating and applying this two-prong test). Inquiry notice requires actual notice, either express or implied, and constructive notice will not suffice. *Id*. at 89. Actual express notice may be written or oral, while actual implied notice occurs when a plaintiff gains knowledge sufficient to prompt a reasonable person to inquire further. *Id.* at 90. Thus, at the minimum, a person has inquiry notice if she possesses facts "sufficient to cause a reasonable person to investigate further." *Pennwalt Corp. v. Nasios*, 314 Md. 433, 449 (1988).

Charette's other claims are governed by Maryland's statute of limitations for suits against health care providers. Under that section, an action for damages for an injury arising out of the "rendering of or failure to render professional services by a health care provider," must be filed within the earlier of (1) five years of the time the injury was committed or (2) three years of the date the injury was discovered. Md. Code Ann., Cts. & Jud. Proc. § 5-109(a). Filing a claim with the Health Care Alternative Dispute Resolution Office ("HCADRO") is deemed to be the filing of an action. *Id.* § 5-109(d).

Here, the face of the complaint does not provide sufficient factual allegations to support an affirmative defense based on the statutes of limitations. Though the complaint indicates that Miller was informed by New Mexico officials, between 2013 and 2015, that he had HBV and HCV, (ECF 56 ¶ 44), the complaint also notes that some patients clear both HBV and HCV without medical intervention, (*id.* ¶ 56), and that Miller's HBV status was not disclosed in his medical records until May 2016, (*id.* ¶ 53). It is therefore plausible that Miller did not discover or could not have reasonably discovered that his condition persisted or that the defendants were failing to treat him for it. Accordingly, the court will not dismiss any of Charette's claims as time-barred, though the defendants may renew this defense if warranted by further factual development.

## V.  Maryland's Health Care Malpractice Claims Act

The defendants also contend that this court is required under Maryland's Health Care Malpractice Claims Act ("HCMCA") to dismiss all of Charette's HBV-related state law claims against all defendants as well as all state law claims against Temesgen, Lee, and Ayalew because Miller failed to satisfy the conditions precedent with respect to that claim and those defendants. Charette argues that since the standard of care for treating HCV includes testing that would have revealed the presence of HBV, it is sufficient to have only raised the HCV claims with HCADRO; in other words, she argues that the failure to treat Miller's HBV was caused by the defendants' failure to treat his HCV.

The Maryland Court of Appeals has had several occasions to "wander . . . into the minefield of interpreting" the HCMCA and its requirement that a plaintiff in a medical malpractice action file a proper certificate of qualified expert, but none appear to have squarely considered the circumstances presented by this challenge, where a certificate arguably did not present as many claims to HCADRO as were raised in a plaintiff's subsequent complaint. *Breslin v. Powell*, 421

Md. 266, 268 (2011). Under Maryland law, a plaintiff in a medical malpractice action must comply with HCMCA's requirements. *See* Md. Code Ann., Cts. & Jud. Proc. §§ 3-2A-01 *et seq*. The act is intended to "weed out non-meritorious claims and reduce the costs of litigation." *Dunham v. Univ. of Md. Med. Ctr.*, 237 Md. App. 628, 646 (Ct. Spec. App. Md. 2018) (internal quotation marks omitted). It mandates that all "claims, suits, and actions" against a health care provider for medical injury "are subject to and shall be governed by the provisions of this [statute]" and an "action or suit may not be brought or pursued in any court of this State except in accordance with [the statute]." Md. Code Ann., Cts. & Jud. Proc. § 3-2A-02(a)(1), (2). HCMCA requires plaintiffs to satisfy several conditions precedent before bringing a medical malpractice action. *Id.* § 3-2A-01, *et seq*. First, plaintiffs must file with the Director of HCADRO a certificate of qualified expert which attests to a departure from the "standards of care" and which states that such a departure "is the proximate cause of the alleged injury." *Id.* § 3-2A-04(b)(1)(i). Next, plaintiffs must submit to arbitration through HCADRO unless they properly waive arbitration. *Id.* § 3-2A-06B(a). If, after waiving arbitration, a plaintiff wishes to join an additional healthcare provider as a defendant, the plaintiff "shall file a certificate of qualified expert . . . with respect to the additional health care provider." *Id.* § 3-2A-06B(g).

The term "claim" as used in HCMCA "should be interpreted broadly to mean a 'group or aggregate of operative facts giving ground or occasion for judicial action,' as distinguished from the narrow concept of a 'cause of action.'" *Lerman v. Heeman*, 347 Md. 439, 448 (1997) (quoting *Group Health Ass'n v. Blumenthal*, 2095 Md. 104, 112 (1983)). The term is "intended to cover all actions arising out of the rendering of or failure to render professional services by a health care provider." *Id.* (internal quotation marks omitted). At the same time, a certificate of qualified expert and report "must identify with specificity, the defendant(s) . . . against whom claims are brought, include a statement that the named defendant(s) breached the applicable standard of care, and that such

a departure from the standard of care was the proximate cause of the plaintiff's injuries." *Carroll v. Konits*, 400 Md. 167, 201 (2007). Maryland courts have repeatedly dismissed cases where the certificate of qualified expert did not explain "what the standard of care was, what [the physician] should have done to satisfy that standard of care, or include any details at all about what happened when [the physician] allegedly violated the standard of care." *Kearney v. Berger*, 416 Md. 628, 650 (2010) (and stating that without this information the plaintiffs' certificate could not be used to evaluate whether the physician violated the standard of care); *see also Carroll*, 400 Md. at 201. The Maryland Court of Appeals has declined to enforce this requirement only in "extraordinary circumstances." *Retina Grp. of Washington, P.C. v. Crosetto*, 237 Md. App. 150, 170 (Ct. Spec. App. Md. 2018); *see also Barnes v. Greater Balt. Med. Ctr., Inc.*, 210 Md. App. 457, 475–76 (Ct. Spec. App. Md. 2013) (holding dismissal of case not mandated even though certificate of qualified expert was clearly deficient where the case had already proceeded to trial, a nurse's testimony cured the deficiencies, a mistrial was declared, and only then did the defendant seek dismissal based on the deficiencies). "[T]he plain language of the HCMCA . . . requires dismissal *without* prejudice of the underlying claim for the filing of a non-compliant [c]ertificate[.]" *Breslin*, 421 Md. at 270 (emphasis in original).

In this case, the certificate of qualified expert states that the standard of care applicable to Miller included, among other things, "serial monitoring of chronic medical conditions such as hepatitis C." (ECF 61-3, Certificate of Dr. Sophia M. Soni ¶ 8). The report links Miller's HCV to his liver damage, stating that "Mr. [Miller] was known to have esophageal varices after a gastrointestinal bleed that occurred in 2012" but was "never referred for a repeat endoscopy, which is the standard of care." (*Id.*, Certificate of Dr. Sophia M. Soni, Supp. Report at 5). This caused him to have "nine more episode of gastrointestinal bleeding" which required emergency room visits and hospital admission. *Id.* Construed broadly and as covering all actions arising out of a failure to provide care, Charette argues that Miller's claim related to HBV is part of the same group of operative facts giving rise to his medical malpractice action. But nowhere in the report does Dr. Soni explain what the standard of care for

treating HBV is; nor does she explain how any of the defendants breached that duty. Thus, her report does not satisfy the requirements articulated in *Carroll* and *Kearney*. Miller was required, as a condition precedent to filing suit, to present his HBV-related claims to HCADRO. Because he did not, the court must dismiss these claims without prejudice. *See Carroll*, 400 Md. at 181 (failure to satisfy condition precedent of filing proper certificate can be raised at any time because the action itself is fatally flawed if the condition is not satisfied); *Breslin*, 421 Md. at 270.

Additionally, the court must dismiss the state law medical malpractice claims against Temesgen, Lee, and Ayalew for failure to file a supplemental expert report. The Fourth Circuit Court of Appeals is clear that HCMCA's provisions are substantive and, under *Erie*, a federal district court sitting in diversity is bound to apply them. *See Rowland v. Patterson*, 882 F.2d 97, 99 (4th Cir. 1989); *see also Zander v. United States*, 843 F. Supp. 2d 598, 605 (D. Md. 2012). Charette did not file a certificate of qualified expert and a report with respect to the additional healthcare providers after seeking to amend her claims. This is an "indispensable step" which is meant to give effect to the legislature's desire to "weed[] out non-meritorious claims.[]" *Dunham*, 237 Md. App. at 651–52 (internal quotation marks omitted). Accordingly, the court must dismiss the state law medical malpractice claims against these three defendants. *See* Md. Code Ann., Cts. & Jud. Proc. § 3-2A-06B(g); *see also Carroll*, 400 Md. at 201.

## VI. Punitive Damages

Finally, the defendants argue that the court should "dismiss Charette's demand for an award of punitive damages for failure to state a claim." (ECF 57-1 at 32). Charette has sought as relief in this action compensatory and punitive damages. Under Maryland law, punitive damages constitute not a claim but a form of relief, often defined as "private fines levied by civil juries" and awarded "to punish reprehensible conduct and to deter its future occurrence." *Fisher v. McCrary Crescent City, LLC*, 186 Md. App. 86, 143 (Ct. Spec. App. Md. 2009) (internal quotation marks

omitted). Some courts have concluded that a Rule 12(b)(6) motion is not the appropriate vehicle to challenge a request for punitive damages, reasoning that Rule 12(b)(6) does "not provide a vehicle to dismiss a portion of relief sought or a specific remedy, but only to dismiss a claim in its entirety." *Meeks v. Emiabata*, No. 7:14cv00534, 2015 WL 1636800, at *2 (W.D. Va. Apr. 13, 2015); *see also Douglas v. Miller*, 864 F. Supp. 2d 1205, 1220 (W.D. Okla. 2012); *Oppenheimer v. Southwest Airlines Co.*, No. 13-CV-260-IEG (BGS), 2013 WL 3149483, at *4 (S.D. Cal. June 17, 2013). Accordingly, any decision about whether Charette may be entitled to punitive damages will be deferred, and the court will deny the defendants' motion as it pertains to the issue of punitive damages.

***

A brief summary of the court's ruling is warranted. The court will dismiss entirely Charette's Article 24, Article 25, and intentional infliction of emotional distress claims. The court will also dismiss all medical malpractice claims against Temesgen, Lee, and Ayalew, and it will dismiss the HBV-related medical malpractice claims against the other defendants. Additionally, the court will dismiss the Eighth Amendment claim against Wexford and any Eighth Amendment claim premised on supervisory or coconspirator liability against the remaining defendants. Finally, the court will dismiss the Fourteenth Amendment claim against Wexford. What remains, then, are Charette's non-HBV-related medical malpractice claims against all defendants except Temesgen, Lee, and Ayalew; Charette's Eighth Amendment direct liability claims against all defendants except Wexford; and, conditionally, Charette's Fourteenth Amendment claim against the Doe defendants.

**CONCLUSION**

For the reasons stated herein, the defendants' partial motions to dismiss for failure to state a claim (ECF 57, 58) will be granted in part and denied in part. The defendants' partial motion to dismiss for failure to comply with HCMCA (ECF 61) will be granted. Charette's medical malpractice claims relating to the treatment of Miller's hepatitis B and all her medical malpractice claims against Temesgen, Lee, and Ayalew will be dismissed without prejudice. A separate Order follows.


| 3/23/2021 | | /s/ |
|---|---|---|
| Date | | Catherine C. Blake |
| | | United States District Judge |