IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ANGELA CHARETTE, as personal     \*
representative of THE ESTATE OF    \*
MICHAEL MILLER,             \*
                            \*
        v.                 \*          Civil Action No. CCB-19-33
                            \*
WEXFORD HEALTH SOURCES,     \*
INC., *et al.*                   \*
                            \*

\*\*\*\*\*

## MEMORANDUM

This is a medical malpractice and civil rights action concerning the alleged mistreatment of the now-deceased Michael Miller's various medical conditions while he was incarcerated in state prison. Miller first filed his complaint in January 2019. (ECF 1, Compl.) After Miller's death in August 2019, Angela Charette, the personal representative of Miller's estate, was substituted as the plaintiff. Charette alleges the defendants, Wexford Health Sources, Inc. ("Wexford") and various medical professionals it employed, treated Miller's Hepatitis B, Hepatitis C, liver disease, and other ailments in a manner that fell below the required standard of care and was constitutionally deficient. Although the court dismissed[1] some of Charette's claims in response to the defendants' earlier Rule 12(b)(6) motions, several claims survived[2] into discovery. (*See* ECF 72, March 23, 2021, Mem.; ECF 73, Order.)

---

[1] In sum, the court dismissed Charette's claims for violations of the Maryland Declaration of Rights, and her claim of intentional infliction of emotional distress. The court also dismissed all medical malpractice claims against Dr. Keshaun Temesgen, Dr. Melaku Ayalew, and Dr. Kenneth Lee, and dismissed the HBV-related medical malpractice claims against the other defendants. Additionally, the court dismissed the Eighth Amendment claim against Wexford and any Eighth Amendment claims premised on supervisory or coconspirator liability against the remaining defendants. Finally, the court dismissed the Fourteenth Amendment claim against Wexford. (*See* ECF 72, at 26.)

[2] The remaining claims were: (1) Charette's non-HBV-related medical malpractice claims against all defendants except Temesgen, Lee, and Ayalew; (2) Charette's Eighth Amendment direct liability claims against all defendants except Wexford; and (3) Charette's Fourteenth Amendment claim against the Doe defendants. (*See* ECF 72, at 26.)

Pending before the court is Charette's motion for leave to file a Third Amended Complaint, (ECF 85, Pl.'s Mot. for Leave to File Third Amend. Compl.), which the defendants have opposed, (ECF 95, Defs.' Opp'n to Pl.'s Mot. for Leave to File Third Amend. Compl. and Mot. to Dismiss).[3] Also pending is Charette's motion for reconsideration of the court's previous order dismissing Charette's state-law medical malpractice claims. (ECF 101, Pl.'s Mot. for Recons.) These issues are fully briefed, (ECF 98, Pl.'s Reply and Opp. to Mot. to Dismiss; ECF 104, Defs.' Reply Supp. Mot. to Dismiss; ECF 105, Defs.' Opp'n to Pl.'s Mot. for Recons.), and no oral argument is necessary. *See* Local Rule 105.6. For the following reasons, the court will grant Charette's motion for reconsideration. Charette's motion for leave to file a Third Amended Complaint will be denied in part and granted in part.[4] Finally, the court will deny Wexford's partial motion to dismiss as moot.

## FACTS AND PROCEDURAL HISTORY

The court largely repeats the allegations as described in its prior decision on the defendants' motions to dismiss. (*See* ECF 72, at 2–6.) Where relevant, the court notes the new facts proffered in the Third Amended Complaint.

On Thanksgiving Day in 2016, Michael Miller was allegedly found eating tile off the floor of his cell at Jessup Correctional Institute ("JCI"). (ECF 56, Second Am. Compl. at ¶ 5.) This followed many bouts of internal bleeding related to his untreated hepatitis infection, which caused him to vomit and defecate blood and left him with a bacterial infection and a spinal abscess. (*Id.* at ¶ 4.) How Miller's condition deteriorated to this point implicates the somewhat complicated

---

[3] The defendants' opposition also argues that if the court allows Charette to amend her complaint, the court should dismiss the claims the court dismissed in its earlier decision on March 23, 2021.

[4] Specifically, the court will deny Charette's motion for leave to file a Third Amended Complaint in all respects other than the new allegations supporting a supervisory liability claim against Dr. Kashaun Temesgen. *See infra* Section II.C.

history of the medical care he received over the previous six years while he was incarcerated in the custody of the Maryland Department of Public Safety and Correctional Services ("DPSCS"). (*Id.* at ¶¶ 1, 12.)

At the times relevant to this complaint, DPSCS contracted with Wexford to provide health care to its inmates. (*Id.* at ¶¶ 13–15.) Wexford in turn employed all of the other named defendants, including: Bolaji Onabajo, MD; Zowie Barnes, MD; Gedion Atnafu, MD; Ayoku Oketunji, MD; Robert Giangrandi, PA; Priscilla Momoh, PA; Bernard Alenda, CFNP; Jennifer Pope, CFNP; Wondaye Deressa, CFNP; Titilayo Otunuga, CFNP; Keshaun Temesgen, MD; Melaku Ayalew, MD; and Kenneth Lee, MD. (*Id.* at ¶¶ 16–29.) In the Third Amended Complaint, Charette also names Dr. Daniel Wolde-Rufael ("Rufael") and Umu Barry as defendants. (ECF 85-2, Redline of Third Amended Compl., at ¶¶ 35–36.)

In 2010, while at JCI, Miller tested positive for Hepatitis B ("HBV") and Hepatitis C ("HCV"). (ECF 56, at ¶ 38.) Both HBV and HCV are "serious medical conditions" that "attack the proper functioning of the liver." (*Id.* at ¶ 31.) If left untreated, HBV and HCV will cause cirrhosis, "an advanced stage of liver malfunction" characterized by scarring which prevents the liver from properly filtering toxins in the blood and which presents "severe risks of serious harm and death." (*Id.*) Prescription antiviral drugs have been available to treat HBV and HCV since 2012 and 2013, respectively. (*Id.* at ¶¶ 35–36.) These drugs help prevent the onset of cirrhosis, and once presented, may help slow its progression. (*Id.* at ¶ 35.) The standard of care for treating HBV and HCV involves testing individuals suspected of having either infection, monitoring both the progress of the infection and the progression of the patient's liver decompensation, and treating the patient with some combination of antiviral medication. (*Id.* at ¶¶ 31, 37.)

One symptom associated with severe cirrhosis is esophageal varices, which is "swollen or ruptured veins near the esophagus and upper gastrointestinal tract." (*Id.* at ¶ 32.) Esophageal varices can result in internal bleeding and poses a substantial risk of serious bodily harm. (*Id.* at ¶ 33.) Allegedly, the standard of care for treating esophageal varices is to perform banding ligation—the placement of minuscule rubber bands around the ruptured varices by endoscopy— and to refer the patient to a liver specialist for follow-up endoscopies to assess healing and to determine whether there are missing bands that need to be replaced. (*Id.* at ¶¶ 33–34.)

When Miller first tested positive for HBV and HCV in 2010, he was given an HBV booster vaccination but he was not treated for HCV at that time. (*Id.* at ¶ 38.) Two years later, when Wexford assumed responsibility for his care, he again tested positive for HBV and HCV, though he alleges those test results were not shared with him. (*Id.* at ¶¶ 39, 187.) Miller's HBV and HCV tests revealed a low viral load count, indicating his conditions were chronic rather than acute. (*Id.* at ¶ 39.) Chronic HBV is "more dangerous" than the more-common acute HBV, and typically requires prescription drug treatment. (*Id.* at ¶ 40.)

Between 2013 and 2015, Miller had recurring episodes of gastrointestinal bleeding and exhibited symptoms of cirrhosis. (*Id.* at ¶ 43.) During that time, Miller had been transferred from JCI to a correctional facility in New Mexico. He was transferred back to JCI in August 2015, where he remained until his release from custody on March 23, 2017. (*Id.* at ¶¶ 43, 45, 106.) Even though Miller was in custody in New Mexico at the time, Wexford remained responsible for reviewing and approving his medical care. (*Id.* at ¶ 43.) Wexford approved one visit to an outside specialist to monitor Miller's esophageal varices during this period. (*Id.* at ¶ 44.)

Charette alleges that Wexford maintains a policy and practice of interpreting "guidelines for treatment of HBV to indicate treatment only in the presence of detectable viral loads, despite

4

the fact that this is not the sole indicator for treatment." (*Id.* at ¶ 167.) Between October 2015 and March 2016, the medical defendants "indicated in writing" that Miller was restricted from visiting the emergency room and instructed that he was to be monitored for active bleeding. (*Id.* at ¶ 139.) Charette alleges that Wexford supervisors and individuals with policymaking authority instructed the medical defendants not to refer Miller for follow-up treatment with an outside specialist. (*Id.* at ¶ 140.) Even after some of Wexford's medical providers requested referrals, Oketunji, Temesgen, and Lee failed to provide Miller with treatment for HBV or HCV. (*Id.* at ¶ 146.) Charette's Third Amended Complaint alleges that Temesgen specifically refused to refer Miller to an outpatient liver specialist because Temesgen believed Miller's care could be managed in the emergency room. (ECF 85-2, at ¶¶ 164–5.)

Charette's Third Amended Complaint adds new allegations that Rufael was responsible for evaluating all patients at JCI for HBV treatment or any other infectious disease. (*Id.* at ¶ 35.) Rufael's obligation to evaluate patients was triggered "automatically" upon request, and Barry was responsible for arranging the evaluation. (*Id.* at ¶ 75.) But Rufael never evaluated Miller. (*Id.* at ¶ 78.)

The defendants allegedly knew Miller had recurring ruptured esophageal varices, as shown by his "repeated episodes of vomiting and defecating blood, abnormal fevers, and changes in mental state," and yet they denied him medical care and refused to report his condition or refer him for outside treatment. (ECF 56, at ¶¶ 181–82.) As a result, he experienced pain and suffering and severe emotional distress due to his "multiple emergency procedures to correct life-threatening episodes of ruptured esophageal varices." (*Id.* at ¶¶ 178, 183.)

Wexford had notice of a "widespread practice wherein the company and its employees failed to keep records that could reliably track patient medical history." (*Id.* at ¶ 149.) Charette

5

alleges that "nearly 1 in every 2 patients who received care outside JCI returned to the facility without copies of their discharge summaries." (ECF 85-2, at ¶ 177.) Further, Wexford allegedly maintained inadequate medical records at facilities other than JCI. (*Id.* at ¶ 178.) Wexford's training and supervision of employees "was inadequate to alert its medical providers as to how accurate documentation could be maintained and retrieved within Wexford's systems." (ECF 56, at ¶ 165.) From October 2015 to May 2016, Wexford's deficient practices caused "Miller's history of HBV infection" to "all but disappear[]" from their records. (*Id.* at ¶ 154.) And Ayalew's May 2016 request for a referral was never submitted for approval. (*Id.* at ¶ 155.) Charette alleges that Wexford's failure to maintain reliable records caused Miller to receive chronic care only for the HCV infection and not the HBV infection. (*Id.* at ¶¶ 158, 163.)

Charette also alleges that this inadequate system for maintaining medical records served to "actively conceal[]" Miller's chronic HBV infection from him as "Wexford and its employees responsible for maintaining this record-keeping system" refused to improve the system with the intent that patients in Wexford's care be deprived of information necessary to bring claims to court. (*Id.* at ¶¶ 192–93.) Indeed, Wexford maintained an "HCV Spreadsheet" listing each inmate treated for Hepatitis A, HBV, or HCV. (ECF 85-2, at ¶ 183.) But that spreadsheet incorrectly noted that Miller completed treatment for HCV. (*Id.*) Charette alleges that the defendants did not inform Miller of his chronic HBV infection or of the fact that this infection was responsible for significant damage to his liver. (ECF 56, at ¶¶ 188–89.) Ultimately, on January 3, 2019, Miller filed a complaint alleging medical malpractice and civil rights violations. (ECF 1.)

6

## STANDARD OF REVIEW

### I. Motion for Reconsideration

Under Rule 54(b), the court may revise an interlocutory order any time before entering a final judgment. *See* Fed. R. Civ. P. 54(b). "[E]very order short of a final decree is subject to reopening at the discretion of the district judge." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 12 (1983). Although the standards outlined by Rules 59(e) and 60(b) are not binding in an analysis of Rule 54(b) motions, *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 514 (4th Cir. 2003), district courts "look to these standards for guidance in considering such motions," *see Innes v. Bd. of Regents of the Univ. Sys. of Md.*, 121 F. Supp. 3d 504, 506 (D. Md. 2015) (citing *Akeva, LLC v. Adidas Am., Inc.*, 385 F. Supp. 2d 559, 565–66 (M.D.N.C. 2005)). Accordingly, reconsideration of an interlocutory order is appropriate when: "(1) there has been an intervening change in controlling law; (2) there is additional evidence that was not previously available; or (3) the prior decision was based on clear error or would work manifest injustice." *Id.* at 506–07 (citing *Akeva*, 385 F. Supp. 2d at 565–66).

### II. Motion for Leave to Amend

Under Rule 15(a), a party may amend a pleading once as a matter of course within "21 days after service of a responsive pleading," if such a response is required. Fed. R. Civ. P. 15(a)(1). But once this initial window has passed, "a party may amend its pleading only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). Although Rule 15(a)(2) encourages the court to give leave "when justice so requires," the court "may deny a motion to amend when the amendment would be prejudicial to the opposing party, the moving party has

acted in bad faith, or the amendment would be futile." *Equal Rts. Ctr. v. Niles Bolton Assocs.*, 602 F.3d 597, 603 (4th Cir. 2010).

## DISCUSSION

### I. Motion for Reconsideration

Charette's motion for reconsideration urges the court to reassess its dismissal of her state-law medical malpractice claims.

The court originally dismissed Charette's medical malpractice claims because she failed to satisfy the requirements of the Maryland Health Care Malpractice Claims Act. The statute requires plaintiffs to file a certificate of a qualified expert explaining how a defendant's departure from relevant "standards of care" proximately caused the alleged injury. Md. Code Ann., Cts. & Jud. Proc. § 3-2A-04(b)(1)(i). Plaintiffs must also submit their claims to arbitration through the Health Care Alternative Dispute Resolution Office ("HCADRO") unless they properly waive arbitration. *Id.* § 3-2A-06B(a). If, after waiving arbitration, a plaintiff wishes to join another healthcare provider as a defendant, plaintiffs must "file a certificate of qualified expert . . . with respect to the additional health care provider." *Id.* § 3-2A-06B(g). Neither Charette nor Miller submitted an HBV claim to HCADRO, and neither plaintiff filed a certificate of qualified expert with respect to Temesgen, Lee, and Ayalew. So the court dismissed Charette's medical malpractice claims related to Miller's HBV, and also dismissed Charette's medical malpractice claims against Temesgen, Lee, and Ayalew. (ECF 72, at 22–25.)

Two months after this court's decision, however, the Fourth Circuit held that federal courts may not dismiss claims because a plaintiff failed to serve an expert certificate before suing. *See Pledger v. Lynch*, 5 F.4th 511 (4th Cir. 2021). *Pledger* involved West Virginia's Medical Professional Liability Act, which requires prospective medical malpractice plaintiffs to serve a

notice of their claim with a "screening certificate of merit" on defendants thirty days before suing. *Id.* at 518. Under the statute, medical professionals use these "screening certificates" to explain how the defendant's breach of a "standard of care" caused the plaintiff's injury. *Id.* Pledger, a federal prisoner, brought medical malpractice claims under the Federal Tort Claims Act ("FTCA") alleging that prison officials failed to provide him with necessary medical treatment. *Id.* at 513. Because the FTCA incorporates state-law liability standards, the defendants argued that Pledger "should be held to the pre-suit requirements of the West Virginia Medical Professional Liability Act." *Id.* at 516. The district court dismissed Pledger's claim because he did not secure the expert certification necessary before filing suit. *Id.* at 513–14. The Fourth Circuit reversed, holding that the Federal Rules displaced the pre-dispute certification requirement in West Virginia's medical malpractice statute. *Id.* at 519.

*Pledger* used the Supreme Court's two-step framework from *Shady Grove Orthopedic Associates, P.A. v. Allstate Insurance Co.*, 559 U.S. 393 (2010), to untangle the apparent conflict between the Federal Rules of Civil Procedure and the West Virginia statute. The first step under *Shady Grove* asks whether the Federal Rules "answer[] the question in dispute." *Shady Grove* at 398. If the Federal Rules answer the disputed question, the second step asks whether the relevant Federal Rules are "invalid under the Constitution or the Rules Enabling Act." *Pledger*, 5 F.4th at 519. If a valid Federal Rule answers the "same question" as the state law, then federal courts must apply the Federal Rules without wading into the "murky waters" of *Erie Railroad Co. v. Tompkins* and its distinct choice-of-law rules. *See id.* (citations omitted).

As to the first step, the West Virginia statute raised the following question: "Does someone need a certificate of merit to state a claim for medical negligence?" *Id.* at 519 (internal alterations and quotations omitted). The court concluded the answer was no under the Federal Rules. The

Fourth Circuit reasoned that Rule 8 and Rule 12 establish general pleading requirements in federal court. *Id.* at 519–20. Unlike West Virginia's expert certificate requirement, neither Rule 8 nor Rule 12 require plaintiffs to present expert evidence at the pleading stage. *Id.* And Rule 11 "expressly provides that a pleading need not be verified or accompanied by an affidavit." *Id.* at 520 (internal punctuation omitted).

Under step two of *Shady Grove*, the *Pledger* panel noted "the Federal Rules of Civil Procedure enjoy 'presumptive validity under both the constitutional and statutory constraints[.]'" *Id.* at 521 (internal alterations and citations omitted). *Pledger* thus held that West Virginia's medical malpractice certificate requirement could not apply to actions in federal court. *Id.*

*Pledger* casts doubt on the fate of the HCMCA's pre-filing requirements. Several members of this court have applied *Pledger* to Maryland's HCMCA. In *DeBlois v. Corizon Health, Inc.*, Civ. No. ELH-20-1816, 2021 WL 3142003, at *9 (D. Md. July 23, 2021), Judge Hollander reasoned that:

> Little in [*Pledger*'s] analysis turned on the nuances of the West Virginia law; what mattered was simply that the law requires plaintiffs to have expert evidence to state a medical malpractice claim. So too does the HCMCA. At a minimum, then, *Pledger* appears to instruct that [a plaintiff's] suit cannot be dismissed for failure to comply with the pre-filing certificate requirements in the HCMCA (or the case law construing those requirements).

*Id.* at *9 (internal citations omitted).[5] Judge Griggsby and Judge Gallagher, too, have recognized *Pledger*'s applicability to the HCMCA's procedural requirements. *See Rodriguez v. United States*, Civ. No. LKG-21-0411, 2022 WL 3156234, at *5 (D. Md. Aug. 8, 2022) (Griggsby, J.) ("Like the West Virginia law that the Fourth Circuit found to be inconsistent with the Federal Rules of Civil Procedure in *Pledger*, the HCMCA requires that a malpractice plaintiff submit a certificate from a qualified expert to the Maryland Health Care Alternative Dispute Resolution Office before

---

[5] Unpublished opinions are cited for the soundness of their reasoning and not for their precedential value.

bringing a tort action."); *Severe v. United States*, Civ. No. SAG-20-3404, 2021 WL 4521345, at *16 (D. Md. Oct. 1, 2021) (Gallagher, J.) (noting the HCMCA's "pre-suit certification" requirements "cannot serve as grounds for dismissal" post-*Pledger*).

This court will not break the consensus. Under *Pledger*, the HCMCA's pre-suit requirements conflict with the Federal Rules. In federal court, a prospective medical malpractice plaintiff need not serve a certificate of an expert opinion and submit to (or affirmatively waive) arbitration just to pass the pleading stage. By the defendants' own description, "if a plaintiff shows up at court without having complied with the Act's conditions precedent, he does not have a claim for which he can recover under Maryland law." (ECF 105, Def. Opp'n to Pl.'s Mot. for Recons., at 2.) These pre-filing requirements raise the pleading standard far beyond Rule 8, which requires only a "short and plain statement of the claim showing that the pleader is entitled to relief." *See* Fed. R. Civ. P. 8(a).

Indeed, Rule 9 confirms the contrast between the HCMCA "and the Federal Rules' baseline pleading standard 'by specifying the few situations when heightened pleading *is* required' in federal court." *See Pledger*, 5 F.4th at 519–20 (quoting *Gallivan v. United States*, 943 F.3d 291, 293 (6th Cir. 2019)). Under Rule 9, plaintiffs who allege fraud or mistake must provide more specific facts at the pleading stage. *See* Fed. R. Civ. P. 9(b). The HCMCA has little relevance to fraud or mistake, but still imposes a "heightened pleading standard" by requiring plaintiffs to provide expert reports on the applicable standard of care and causation issues as a pleading condition. *See Pledger*, 5 F.4th at 519–20 (quoting *Gallivan*, 943 F.3d at 293).

Both the arbitration requirement and the expert certificate requirement in the HCMCA present "additional hurdle[s] for plaintiffs" untethered from Rule 12, which asks only whether a complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is

plausible on its face.'" *See Pledger*, 5 F.4th at 520 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009)). Requiring plaintiffs to gather expert evidence before suing is unnecessary in determining

a claim's plausibility. *See Pledger*, 5 F.4th at 520 (citing *Gallivan*, 943 F.3d at 293) ("Plaintiffs

need not gather any expert evidence or serve it on defendants 'for a claim to be plausible.'"). In

sum, the HCMCA's pre-suit expert report and arbitration requirements clash with valid[6] Federal

Rules.[7]

The defendants present little argument to the contrary. Most of the opposition argues that

the Fourth Circuit decided *Pledger* incorrectly.[8] But disagreement with precedent does not make

it less binding. *Pledger* is a published, on-point decision by a majority panel of the Fourth Circuit.[9]

This court will follow *Pledger*. *See United States v. Collins*, 415 F.3d 304, 311 (4th Cir. 2005)

(citations omitted) (noting that district courts must follow a Fourth Circuit decision unless it is

"overruled by a subsequent *en banc* opinion . . . or a superseding contrary decision of the Supreme

Court").

*Pledger* even criticized a prior Fourth Circuit decision that "affirmed the application of a

Maryland pre-dispute arbitration requirement in federal court." *See Pledger*, 5 F.4th at 523 (citing

---

[6] The defendants do not challenge the validity of the relevant Federal Rules under the Constitution or the Rules Enabling Act. In any event, the Federal Rules and the Rules Enabling Act are entitled to a presumption of validity. *See Pledger*, 5 F.4th at 521. Charette's motion for reconsideration thus satisfies step two of the *Shady Grove* framework.

[7] Charette raises several other Federal Rules that may conflict with the HCMCA's requirements. (*See* ECF 101, at 8–12.) The court need not address these concerns to resolve Charette's motion for reconsideration.

[8] *See, e.g.*, ECF 105, at 2 ("[T]he Court should not consider *Pledger* to be persuasive authority. The Fourth Circuit reached the wrong decision in *Pledger*."); *id.* at 7 ("*Pledger* was incorrectly decided, and the Court should not regard it as persuasive authority."); *id.* at 11 ("Not only is *Pledger* not controlling, but the Court should also not consider *Pledger* persuasive authority. The appellate panel's 2-1 opinion reached the wrong conclusion based on faulty reasoning."); *id.* at 16 ("Neither *Shady Grove* nor any of the three court of appeals decisions discussed above provides any support whatsoever for *Pledger*'s conclusion that state-law, pre-suit certification requirements can never dispose of a claim in federal court.").

[9] The Fourth Circuit denied the petition to rehear the case *en banc*. *See Pledger v. Lynch*, No. 18-2213 (4th Cir. Nov. 18, 2021) (Docket No. 66, Order).

*Davison v. Sinai Hosp. of Balt., Inc.*, 617 F.2d 361, 362 (4th Cir. 1980) (per curiam)). The *Pledger*

majority found *Davison*'s reasoning "unconvincing" because it predated *Shady Grove. Id.* at 523

(citations omitted). In doing so, the Fourth Circuit may have "revealed something of its view"

toward the HCMCA's arbitration requirement. *See Rodriguez*, 2022 WL 3156234, at *5 n.2

(quoting *DeBlois*, 2021 WL 3142003, at *9). Indeed, other language in the case suggests the Fourth

Circuit did not intend to cabin its holding to West Virginia's statute. *See Pledger*, 5 F.4th at 523

("In short, like courts before us, we find that it is 'impossible to reconcile' certificate requirements

like West Virginia's with the 'requirements of the Federal Rules of Civil Procedure.'") (citations

omitted).[10]

Because *Pledger* announced an intervening change in controlling law, the court will grant

Charette's motion for reconsideration as to her medical malpractice claims. *See* Fed. R. Civ. P.

54(b); *see also Innes*, 121 F. Supp. 3d at 506–07. The court will amend its prior order to deny the

defendants' motion to dismiss as to those claims.

## II. Motion for Leave to File Third Amended Complaint

With discovery completed, Charette moves to amend her complaint for a third time. Her

Third Amended Complaint: (1) adds as defendants Dr. Daniel Wolde-Rufael ("Rufael") and

Infection Control Nurse Ms. Umu Barry; (2) alleges new facts about Wexford's recordkeeping

---

[10] The defendants fail to distinguish the HCMCA from the West Virginia statute. The HCMCA's arbitration requirement, according to the defendants, concerns "Charette's *right* to bring her claim at all" whereas West Virginia's statute governs the "sufficiency" of a plaintiff's complaint. (ECF 105, at 17.) This is a distinction without a difference. If a plaintiff does not have a right to bring her claim, that plaintiff's complaint would necessarily be insufficient. *See* Fed. R. Civ. P. 8(a)(2) (a pleading must contain "a short and plain statement of the claim showing that the pleader is *entitled to relief*") (emphasis added).

practices to revive her *Monell* claim; and (3) alleges new facts involving Keshaun Temesgen's role in supervising other defendants.[11]

## A. Adding New Defendants Under Rule 15(c)

The court will not permit Charette to add Rufael or Barry to this litigation. Amending her complaint to add either defendant would be futile and prejudicial. Her claims against them are time-barred under the most liberal reading of the limitations period. The latest date her claims against Rufael and Barry could have accrued is March 24, 2017, when Miller was released on parole. The applicable statute of limitations is three years, so any claim needed to be filed by March 24, 2020. *See* Md. Code Ann., Cts. & Jud. Proc. § 5-101. Charette moved to amend her complaint on October 1, 2021, far past the limitations period.

Because the limitations period has expired, Charette's amendment must "relate back" to the operative complaint. *See* Fed. R. Civ. P. 15(c). "[A]n amendment to add an additional party 'relates back' when (1) the claim asserted in the proposed amendment arises out of the same conduct set forth in the original pleading, and (2) the party to be added (a) received timely notice of the action such that he would not be prejudiced in maintaining a defense on the merits, and (b) knew or should have known that he would have been named as defendant 'but for a mistake concerning the proper party's identity.'" *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 371 (4th Cir. 2014). An amendment is futile if it fails to relate back to the original complaint and is otherwise barred by the statute of limitations. *United States v. Pittman*, 209 F.3d 314, 318 (4th Cir.

---

[11] Charette's Third Amended Complaint restates her claims for intentional infliction of emotional distress, violation of the Maryland Declaration of Rights, and violation of the Fourteenth Amendment Due Process clause for violation of the decedent's access to the courts only to preserve the argument for appeal. In other words, Charette has not proffered any new facts to resolve the reasons the court dismissed these claims in its March 23, 2021, order. Accordingly, Charette's motion for leave to amend as to these claims will be denied as futile.

2000) ("Because the amended claims do not relate back to the original motion, they are barred by the statute of limitations and therefore futile.").

The court need not decide whether the allegations against Rufael and Barry involve the "same conduct" set out in the original pleading, or whether Charette's failure to name Rufael or Barry was a "mistake."[12] No allegation implies Rufael or Barry received timely notice, so the court will deny Charette's attempt to add them as defendants. Rufael and Barry needed to receive notice within 90 days of Charette filing her complaint. *See* Fed. R. Civ. P. 15(c)(1)(C) (requiring "a party to be brought in by amendment" to have received notice of the action "within the period provided by Rule 4(m) for serving the summons and complaint" such that the new party "will not be prejudiced in defending on the merits"); Fed. R. Civ. P. 4(m) (requiring service within 90 days after filing a complaint). Miller filed his original complaint on January 3, 2019 (ECF 1), so any new defendants needed to have notice of the action by April 3, 2019.

Charette contends defendants bear the burden of establishing a defense based on the statute of limitations, which requires the facts necessary to the affirmative defense to appear "on the face of the complaint." (ECF 98, at 22 (citing *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (en banc)) (emphasis omitted)). But Charette misstates the applicable burden. "Although the statute of limitations is an affirmative defense that must be established by the defendant, when relation back is required to satisfy the statute of limitations, the *burden is on the plaintiff* to prove

---

[12] Charette named John Doe defendants in her operative complaint. Whether naming John Doe defendants constitutes a "mistake" under Rule 15(c) is a somewhat open question in the Fourth Circuit. *See Williams v. Kincaid*, 45 F.4th 759, 775 (4th Cir. 2022) (noting the Fourth Circuit has not yet "squarely address[ed] this question"). District courts have come to different conclusions. *Compare Touko v. United States*, No. GJH-20-1113, 2021 WL 2685328, at *5 (D. Md. June 29, 2021) ("[N]aming 'John Doe' as a defendant does not constitute a "mistake" for purposes of Rule 15(c).") *with Rumble v. 2nd Ave Value Stores*, 442 F. Supp. 3d 909, 917 (E.D. Va. 2020) (describing Fourth Circuit precedent as "reject[ing] the notion that a John Doe substitution can never qualify as a mistake that permits relation back under Rule 15(c)"). The Fourth Circuit's most recent pronouncement on the issue emphasizes that district courts should focus on "notice, rather than on the type of 'mistake' that has occurred." *See Williams*, 45 F.4th at 775 (quoting *Goodman*, 494 F.3d at 473). This suggests Rule 15(c) permits plaintiffs to rename Doe defendants so long as those defendants have sufficient notice.

that Rule 15(c) is satisfied." *Covey v. Assessor of Ohio Cnty.*, 666 F. App'x 245, 248 (4th Cir. 2016) (first citing *Goodman*, 494 F.3d at 464; and then citing *W. Contracting Corp. v. Bechtel Corp.*, 885 F.2d 1196, 1200 (4th Cir. 1989)) (emphasis added).

Nothing suggests Rufael or Barry received actual or constructive notice within the limitations period. Charette focuses on Rufael and Barry's constructive notice. She argues the original complaint "clearly intended to sue *any medical provider* who was responsible for failing to treat [Miller's] HCV or his recurring esophageal varices." (ECF 98, at 21.) But imputing notice upon every medical provider who failed to treat Miller goes too far. The challenged conduct concerns Rufael and Barry's alleged *inaction*, which makes it harder to assume they would know about their potential liability.

Nor can Charette rely on an "identity of interest" theory to establish Rufael or Barry's notice. Because Rufael and Barry share an "identity of interest" with Wexford and the other defendants, Charette urges the court to presume Rufael and Barry received notice once Wexford and the other defendants learned of Miller's suit. (*See* ECF 98, at 27–29.) But this case has little resemblance to *Goodman*, the only authority Charette cites for this proposition. *Goodman* analyzed the "identity of interests" between a parent and subsidiary company. There, the plaintiff intended to sue the successor of Tracer Research, and named Praxair, Inc. as a defendant. *Goodman*, 494 F.3d at 473–74. But Praxair Services, Inc., *not* Praxair, Inc., was the corporate entity that acquired Tracer Research. *Id.* The Fourth Circuit found that Praxair, Inc. and Praxair Services, Inc. were two "closely related business entities represented by the same lawyers," so Praxair Services, Inc. had sufficient notice of the plaintiff's claim. *Id.* at 474.

16

Rufael and Barry's relationship with Wexford is different. Names of corporate subsidiaries are sometimes distinguished by a single word,[13] increasing the risk that a plaintiff may mistakenly name the wrong entity. But individuals like Rufael and Barry are not so easily confused with their coworkers and their employer. Charrette only speculates that Rufael and Barry *could* share counsel with Wexford. Mere hints of shared representation do not establish constructive notice; Rule 15 requires more. *See Moran v. Polk Cnty.*, No. 1:18-CV-300-MR-WCM, 2020 WL 9893041, at *7 (W.D.N.C. July 17, 2020) (even when "it is reasonable to presume" prospective defendants "will employ the same defense counsel as the current [d]efendants," there may be "insufficient information to presume that the proposed defendants received notice under a 'shared attorney theory'").[14]

Finally, Rufael and Barry would be prejudiced in defending against Charette's claims. *See* Fed. R. Civ. P. 15(c)(1)(C)(i). Discovery is complete. This litigation has been developing for more than three years. Trial dates are set. Adding Rufael and Barry into the mix at this stage would force them into a perpetual game of catchup, even with the current defendants' counsel. *See Equal Rts. Ctr. v. Niles Bolton Assocs.*, 602 F.3d 597, 603 (4th Cir. 2010) (affirming district court's decision to deny motion to amend "after the close of a three-year long discovery process" and before the deadline for dispositive motions).

---

[13] For example, NIKE International Holding B.V., NIKE International Holding, Inc., NIKE International LLC, and NIKE International Ltd., are all Nike subsidiaries. *See* Securities and Exchange Commission, Electronic Data Gathering, Analysis, and Retrieval Archives, *Nike: Subsidiaries of the Registrant*, https://www.sec.gov/Archives/edgar/data/320187/000119312510161874/dex21.htm (last accessed September 17, 2022).

[14] Charette argues in passing that the defendants are estopped from asserting a statute of limitations defense due to withholding information during discovery. The court disagrees. Charette makes no allegation that the defendants "wrongfully deceived or misled the plaintiff in order to conceal the existence of a cause of action." *Mezu v. Morgan State Univ.*, 264 F. Supp. 2d 292, 295 (D. Md. 2003), aff'd sub nom. *Mezu v. Dolan*, 75 F. App'x 910 (4th Cir. 2003). Accordingly, the court will not apply estoppel or toll the limitation period.

Accordingly, the court will deny Charette's motion for leave to amend her complaint to add Rufael and Barry as defendants.[15]

## B. Section 1983 *Monell* Claim Against Wexford

Even with her new allegations, Charette cannot resurrect her *Monell* claim. To establish *Monell* liability by a theory of condonation, a plaintiff must allege there was a persistent and widespread practice of municipal officials, the duration and frequency of which show that policymakers (1) had actual or constructive knowledge of the conduct, and (2) failed to correct it due to their deliberate indifference. *See Owens v. Baltimore City State's Att'ys Off.*, 767 F.3d 379, 402 (4th Cir. 2014) (citing *Spell v. McDaniel*, 824 F.2d 1380, 1390 (4th Cir. 1987)) (alterations omitted).[16]

Charette's Third Amended Complaint provides several new allegations that may come close to establishing a *Monell* claim. Allegedly, "nearly 1 in every 2 patients who received care outside JCI returned to the facility without copies of their discharge summaries." (ECF 85-2, at ¶ 177). Charette alleges Wexford maintained inadequate medical records at facilities other than JCI. (*Id.* at ¶ 178.) And Wexford allegedly used an "infection control spreadsheet listing each inmate who had been treated for Hepatitis A, HBV, or HCV." (*Id.* at ¶ 183.) That spreadsheet incorrectly noted that Miller completed treatment for HCV. (*Id.*)

But these new allegations do not resolve the court's prior concerns with Charette's *Monell* claim. Take the allegation that nearly "1 in every 2 patients who received care outside JCI returned to the facility without copies of their discharge summaries." (ECF 85-2, at ¶ 177.) Whether a

---

[15] The court will allow Charette to amend her complaint to include factual allegations that *mention* Rufael and Barry, if Charette chooses, as those allegations merely "add specificity" and context to her other claims. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999).

[16] The court detailed the application of 42 U.S.C. § 1983 to private entities such as Wexford in its prior Memorandum. (*See* ECF 72, March 23, 2021, Mem., at 8–9.)

18

patient returned to a correctional facility without proper paperwork does not fall on Wexford. A provider discharging a patient without their documents is more culpable in those situations. Charette's theory would hold Wexford liable if third-party hospitals failed to prepare reports, lost discharge summaries, delayed transmitting documents, or even had inaccuracies in the records. Assuming the truth of Charette's allegations, these oversights are not fairly attributable to Wexford.

No allegation implies Wexford failed to process discharge summaries, lost patient paperwork, or even knew how often patients returned without discharge summaries. Nor has Charette alleged that Wexford failed to retrieve these discharge summaries at some point after patients returned to the correctional facility. And there is no allegation suggesting these missing records caused harm, much less serious injury. In sum, Charette's vague references to Wexford's administrative oversights does not constitute a policy or custom of delaying or denying care to patients. *Foreman v. Wexford Health Sources, Inc.*, No. CV ELH-17-26, 2018 WL 638290, at *14 (D. Md. Jan. 31, 2018).

The new allegations about Wexford's HCV spreadsheet do not change the outcome. Charette's allegations about the inaccurate spreadsheet focus only on Miller's discrete injuries. No allegation implies *other* inmates had inaccurate information on the document. Even if other inaccuracies existed, Charette does not link those informational deficiencies to a tangible harm beyond those suffered by Miller.

Accordingly, Charette's motion for leave to amend her complaint will be denied as to her attempt to revive her *Monell* claims against Wexford.

## C. New Allegations of Dr. Temesgen's Supervisory Liability

Charette's Third Amended Complaint provides new allegations about Keshaun Temesgen's role in supervising other defendants. (*See* ECF 85-2, at ¶¶ 163–70.) These allegations suggest Temesgen directed other defendants to refuse Miller care at times. (*See id.* at ¶ 166.) Other allegations imply Temesgen refused to develop adequate treatment plans for patients. (*See id.* at ¶ 165.) These facts are enough to state a claim for supervisory liability. *See King v. Rubenstein*, 825 F.3d 206, 224 (4th Cir. 2016) ("[A] supervisor can be liable where (1) he knew that his subordinate 'was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury'; (2) his response showed 'deliberate indifference to or tacit authorization of the alleged offensive practices'; and (3) that there was an 'affirmative causal link' between his inaction and the constitutional injury.") (citations omitted).[17]

The defendants put up little opposition to Charette's amendments concerning Temesgen's supervisory liability. Indeed, the name "Temesgen" does not appear in the defendants' opposition papers. (*See* ECF 95). Granting Charette leave to amend her complaint to include these allegations about Temesgen would not be prejudicial.[18] As described above, the court will grant Charette's motion for reconsideration of the order dismissing the state-law medical malpractice claims against

---

[17] Charette does not appear to use these additional facts to revive her theory that Temesgen "exercised the final-decision making power" conferred by Wexford "to decide that Miller would not receive treatment for his conditions." (ECF 72, at 10.) To be clear, these additional facts simply state a claim for Temesgen's supervisory liability for some actions by other *individual* defendants. These new allegations do not resolve the court's prior concern that Temesgen lacked the formal and final policymaking authority to create "policy" on behalf of Wexford. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986) (liability attaches "only where the decisionmaker possesses final authority to establish [an entity's] policy with respect to the action ordered") (Brennan, J., joined by White, Marshall, and Blackmun, JJ.); *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 664 (7th Cir. 2016) (Wexford not subject to *Monell* liability where the doctor who "had the final say on [the plaintiff's] treatment plan" was the final "decision-maker" but not the "final policymaker").

[18] The defendants argue that the claims against Temesgen, Ayalew, and Lee were dismissed after the statute of limitations period had run, so the dismissal was effectively with prejudice. But granting Charette's motion for reconsideration reinstates her prior state-law medical malpractice claims against Temesgen, Ayalew, and Lee. These defendants were named in the Second Amended Complaint on November 12, 2019. Assuming the limitations period closed March 24, 2020, *see supra* II.A, Temesgen, Ayalew, and Lee were timely named as defendants.

Temesgen, Lee, and Ayalew for failure to file a supplemental expert report. Because Temesgen's involvement in this case is inevitable, he will face no prejudice from Charette's additional allegations about his supervisory role over other defendants.[19]

## CONCLUSION

For the reasons stated here, the court will grant Charette's motion for reconsideration. Charette's motion for leave to file a Third Amended Complaint will be denied in part and granted in part. Finally, the court will deny the defendants' partial motion to dismiss as moot.[20] A separate Order follows.

_9/23/22_
Date

_CCB_
Catherine C. Blake
United States District Judge

---

[19] To preserve her rights on appeal, Charette restates her claims for intentional infliction of emotional distress, violation of the Maryland Declaration of Rights, and violation of the Fourteenth Amendment Due Process clause for violation of Miller's access to the courts. (ECF 85, at ¶ 25.) Charette offers no new facts to resolve the court's prior dismissal of these claims, so amendment would be futile. Accordingly, the court will deny Charette leave to amend her complaint as to these claims.

[20] The defendants' partial motion to dismiss will be denied as moot because the parts of the Third Amended Complaint the defendants seek to dismiss are those the court has not permitted to be included in the Third Amended Complaint.