IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| ANGELA CHARETTE, Personal Representative of the Estate of Michael Anthony Miller, | * | |
| | * | |
| Plaintiff, | * | Civil Action No. GLR-19-33 |
| v. | * | |
| WEXFORD HEALTH SOURCES, INC. et al., | * | |
| | * | |
| Defendants. | | |

\*\*\*

## MEMORANDUM OPINION

THIS MATTER is before the Court on Defendants Wexford Health Sources, Inc. ("Wexford"), Nurse Bernard Alenda, Dr. Gedion Atnafu, Dr. Melaku Ayalew, Dr. Zowie Barnes, Nurse Wondaye Deressa, Physician Assistant ("PA") Robert Giangrandi, Dr. Kenneth Lee, PA Priscilla Momoh, Dr. Ayoku Oketunji, Dr. Bolaji Onabajo, Nurse Titilayo Otunuga, Nurse Jennifer Pope, and Dr. Kasahun Temesgen's (collectively, "Defendants") Motion for Summary Judgment (ECF No. 115) and Plaintiff Angela Charette's Cross-Motion for Partial Summary Judgment (ECF No. 129). The Motions are ripe for disposition, and no hearing is necessary. See Local Rule 105.6 (D.Md. 2023). For the reasons outlined below, the Court will grant in part and deny in part Defendants' Motion for Summary Judgment. Additionally, the Court will deny Charette's Cross-Motion for Partial Summary Judgment.

# I.  BACKGROUND

## A.  Factual Background

Michael Miller spent the last two decades of his life caught in a revolving door of incarceration. (See Defs.' Ex. 1, Inmate Traffic History ["Inmate Traffic Hist."], ECF No. 115-3). Miller's imprisonment was defined by cascading medical complications related to chronic cirrhosis, hepatitis B, and hepatitis C—conditions that ultimately caused his death. This dispute focuses mainly on Miller's medical care while incarcerated at Jessup Correctional Institution ("JCI") between September 2, 2015 and March 24, 2017. During this time, Wexford, a private medical company, provided health care services to inmates in Maryland. The other thirteen Defendants are individual health care providers employed or contracted by Wexford. These individual Defendants each participated in Miller's care in some fashion. The Court recounts Miller's complicated medical history with attention to the care that was—or was not—provided by Defendants.

### 1.     Miller's Early Detection of Hepatitis B and C

Miller first entered the Maryland state prison system in 1997. (Inmate Traffic Hist. at 8). He spent several years cycling between prison and mandatory supervision on release before starting a decade-long prison sentence in 2005. (Id.; see also Defs.' Ex. 2, Sentence Status Change Report ["Sentence Rep."], ECF No. 115-4).[1]

---

[1] Miller's convictions are recorded under two different names, Michael A. Miller and Robert A. Williams. (See Sentence Rep. at DPSCSBF000031). Mr. Miller, at times, would refer to himself as Robert Williams. The parties' briefs refer to the decedent as Michael Miller, so the Court will do the same.

Miller was likely infected with at least one form of hepatitis before his re-imprisonment in 2005. (Defs.' Ex. 4, Kali Zhou, M.D., Dep. Tr. ["Dr. Zhou Dep."] at 43:17–44:12, ECF No. 115-6). This was no secret to Miller, who believed he contracted hepatitis C in 1999. (Defs.' Ex. 10, Integris Medical Records ["Integris Med. Rs."] at IMBC-SUB-000033, ECF No. 115-12). On October 12, 2007, Miller told a nurse practitioner he was infected with both hepatitis B and hepatitis C. (Defs.' Ex. 3, Wexford Medical Records ["Wexford Med. Rs."] at DPSCS000038, ECF No. 115-5). Because nothing at that time corroborated Miller's belief, the nurse practitioner ordered lab reports and noted that she would follow-up with Miller once she received the results. (Id.).

It is worth pausing to discuss the risks associated with hepatitis B, hepatitis C, cirrhosis, and esophageal varices—each of which contributed to Miller's deteriorating health. Hepatitis B is a potentially-life threatening liver infection caused by the hepatitis B virus ("HBV"). HBV is generally transmitted through blood, sexual contact, or childbirth. See generally World Health Organization, Fact Sheet: Hepatitis B (June 24, 2022), https://www.who.int/news-room/fact-sheets/detail/hepatitis-b. Some symptoms associated with hepatitis B include "yellowing of the skin and eyes (jaundice), dark urine, extreme fatigue, nausea, vomiting, and abdominal pain." Id. Hepatitis B can take on both acute and chronic forms. Id. While acute hepatitis B involves a short-term infection, a person has chronic hepatitis B when the virus remains active in a body for more than six months. (See Pl.'s Ex. O, Ryan D. Herrington, M.D., Expert Rep. ["Dr. Herrington Rep."] at 18, ECF No. 127-15).

Chronic hepatitis B infects cells within the liver, causing an "inflammatory response that injures or 'scars' the liver," a process called "fibrosis." (Id. at 17). While healthy livers can regenerate, "long-term inflammation/injury from presence of HBV in the liver leads to progression of fibrosis until there is so much scar tissue the liver can no longer regenerate and begins to fail – the time point called cirrhosis." (Id.). A person may eventually experience "decompensated cirrhosis," which happens when complications related to liver failure start appearing. (Id.). These complications include "bleeding from varices (dilated esophageal veins from excess pressure in liver vessels), ascites (fluid in abdomen), and encephalopathy (confusion due to toxic ammonia build-up)." (Id.). A hepatitis B infection may move between an inactive state (with an undetectable viral load) and an active state (with a detectable viral load) throughout a patient's life. (Id. at 19).

Like hepatitis B, hepatitis C is a viral disease that affects the liver. And just as hepatitis B has both acute and chronic forms, so too does hepatitis C. Chronic hepatitis C similarly presents risks of fibrosis, cirrhosis, and liver failure.

On May 2, 2010, Miller took serology tests for hepatitis A, hepatitis B, and hepatitis C. (Defs.' Ex. 5, BioReference Laboratory Report ["BioReference Lab'y Rep."] at BIO000011, ECF No. 115-7).[2] Although Miller tested negative for hepatitis A, he tested positive for hepatitis B surface antigen. (Id.). A positive surface antigen test signifies a person currently has a hepatitis B infection. Miller also tested positive for hepatitis C

---

[2] Serologic testing involves measuring specific viral antigens and antibodies. In the context of hepatitis B, for instance, different serologic "markers" help identify different phases of HBV infections.

4

antibodies. (Id.). Antibodies indicate a person has been infected with hepatitis B in the past. As a follow-up, on May 17, 2010, Miller underwent genotype and quantitative PCR testing for hepatitis C viral RNA. (Id. at BIO000013). Those tests revealed Miller did not have detectable levels of hepatitis C viral RNA. (Id.). Taken together, these results established that Miller did not have an active, treatable hepatitis C infection in May 2010, despite having been exposed to hepatitis C at some point. (Dr. Zhou Dep. at 41:17–18, 42:3–9). Miller did, however, have an active hepatitis B infection at that time.

On May 19, 2010, two days after Miller's provider tested his hepatitis C viral load but one day before the prison received those test results, Miller saw an infection control nurse. During that visit, the nurse (1) educated Miller about hepatitis C and the possibility for treatment; (2) obtained Miller's signed consent to receive hepatitis C treatment and to participate in the chronic care clinic; and (3) administered the first of three doses of the Twinrix vaccine for hepatitis A and hepatitis B. (Wexford Med. Rs. at DPSCS000170–72). Miller received the second and third dose of the Twinrix vaccine on June 9, 2010, and November 19, 2010, respectively. (Id. at DPSCS0000175, DPSCS000220).

### 2. Miller's Initial Gastrointestinal Bleeding

In late February 2012, Miller had his first episode of bleeding esophageal varices. Miller began vomiting blood on February 27, 2012. (Id. at DPSCS000434). The next day, he complained of chills, bloody diarrhea, black stool, and fatigue—all while continuing to vomit blood. (Id. at DPSCS000436). Miller was sent to an emergency room, where an esophagogastroduodenoscopy ("EGD") revealed that Miller's bleeding was caused by

esophageal varices. (Id. at DPSCS000439–42).[3] Bleeding esophageal varices suggest a patient has end-stage liver disease from a decompensated liver. (Dr. Zhou Dep. at 56:10–15). While at the hospital, Miller was prescribed Protonix and propranolol to treat the portal hypertension underlying his esophageal varices. (Wexford Med. Rs. at DPSCS000442).[4] Miller's bleeding was resolved by March 1, 2012. (Id.). The doctor's notes related to this event, however, list only one chronic condition: hepatitis C. (Id.).

Miller started vomiting blood again just days after returning to prison. (Pl.'s Ex. R, Miller Medical Records ["Miller Med. Rs."] at DPSCS000473, ECF No. 127-18). So, on March 4, 2012, Miller returned to the emergency room where he underwent a second EGD. (Id. at DPSCS000485). The hospital provider expressed concern that Miller's "history of HCV and HBV" would make his varices worse. (Id.). Miller was advised that he may need surgery "at some later time." (Id.). These concerns were memorialized in a note by Ava Joubert, MD, after Miller returned to the prison infirmary on March 8, 2012. (Id. at

---

[3] An esophagogastroduodenoscopy (EGD) is a type of endoscopy. To perform an EGD, a gastroenterologist generally inserts a tube through the mouth down to the small intestine to look for abnormalities in the upper portion of a patient's gastrointestinal tract. (See generally Pl.'s Ex. Q, Prevention and Management of Gastroesophageal Varices and Variceal Hemorrhage in Cirrhosis ["Guidelines for GI Treatment"], ECF No. 127-17).

[4] In patients with cirrhosis, scar tissue constricts the portal vein, which is the primary vessel that transports blood through the liver and back to the heart. (Dr. Zhou Dep. at 84:3–85:20). This constriction causes portal hypertension, which is increased blood pressure in the portal system. (Id. at 84:3–85:9). Blood that would normally be transported through the portal vein is then diverted to other vessels, including those of the stomach and the esophagus. (Id. at 84:16–85:6). That increase pressure causes veins in the esophagus to enlarge, eventually becoming "esophageal varices." (Id. at 85:7–10). With too much pressure, varices may rupture and bleed. (Id. at 85:11–13). Bleeding esophageal varices are a sign that a patient's liver has decompensated and indicate that a patient has end-stage liver disease. (Id. at 56:10–15).

DPSCS000485, DPSCS000501). Dr. Joubert, according to this note, requested that Miller receive "specialty service" from infectious disease ("ID") personnel. (Id. at DPSCS000486). Dr. Joubert explained she would "push for ID to see [Miller] regarding Hep B and Hep C status/treatment options." (Id.). Over the next four days, Miller stayed in the prison infirmary and complained of severe pain. (Id. at DPSCS000493, DPSCS000498). Although Miller was discharged from the infirmary on March 12, 2012, he was sent to the hospital later that month due to abdominal pain and vomiting. (Id. at DPSCS000501, DPSCS000524). With no signs of active gastrointestinal ("GI") bleeding, Miller was returned to the infirmary on March 21, 2012, and discharged to the general prison population on March 22, 2012. (Id. at DPSCS000524).

Concerns related to Miller's hepatitis were not forgotten during this time. On March 28, 2012, Sandra Pryor, LPN, reviewed Miller's medical records after learning that Miller's provider requested a hepatitis C evaluation. Pryor explained that Miller "would not be a good candidate for treatment" because he had a history of "non-compliance with medications" and recently refused care "unless he got something stronger for pain." (Id. at DPSCS000543). Although Pryor noted that Miller was co-infected with hepatitis B, she wrote that Miller had an undetectable viral load of both HBV and HCV in June 2010. (Id.).

The next week, on April 6, 2012, Miller met with Dianna Harvey, LPN, to discuss his hepatitis C infection. (Id. at DPSCS000559). Harvey assured Miller that his condition was "being followed by [the] Chronic Care Clinic" and that "his viral load [was] <3200." (Id.). She also told Miller that his Twinrix vaccine would protect him from hepatitis A and hepatitis B. (Id.).

One week later, on April 12, 2012, Pryor consulted an unnamed "ID Specialist," who reviewed Miller's lab results and hospitalization records. (Id. at DPSCS000559). The ID Specialist recommended against treating Miller's hepatitis C because he was "not stable" and was "high risk." (Id.). Pryor asked if Miller required an updated viral load test, but the specialist said there was no need "until we are ready to treat him." (Id.). Again, Pryor noted that Miller had undetectable viral loads when he was tested in May 2010. (Id.). A few days later, on April 16, 2012, Harvey informed Miller that he would not be treated for hepatitis C because he did not have a sufficient viral load. (Id. at DPSCS000567). Harvey also instructed Miller to report to the Chronic Care Clinic ("CCC") in 90 days. (Id.).[5] Despite being denied treatment, Wexford's "HCV Spreadsheet"—a tool used to track the progression of inmates' infections—showed that Miller had been successfully treated for hepatitis C, and that Miller was in fact hepatitis B negative. (See Pl.'s Ex. T ["HCV Spreadsheet"], ECF No. 127-20).

---

[5] The CCC is tasked with diagnosing, treating, monitoring, and controlling chronic conditions. (See Pl.'s Ex. S ["DPSCS Chronic Disease Management Manual"] at WEX.RRPD.002965, ECF No. 127-19). For instance, the CCC aims to develop and implement "[i]ndividualized treatment plans through period outpatient evaluations that minimize acute hospital care services and prevent misuse of primary care services." (Id. at WEX.RRPD.002966). Inmates enrolled in the CCC are generally required to be "evaluated at a minimum of every three months by a CRNP or a midlevel provider," and by a physician "at a minimum of every 6 months." (Id.). Further, "additional RN nursing and clinician chronic care evaluations shall be scheduled when medically indicated," along with a "monthly evaluation and education session regarding treatment plan compliance." (Id.).

Miller's liver showed little signs of improvement as he was transferred between facilities over the next few years.[6] In March 2013, he was transferred to a prison in Oklahoma. (Inmate Traffic Hist. at 6). Just a few days after his arrival, on March 30, 2013, Miller was sent to Purcell Municipal Hospital due to complaints of blood in his stool. (Defs.' Ex. 8 ["Purcell Municipal Hospital Records"] at PMH00021–23, PMH00036, ECF No. 115-10). The doctors noted Miller's esophageal varices had returned and that he was experiencing a GI bleed. (Id. at PMH00023). Miller was referred to a GI specialist at Norman Regional Hospital, where he underwent a banding ligation procedure to treat his esophageal varices. (See id. at PMH00023, PMH00036; see also Miller Med. Rs. at NRDLMH000057). On April 11, 2013, shortly after Miller returned to prison, he allegedly suffered a seizure and injured himself in a fall. (Miller Med. Rs. at NRDLMH000057). He was transported to Lindsay Municipal Hospital where he complained of fall-related injuries and mild abdominal cramping. (Id. at NRDLMH000057–58). During his stay at Lindsay Municipal Hospital, Miller also expressed concern that his esophageal varices were bleeding again. (Id. at NRDLMH000058). His doctor found no evidence of bleeding esophageal varices or a fall-related injury. (Id. at NRDLMH000057–58).

In early July 2013, however, Miller's gastrointestinal bleeding returned, and he underwent a banding ligation procedure at St. Anthony Hospital. (Integris Med. Rs. at IMBC-SUB-000020–21). On July 13, 2013, about ten days after his treatment at St.

---

[6] Miller served parts of his sentence outside of Maryland under the Interstate Corrections Compact. (See Inmate Traffic Hist. at 6, 8; see generally Md. Code Regs. 12.02.18.03).

Anthony, Miller was admitted to Integris Baptist Medical Center for complaints of seizures and recurrent gastrointestinal bleeding. (Id.). He was referred to a gastroenterology specialist, who performed a colonoscopy and EGD. (Id. at IMBC-SUB-000035). The colonoscopy revealed Miller suffered from internal hemorrhoids. (Id.). The specialist noted Miller had end-stage liver disease with a poor prognosis; in the specialist's opinion, supportive care was Miller's only option. (Id.). The EGD revealed that Miller's esophageal varices had returned only one week after his last banding procedure. (Id. at IMBC-SUB-000037). Although his varices were not actively bleeding, the specialist noted that Miller may need a transjugular intrahepatic portosystemic shunt ("TIPS"). (Id.).[7]

Miller was transferred back to Maryland on December 19, 2013. (See Inmate Traffic Hist. at 6). While reviewing Miller's medical records as part of the transfer process, a nurse noted that Miller had been referred to the prison's infection control program for the management of hepatitis. (Wexford Med. Rs. at DPSCS000761). During a sick call, on December 31, 2013, a physician noted that Miller had an undetectable level of hepatitis B and C. (Id. at DPSCS000784–85). But just four days later, on January 3, 2014, Miller was sent to the hospital for vomiting blood. (Id. at DPSCS000787–88). A consulting gastroenterologist at Meritus Medical Center performed an EGD, which revealed that Miller had several columns of bleeding esophageal varices. (Defs.' Ex. 43, Meritus Medical Center Records ["Meritus Med. Ctr. Rs."] at MMC000287–88, ECF No. 115-45).

---

[7] TIPS is a procedure typically performed by an interventional radiologist in which a tube is placed to shunt blood around the portal system to bypass the compressed portal vein. (Dr. Zhou Dep. at 171:11—172:5).

Miller was then transferred to Bon Secours Hospital, where he consulted gastroenterologist Maaza Abdi, M.D. on January 5, 2014. (Wexford Med. Rs. at DPSCS003468–50). Dr. Abdi noted that Miller had "massive upper gastrointestinal bleeding secondary to esophageal varices." (Miller Med. Rs. at DPSCS003643). She requested that Miller follow-up with her for another GI evaluation. (Id.).

Miller was transferred to a prison in New Mexico from February 20, 2014 to August 31, 2015. (Inmate Traffic Hist. at 5). On March 11, 2014, Miller was sent to St. Vincent Regional Medical Center after vomiting blood. (Defs.' Ex. 11, New Mexico Medical Records ["New Mexico Med. Rs."] at NM000385–88, ECF No. 115-13). There, he underwent an EGD and had seven bands placed on his esophageal varices. (Id. at NM000377–78). On March 15, 2014, just one day after he was discharged from St. Vincent, Miller was sent to the University of New Mexico Hospital after lodging new complaints of hematemesis. (Id. at NM000453–57). Miller underwent another EGD on March 17, 2014, during which the gastroenterologist decided not to perform further banding of Miller's varices after observing the scars of his prior banding ligation. (Id. at NM000467–68). Four months later, on July 7, 2014, Miller was sent to St. Vincent Regional Hospital to check for the development of new esophageal varices. (Defs.' Ex. 12, St. Vincent Hospital Records ["St. Vincent Hosp. Rs."] at SVH000318, ECF No. 115-14). Although Miller had no active bleeding, the gastroenterologist noticed some varices that could use additional banding. (Id.). The doctor banded those varices. (Id.).

Miller, then 40 years old, was transferred from New Mexico to Maryland in August 2015. (Inmate Traffic Hist. at 5). But during his return flight, Miller had a seizure which

forced the plane to land in Oklahoma. (Defs.' Ex. 9 ["Lindsay Municipal Hospital Records"] at NRDLMH000125, ECF No. 115-11). He was admitted to Saint Anthony Hospital, where he received treatment for yet another round of bleeding esophageal varices. (Id. at NRDLMH000115). Miller was sent to Lindsay Municipal Hospital for further monitoring. There, Miller's doctor noted his significantly decompensated liver, severe cirrhosis, and portal hypertension—taken together, Miller's prognosis looked "very poor." (Id.).

On August 31, 2015, Miller was transferred to Bon Secours Hospital in Maryland. (Defs.' Ex. 13, Bon Secours Hospital Records ["Bon Secours Hosp. Rs."] at BSH000059, ECF No. 115-15). A neurologist concluded that Miller's episodes were "not real seizures" but rather "psychogenic seizures" or perhaps related to withdrawal from narcotics. (Id. at BSH000063). But Miller's lab work at Bon Secours revealed he was positive for hepatitis B surface antigen. (Id. at BSH000078). Miller also consulted Dr. Abdi, a gastroenterologist who treated him a year and a half earlier. (Id. at BSH00053–58). Dr. Abdi noted Miller's history of hepatitis C, cirrhosis, ascites, hepatic encephalopathy, and recent esophageal variceal bleed. (Id. at BSH00057). At that point, however, Miller was hemodynamically stable with no evidence of recurrent bleeding. (Id.). Dr. Abdi noted that Miller "needs [a] follow-up in [a] hepatology clinic." (Id.). Among other recommendations, Dr. Abdi suggested Miller receive an EGD if his varices had not flattened, further band ligation in two weeks with platelet transfusions, screening for hepatocellular cancer, and further evaluation of his hepatitis B. (Id. at BSH00057–58). Miller was discharged on September 2, 2015. (Id. at BSH00052). Miller's discharge notes, drafted by Moges Gebremariam,

M.D., indicate that, although "no acute intervention was recommended at th[at] time," Miller "should have outpatient [g]astroenterology follow up with Dr. Abdi[.]" (<u>Id.</u>).

### 3.    **Miller's Medical Care from Defendants**

#### a.  **Fall 2015**

Miller was transferred from Bon Secours to the Jessup Regional Infirmary ("JRI") on September 2, 2015. (Inmate Traffic Hist. at 5). Defendant Melaku Ayalew, M.D. met with Miller upon his arrival at JCI. (Wexford Med. Rs. at DPSCS000872). Dr. Ayalew noted that Miller suffered from end-stage liver disease, secondary to his hepatitis C and hepatitis B. (<u>Id.</u>). Dr. Ayalew's notes correctly copied parts of Dr. Gebremariam's discharge summary; namely, that Miller was "evaluated by GI, neurology, and psychiatry." (<u>Id.</u>). But where Dr. Gebremariam stated, "no acute intervention was recommended at this time," Dr. Ayalew instead wrote, "NO ACTUAL INTERVENTION WAS RECOMMENDED." (<u>Compare</u> Bon Secours Hosp. Rs. at BSH000052 <u>with</u> Wexford Med. Rs. at DPSCS000872; emphasis in original). Further, Dr. Ayalew's notes never referenced Dr. Gebremariam's recommendation that Miller should have a gastroenterology outpatient follow-up with Dr. Abdi. Rather, Dr. Ayalew ordered several medications for Miller, such as propranolol and Aldactone to treat his portal hypertension and prevent variceal bleeding, Protonix to protect his gastrointestinal tract, lactulose to prevent hepatic encephalopathy, and Percocet for pain relief. (Wexford Med. Rs. at DPSCS000885–86). During Miller's four-week stay at the infirmary, neither Dr. Ayalew nor the assigned nurse—Wondaye Deressa, RNP—referred Miller for a follow-up with Dr. Abdi.

Miller remained in the infirmary until he was discharged to the general population of JCI on October 1, 2015. (Id. at DPSCS001006–07). Defendant Priscilla Momoh, PA visited Miller on October 5, 2015. (Id. at DPSCS001011–13). Miller complained of chest pain, so PA Momoh performed a physical examination and renewed Miller's prescriptions for oxycodone and gabapentin. (Id.). PA Momoh then referred him to the chronic care clinic for further pain management. (Id.).

On October 7, 2015, Defendant Zowie Barnes, M.D. renewed Miller's medications and enrolled Miller in the chronic care clinic for his liver disease. (Id. at DPSCS001021). She saw Miller one week later, on October 14, 2015, for a chronic care visit. (Id. at DPSCS001034). Dr. Barnes noted that Miller had end-stage liver disease resulting from hepatitis B and hepatitis C. (Id.). She created a care plan centered on "medication management," "counseling," and "continued monitoring." (Pl's. Ex. D, Zowie Barnes, M.D., Dep. Tr. ["Barnes Dep."] at 73:15–19, ECF No. 127-4). This plan did not include an outpatient follow-up with a gastroenterologist or any input from an outside specialist. (Id. at 73:11–74:8). And although Miller did not have an active hepatitis C infection at this point, Dr. Barnes's plan focused on Miller's "HCV and Pain Management." (See Wexford Med. Rs. at DPSCS001034).

On October 25, 2015, Miller faked being unresponsive to obtain more pain medication. (Id. at DPSCS001058). Miller demanded he receive his medications early and insulted the medical staff. (Id.). The Court need not recount each instance of Miller attempting to manipulating medical staff; it is sufficient to note that Miller, at times, faked injuries while in Defendants' care.

14

On November 11, 2015, Miller had a blood test. (Defs.' Ex. 14, Garcia Laboratory Results ["Garcia Lab'y Results"] at GARCIA000011–16, ECF No. 115-16). The tests revealed that Miller did not have detectable viral loads of hepatitis C RNA or hepatitis B DNA. (Id. at GARCIA000015). The results also showed Miller's platelet count was only 25, which constituted a "panic value." (Id.). Over the next two weeks, Dr. Barnes educated Miller about his low platelet count and thrombocytopenia. (Wexford Med. Rs. at DPSCS001070, DPSCS001079).

Miller suffered from severe mental health issues during this time. On November 28, 2015, for example, Miller expressed suicidal ideations to Nurse Deressa. (Id. at DPSCS001087). She contacted the psychiatry department to assess Miller. (Id.). Recognizing Miller's history of liver cirrhosis, Nurse Deressa ordered lab tests. (Id.). This event was the last time Nurse Deressa encountered Miller.

Miller's failing liver raised a variety of unpredictable health consequences. For instance, Miller had a telemedicine exam with Defendant Bernard Alenda, NP, and Defendant Gedion Atnafu, M.D., to address an issue of testicular swelling on December 3, 2015. Dr. Atnafu diagnosed the issue as a hydrocele and explained that the swelling may have resulted from ascites, a byproduct of Miller's liver disease. (Id. at DPSCS001098–99). On instruction from Dr. Barnes, Miller was sent to Bon Secours Hospital for an ultrasound. (Id. at DPSCS001109–11). After reviewing the results, Dr. Atnafu recommended that Miller receive a sitz bath and scrotal support.

### b. Spring 2016

From December 2015 through February 2016, Miller experienced a short-lived respite with no apparent issues related to his liver disease. But on March 13, 2016, Miller vomited blood yet again. (Id. at DPSCS001155). Wexford's Regional Medical Director, Defendant Kasahun Temesgen, M.D., directed the responding nurse to start Miller on an IV of saline. (Id.; see also Defs.' Ex. 39, Kasahun Temesgen, M.D., Dep. Tr. ["Dr. Temesgen Dep."] at 9:2–6, ECF No. 115-41). Dr. Atnafu instructed the responding nurse to send Miller to an emergency room only if she personally observed him vomiting blood. (Id.). When Miller did just that, the nurse called 911. (Id.).

Miller arrived at Bon Secours Hospital in the early hours of March 14, 2016. (Bon Secours Hosp. Rs. at BSH000188). Dr. Atnafu was Miller's admitting and attending physician during his hospital stay. (Id.).[8] Gastroenterologist Dr. Abdi, who had treated Miller in 2014 and 2015, performed an EGD that morning. (Id. at BSH000201–03). Miller's esophageal varices had deteriorated to "Grade 3" status, according to Dr. Abdi. While his varices had red wale signs, there was no active bleeding. (Id. at BSH000202). Dr. Abdi performed a banding ligation of those varices. (Id.). Dr. Abdi recommended that Miller receive another banding ligation procedure in two weeks. (Id.). And if Miller had

---

[8] Dr. Atnafu was an independent contractor for Wexford at the time relevant to this dispute. (Defs.' Ex. 34, Gedion Atnafu, M.D., Dep. Tr. ["Dr. Atnafu Dep."] at 10:12–16, 11:15–16, ECF No. 115-36). In addition to his role at Weford, Dr. Atnafu practiced at Bon Secours Hospital, where he consulted on infectious disease issues and served as a hospitalist in the prison unit. (Id. at 11:14–19).

another bleeding episode, Dr. Abdi suggested that his providers "consider TIPS." (Id.). Finally, Dr. Abdi recommended "hepatology outpatient evaluation for Harvoni." (Id. at BSH000203).

Miller was discharged from Bon Secours on March 15, 2016. (Id. at BSH000227). As Miller's attending physician at Bon Secours, Dr. Atnafu completed a discharge summary of Miller's treatment. (Id. at BSH000225–29). Dr. Atnafu's summary noted Miller's hepatitis B infection, as well as Miller's history with hepatitis C. (Id. at BSH000225, BSH000227). He also stated that Miller was a "possible candidate for [hepatitis C] treatment and will consider that as an outpatient." (Id. at BSH000227). Finally, both Dr. Atnafu's discharge paperwork and Nurse Alenda's notes included a follow-up appointment with Dr. Abdi in one week. (Id. at BSH000229; see also Wexford Med. Rs. at DPSCS001156).[9]

No follow-up occurred. On April 9, 2016, nearly a month after Miller's discharge from Bon Secours, Miller vomited blood again. (Wexford Med. Rs. at DPSCS001156). Nurse Alenda was informed of the situation and arranged for Miller to stay in isolation at the prison infirmary for 24-hour observation. (Id.). Miller declined to see Nurse Alenda. (Id.).

---

[9] It is unclear who was ultimately responsible for scheduling this follow-up appointment. Nurse Alenda's note states that "medical records will have to send a copy of the dictated discharge report to the onsite medical director for follow up consults to be generated." (Wexford Med. Rs. at DPSCS001156). But other evidence in the record suggests that Nurse Alenda may have been responsible for setting up the appointment. (See Pl.'s Ex. J, Ayoku Oketunji, M.D., Dep. Tr. ["Dr. Oketunji Dep."] at 30:4–12, ECF No. 127-10).

Two days later, on April 11, 2016, Miller vomited blood again. (Id. at DPSCS001166). Miller explained to PA Momoh that he had black stool, fatigue, and a loss of appetite. (Id.). PA Momoh promptly sent Miller to the emergency room at Baltimore Washington Medical Center. (Id. at DPSCS001169; see also Defs.' Ex. 16, BWMC Records ["BWMC Rs."] at BWMCSUB000949, ECF No. 115-18). Miller's platelet count on arrival was only 24, so he received a transfusion in the emergency room. (Id.).

On April 13, 2016, Miller underwent an EGD from gastroenterologist Eric Blum, M.D. (Id. at BWMCSUB000966–67). Dr. Blum observed and banded 4 new columns of esophageal varices. (Id. at BWMCSUB000966). Miller showed signs of scarring, suggesting his new varices developed after his prior ligation procedure in March 2016. (Id. at BWMCSUB000966–67). Miller was cleared for discharge on April 15, 2016. Miller's discharge summary, prepared by Haimanot Zeamanuel Haile, M.D., notes that Miller "needs to follow up with gastroenterology as out patient." (Pl.'s Ex. V, January to May 2016 Medical Records ["Jan. to May 2016 Med. Rs."] at BWMCSUB000955–96, ECF No. 127-22). Nurse Alenda debriefed with Miller upon his return to the prison. (Wexford Med. Rs. at DPSCS001169). Nurse Alenda's summary of Miller's hospital visit omitted any reference to his required follow-up with a gastroenterologist. (Id.).

On April 19, 2016, four days after he returned to the prison, Miller asked PA Momoh to schedule his follow-up at Baltimore Washington Medical Center. (Wexford Med. Rs. at DPSCS001180). PA Momoh referred Miller to his "hospital return documentation," which

did not provide specific instructions for a follow-up. (Id. at DPSCS003691–97).[10] PA Momoh instead recommended that Miller visit the prison's chronic care clinic. (Id. at DPSCS001180). But later that same afternoon, Miller saw blood in his saliva and stool. (Id. at DPSCS001182). Nurse Alenda ordered stat labs, which revealed Miller had a very low platelet count of 16. (Id.). Miller was also running a fever of 102.8ºF and 103.2ºF. (Id.). Dr. Atnafu directed Nurse Alenda to send Miller to Bon Secours Hospital the following morning. (Id.).

Miller was admitted to Bon Secours on April 20, 2016. (Bon Secours Hosp. Rs. at BSH000392). That afternoon, the familiar Dr. Abdi saw Miller for a gastroenterology consultation. (Id. at BSH000389). Although Miller had a fever of 102.8ºF, he refused all tests and wanted to leave the hospital if he was not given pain medications and food. (Id.). Dr. Abdi noted Miller's malingering behavior. (Id. at BSH000392). As for the cause of his fever, Dr. Abdi suspected Miller contracted spontaneous bacterial peritonitis. (Id.)[11]

---

[10] Evidence in the record suggests that, as a matter of policy, inmates were prohibited from learning the precise details of future hospitalization or proposed treatment:

> For security reasons, inmates must NOT be informed of date, time or location of proposed treatment or possible hospitalization. Authorization and payment is provided ONLY for requested procedures or treatments of life-threatening conditions. Prior review/discussion with Medical Director is required for additional treatment, procedures and hospitalizations.

(See Jan. to May 2016 Med. Rs. at NRDCOR000454).

[11] Spontaneous bacterial peritonitis is an infection in the lower abdomen that can lead to sepsis or septic shock. (Defs.' Ex. 19, Melaku Ayalew, M.D., Dep. Tr. ["Dr. Ayalew Dep."] at 79:19–81:4, ECF No. 115-21). It is a condition that can quickly progress and lead to death. (Id. at 81:2–4). Generally, this infection is treated with IV antibiotics. (Id. at 80:2–7).

Furthermore, Dr. Abdi performed an ultrasound of Miller's liver and recommended that Miller "follow up with hepatology for evaluation of Harvoni therapy." (Id.). When Dr. Gebremariam assessed Miller later that day, Miller again demanded pain medication. (Id. at BSH000402). Dr. Gebremariam refused, so Miller repeated his desire to leave the hospital against medical advice. (Id.). Dr. Gebremariam discharged Miller with instructions to take IV ceftriaxone for ten days. (Id.).

Nurse Alenda saw Miller when he returned to the prison from Bon Secours on April 21, 2016. (Wexford Med. Rs. at DPSCS001185). In summarizing Miller's hospital course, Nurse Alenda noted that Miller should "follow up with onsite chronic care ASAP." (Id.).

Six days later, on April 27, 2016, Miller saw Defendant Bolaji Onabajo, M.D. for a chronic care visit. (Id. at DPSCS001189). After speaking with Dr. Atnafu, Dr. Onabajo admitted Miller to the prison infirmary, restarted him on ceftriaxone, and ordered laboratory tests. (Id. at DPSCS001196–98, DPSCS001200).

On May 5, 2016, Dr. Ayalew noted that Miller appeared drowsy and sleepy. (Id. at DPSCS001243). Dr. Ayalew became concerned that Miller was feeling the effects of hepatic encephalopathy, so Dr. Ayalew ordered Miller 30cc of lactulose per day to minimize the absorption of ammonia through his intestine. (Id. at DPSCS001243–45, DPSCS001249–52). Because of this dietary shift, Dr. Ayalew withheld Miller's narcotic medications to prevent constipation. (Id. at DPSCS001244). Miller acted erratically once he learned that his narcotics were being withheld. Prison nursing staff observed Miller pulling wires from electrical sockets. (Id. at DPSCS001246). At one point, Miller

threatened to harm one of his roommates. (Id. at DPSCS001247). Dr. Temesgen soon released his medications and Miller ended his outbursts. (Id.).

A week later, on May 11, 2016, Dr. Ayalew requested an "ID evaluation" for hepatitis B and hepatitis C. (Jan. to May 2016 Med. Rs. at NRDCOR000454).[12] Two days later, on May 13, 2016, Dr. Ayalew submitted an infectious disease consultation request for Miller to see Daniel Wolde-Rufael, M.D. (Id. at NRDCOR000468). By that time, Miller's AST levels had increased to 107. (Id. at WEX.RRPD000540). But Miller never ultimately had his consultation with Dr. Wolde-Rufael. (See Pl.'s Ex. B, Kasahun Temesgen, M.D., Dep. Tr. ["Dr. Temesgen Dep."] at 85–94, ECF No. 127-2).

### c.  Summer 2016

Miller vomited blood again on June 2, 2016. (Wexford Med. Rs. at DPSCS001295). The next day, prison staff sent Miller to an emergency room after finding him unresponsive. (Id. at DPSCS001296). Miller was admitted to Baltimore Washington Medical Center, where he received a platelet transfusion and a referral to see a gastroenterology specialist. (BWMC Rs. at BWMCSUB000708). Miller informed gastroenterologist Edward Wolf, M.D., that nurses saw him sleeping with a "pool of blood on his pillowcase." (Id. at BWMCSUB000759). Dr. Wolf did not believe that was variceal bleeding, however, "because of [Miller's] apparent stability both hemodynamically and in terms of his hematocrit." (Id. at BWMCSUB000760). Despite his speculation that nasal bleeding may have caused the issue, Dr. Wolf performed an EGD the next day. (Id.).

---

[12] "ID" refers to "infectious disease," or "infectious disease specialist."

21

During the EGD, Dr. Wolf observed signs of portal hypertensive gastropathy and two columns of esophageal varices. (Id. at BWMCSUB000762). Because there was "no other potential site of bleeding," Dr. Wolf banded the varices. (Id.). Miller was discharged from the hospital on June 6, 2016. (Id. at BWMCSUB000751). His discharge summary noted that he needed to schedule a follow-up appointment with a gastroenterologist "as soon as possible for a visit in 1 month." (Id.; see also Wexford Med. Rs. at DPSCS003702–03). Upon his return to the prison, Nurse Alenda noted Miller's need to have a follow-up with a gastroenterologist in one month. (Wexford Med. Rs. at DPSCS001298). Nurse Alenda explained that "medical record [sic] will need to forward a copy of the dictated discharge report to the onsite Medical Director so that follow up consults can be generated." (Id.). No such follow-up occurred.

Two weeks later, on June 21, 2016, Miller complained of edema to Defendant Titilayo Otunuga, NP. (Id. at DPSCS001305).[13] Nurse Otunuga recommended that Miller complete a course of antibiotics. (Id.). Miller also had labs drawn that day, which revealed he had a low platelet count of 26. (Id. at DPSCS001309). On June 27, 2016, Miller complained of a two-day long headache to Nurse Alenda. (Id. at DPSCS001311). After discussing Miller's case with Dr. Atnafu, Nurse Alenda kept Miller under observation. (Id.). The next morning, on June 28, 2016, a correctional officer saw Miller vomiting blood. (Id. at DPSCS001314). Miller met with Nurse Otunuga, who spoke to Dr. Atnafu about

---

[13] Edema is the swelling of legs from a buildup of extra fluid. See generally Harvard Medical School, Edema (Feb. 28, 2022), https://www.health.harvard.edu/a_to_z/edema-a-to-z.

Miller's condition. (Id. at DPSCS001316). Dr. Atnafu recommended taking stat labs and admitting Miller to the infirmary. (Id.). Nurse Otunuga also contacted Wexford's Regional Medical Director, Defendant Isaias Temesgen, M.D., who approved admitting Miller to isolation if there was no bed available in the infirmary. (Id.).

Later that evening, Miller asked to go to the emergency room because he was spitting out blood. (Id. at DPSCS001320). His request was denied because, when asked to spit in a cup, no blood was visible. (Id.). Nurse Otunuga and Nurse Alenda ordered Miller into isolation for observation. (Id.). Miller did not want to go to an isolation cell, and he threatened to harm himself and destroy property as he was sent to his segregated unit. (Id.).

The next day, June 29, 2016, Miller asked to see a doctor. He told prison staff that if he did not see a doctor, he would "make the night very difficult for everybody." (Id. at DPSCS001321). Suddenly, "he was found on the floor spitting out blood from his mouth." (Id.). Despite the nurses recognizing an "[a]lteration in [Miller's] health status," they decided to "continue [the] plan of care" and continued observing Miller. (Id.). But the next morning, after he was admitted to the prison infirmary, Miller told Dr. Ayalew that he was "looking to go to [an] outside hospital," and said he was no longer vomiting blood. (Id. at DPSCS001325).

On July 20, 2016, Miller had a chronic care visit with Dr. Onabajo. (Id. at DPSCS001383–86). Miller asked Dr. Onabajo to treat him for hepatitis C. (Id.). Dr. Onabajo noted Miller's test results from November 2015 showed that he already cleared the hepatitis C virus. (Id.). Still, Dr. Onabajo said he would consult "ID about resolving it with the patient." (Id.). Miller also complained of chronic shoulder and knee pain during

23

his visit. (Id.). Dr. Onabajo submitted a request for Miller to see an orthopedic surgeon for further evaluation. (Id.). But when Dr. Onabajo raised that request during a collegial review session with Wexford's Utilization Management Medical Director, Defendant Kenneth Lee, M.D, the request was denied in favor of "continu[ing] conservative management on site." (Id. at DPSCS003477).

On August 4, 2016, Miller was again spitting up blood and passing dark stool. (Id. at DPSCS001391). Miller was sent to Baltimore Washington Medical Center, where the emergency physician noted that Miller was hemodynamically stable. (BMWC Records at BWMCSUB000488). Miller met with Dr. Blum, a gastroenterologist who had treated Miller in April of that year. (Id. at BWMCSUB000527). Dr. Blum performed an EGD on August 5, 2016. (Id. at BWMCSUB000531–32). He observed three columns of esophageal varices, which he banded. (Id.). And while "there was no clear and obvious stigmata of bleeding," Dr. Blum noted that Miller had moderate portal gastropathy. (Id.). Miller's discharge summary recommended an appointment with his medical provider in one week. (Id. at BWMCSUB000516). Separately, the discharge summary provided "[p]ertinent information for [a] community provider." (Id.). This same day, an unauthored note in Wexford's record system suggested Miller would, at some point, consult a GI. (Pl.'s Ex. Y, August 2016 Medical Records ["August 2016 Med. Rs."] at WEX.RRPD.000850, ECF No. 127-25). That note also stated: "Big concern for medical parole due to pancytopenia, and MDS." (Id.). Miller returned to JCI on August 8, 2016. (Wexford Med. Rs. At DPSCS001398).

### d. Fall 2016

On October 19, 2016, Miller discussed the progression of his liver disease during a chronic care visit with Dr. Onabajo. (Id. at DPSCS001413–15). Dr. Onabajo once again requested that Miller have a consultation with the infection disease specialist, Dr. Wolde-Rufael. (Pl.'s Ex. Z, October 2016 Medical Records ["October 2016 Med. Rs."] at NRDCOR000607, ECF No. 127-26). Dr. Onabajo also requested that Miller meet with a hematology specialist, which was referred to Dr. Lee under Wexford's collegial review policy. (Id. at WEX.RRPD.000385). Neither referral was approved. (See id. at WEX.RRPD.000848).

On November 2, 2016, Miller complained of chest pain, abdominal pain, and passing black stool. (Wexford Med. Rs. At DPSCS001426). Defendant Jennifer Pope, NP, verified that Miller was not bleeding, filled Miller's medications, and ordered various tests. (Id. at DPSCS001426–29).

Six days later, on November 8, 2016, Miller visited Nurse Pope with a complaint that he injured his hand. While evaluating Miller, Nurse Pope realized that Miller had a 102.5º fever and an abnormally high heartrate and blood pressure. (Id. at DPSCS001446). She sent Miller to the prison dispensary for further treatment. (Id. at DPSCS001446–48). In the dispensary, Miller became unresponsive, and Dr. Atnafu sent him to the hospital via 911. (Id. at DPSCS001452).

Miller arrived at the Baltimore Washington Medical Center later that afternoon. (BWMC Rs. at BWMCSUB000434). In describing his ailments to the emergency room physician, Miller included several details that he had not reported to Nurse Pope. For

example, Miller said he vomited "buckets of blood" earlier in the day but denied any such episode to Nurse Pope. (<u>Id.</u>). Miller was discharged back to the prison that same evening. (<u>Id.</u> at BWMCSUB000438).

Upon arrival, Robert Giangrandi, PA, transcribed the information that returned from the hospital. (Wexford Med. Rs. at DPSCS001454). His notes listed a "possible GI bleed" as a diagnosis. (<u>Id.</u>). Before discharging Miller to his housing unit, PA Giangrandi recorded that Miller needed a follow-up with prison medical staff to have his platelet count tested. (<u>Id.</u>).

Three days later, on November 12, 2016, Miller again vomited blood and complaining of nasal bleeding. (<u>Id.</u> at DPSCS001460). Dr. Atnafu sent Miller to the emergency room via 911. (<u>Id.</u> at DPSCS001461). Miller was admitted at the Baltimore Washington Medical Center. (BWMC Rs. at BWMCSUB001217). The emergency physician doubted that Miller was experiencing gastrointestinal bleeding because he had "no active vomiting or melanotic stools" along with "stable vitals and normal [hemoglobin]." (<u>Id.</u> at BWMCSUB001221). During his hospital stay, Miller was diagnosed with four paraspinal abscesses and MSSA bacteremia. (<u>Id.</u> at BWMCSUB001289). He remained in the hospital while being treated for these conditions. (<u>Id.</u> at BWMCSUB001246). On November 22, 2016, he was discharged to complete a 6-week course of IV vancomycin in a prison infirmary environment. (<u>Id.</u> at BWMCSUB001245–46). His discharge paperwork from gastroenterologist Ben Da, M.D., noted: "patient needs GI follow up through jail coordinator within 2-4 weeks to schedule repeat EGD for varices surveillance." (Pl.'s Ex. AA, November 2016 Records ["Nov. 2016 Rs."] at

26

UMMSNRD000152, ECF No. 127-27). A separate discharge summary from Daphne Gellerson, M.D., emphasized that Miller "will need a follow up EGD done by GI outpatient in one month." (Id. at UMMSNRD000136).

In the late evening of November 22, 2016, Miller showed signs of having a seizure with blood on his mouth and nose. (Wexford Med. Rs. at DPSCS001470). He was sent to the University of Maryland Medical Center via 911. (Id.). But when he arrived at the hospital, Miller denied having a seizure. (Defs.' Ex. 20 ["UMMC Records"] at UMMS000473, ECF No. 115-22). Miller's vitals appeared normal. (Id. at UMMS000477). He was discharged the same day he was admitted. (Id. at UMMS000482). In Miller's discharge summary, his treating physician observed that Miller stood "to have secondary gain for being in the hospital for IV narcotics." (Id.). Still, the discharge recommendations include a note that Miller "needs GI follow up through jail coordinator within 2–4 weeks to schedule repeat EGD for varices surveillance." (Id.).

When Miller learned of his discharge and transfer, he removed his PICC line and threatened to harm himself. (Id. at UMMS000488). As he was transported to the infirmary at Metropolitan Transition Center ("MTC") in Baltimore, Miller told correctional officers and medical staff that he was "both suicidal & homicidal." (Wexford Med. Rs. at DPSCS001474). On the morning of Thanksgiving, November 24, 2016, Miller was found eating floor tile and bleeding from the mouth. (Id. at DPSCS001477). Miller admitted his malingering behavior to a psychiatrist the following afternoon. (Id. at DPSCS001490). Miller removed his PICC line, again, on November 25, 2016. (Id. at DPSCS001500). Over the next several days, Miller threatened—and attempted—to harm himself and others. (Id.).

Miller was sent to the emergency room for bleeding once again on December 5, 2016. (Id. at DPSCS001565). Miller was evaluated at Baltimore Washington Medical Center and then transferred to Bon Secours Hospital; both facilities concluded Miller had no active gastrointestinal bleeding. (Bon Secours Hosp. Rs. at BSH000593–94; see also BWMC Rs. at BWMCSUB000397). Miller was discharged on December 6, 2016. (Wexford Med. Rs. at DPSCS001574). Upon his return, Dr. Ayalew noted that the hospital staff concluded Miller faked his injuries. (Id.). Over the next month, Miller threatened to remove his PICC line if he did not receive certain types of pain medications. (Id. at DPSCS001580–81, DPSCS001608).

On December 12, 2016, Matthew Carpenter, PA, noted that Miller was generally non-compliant with treatment given that he had removed his PICC line several times. (Id. at DPSCS001599). Dr. Atnafu told Carpenter to keep Miller on oral antibiotics before having a new PICC line placed. (Id.). That same day, Carpenter placed a consultation request for an infectious disease specialist to evaluate Miller's hepatitis B, hepatitis C, esophageal varices, and thrombocytopenia. (Id.).

Four days later, on December 14, 2016, Dr. Temesgen met with Miller to explain the importance of complying with his treatment plan. (Id. at DPSCS001622). Miller, at this point, was still waiting for a consultation with an infectious disease specialist. (Id. at DPSCS001626). Miller agreed to cooperate and accepted a new PICC line on December 17, 2016. (Id. at DPSCS001622–24). But on December 19, 2016, Miller threatened to pull his new PICC line out if he did not receive more pain medication. (Id. at DPSCS001639). Despite experiencing complications involving his spinal abscesses, Miller refused to speak

28

with physicians for about three days. (<u>Id.</u> at DPSCS001655, DPSCS001668–69, DPSCS001672–77). Miller eventually spoke with Dr. Temesgen on December 27, 2016. (<u>Id.</u> at DPSCS001679). Dr. Temesgen prescribed new medication to Miller and noted that Miller's referral to the infectious disease specialist remained pending. (<u>Id.</u>).

By January 11, 2017, Miller's paraspinal abscess was resolved and was discharged from the infirmary back to JCI. (<u>Id.</u> at DPSCS001751–52). Still, Miller's referral to an infectious disease specialist for a hepatitis evaluation had not been approved. (<u>Id.</u> at DPSCS001752).

The next two months were largely uneventful for Miller. He met with Nurse Otunuga three times in January and February 2017 to refill his medications. (<u>Id.</u> at DPSCS001767–68, DPSCS001778–79, DPSCS001786). Miller also met with Dr. Oketunji for a chronic care visit on February 1, 2017. (<u>Id.</u> at DPSCS001782). Miller explained he was set to be released in 50 days, so Dr. Oketunji filled his medications through April 1, 2017. (<u>Id.</u> at DPSCS001782–84).

### e.  Spring 2017

On March 7, 2017, just before his release date, Miller was found unresponsive and covered in blood on the floor of his cell. (<u>Id.</u> at DPSCS001787). Dr. Oketunji sent Miller to the emergency room. (<u>Id.</u>). An ambulance took Miller to Baltimore Washington Medical Center, where he explained that he vomited blood three times before passing out. (BWMC Rs. at BWMCSUB000111). Miller underwent an EGD later that evening. (<u>Id.</u> at BWMCSUB000153–54). The gastroenterologist observed four columns of esophageal varices, at least two of which had red wale signs and stigmata of recent bleeding. (<u>Id.</u>). The

gastroenterologist banded those varices. (Id.). Miller was discharged on March 10, 2017. (Id. at BWMCSUB000134–35). Because Miller would be released within the next week, his discharge summary recommended that he follow-up with both his primary care provider and Woodholme Gastroenterology. (Id.). PA Giangrandi met Miller upon his return to the prison and noted the hospital's follow-up recommendations. (Wexford Med. Rs. at DPSCS001794–96). Miller was then admitted to the infirmary. (Id.).

On March 13, 2017, Miller demanded to leave the infirmary and return to JCI against medical advice. (Id. at DPSCS001806). He was discharged to JCI that day. (Id.). Miller reported spitting up blood the next day, March 14, 2017. (Id. at DPSCS001811). Nurse Otunuga told Miller that he should notify medical staff if it happened again. (Id.).

On March 23, 2017, the day before he was set to be released on mandatory supervision, Miller pretended to be unresponsive. (Id. at DPSCS001817). Later that evening, a correctional officer reported to Nurse Alenda that Miller was vomiting blood. (Id. at DPSCS001818). Dr. Atnafu sent Miller to Baltimore Washington Medical Center via 911. (Id.). The emergency care physician did not believe Miller had a significant gastrointestinal bleed because his hemoglobin levels had not changed since the last time he was in the hospital. (BWMC Rs. at BWMCSUB000036).

### 4. Miller's Release from Custody

On March 24, 2017, Miller's prison-term ended while he was still in the hospital. (Id.). Before Miller could receive an EGD, he left the hospital against medical advice. (Id. at BWMCSUB000048). Miller checked into the emergency department of Saint Agnes Hospital in Baltimore on April 2, 2017, only nine days after his release from prison. (Defs.'

Ex. 21, Saint Agnes Hospital Records ["Saint Agnes Hosp. Rs."] at SAH000023, ECF No. 115-23). Miller complained of a fever, chills, nausea, and vomiting blood. (Id.). He admitted taking heroin the day before. (Id. at SAH000095). During his hospital stay, Miller met with gastroenterologist Christopher Kim, M.D. (Id. at SAH000086). Dr. Kim noted that Miller was positive for hepatitis B surface antigen and that his "current liver numbers and markers [were] consistent with chronic rather than acute disease." (Id.). Dr. Kim could not perform an EGD immediately, however, because Miller was not medically competent to consent. (Id.). Once Miller's cognition improved, Dr. Kim performed an endoscopy, revealing small varices and portal hypertension. (Id. at SAH000090–91). Dr. Kim recommended a "follow-up of esophageal varices" and provided the name of a community gastroenterologist. (Pl.'s Ex. A, Post-March 2017 Medical Records ["Post-March 2017 Med. Rs."] at SAHSUB000111–12, ECF No. 127-31). Separately, a quantitative test established that Miller was positive for hepatis B viral DNA with a viral load of 13,000 IU/ml. (Wexford Med. Rs. at SAH000152). Miller was discharged on April 5, 2017. (Id. at SAH000018).

Miller then moved to upstate New York to live with his sister, Plaintiff Angela Charette. (Defs.' Ex. 22, Angela Charette Dep. Tr. ["Charette Dep."] at 51:15–18, ECF No. 115-24). He visited several hospitals between April and June 2017. (See, e.g., Defs.' Ex. 23, Alice Hyde Medical Center Records ["Alice Hyde Med. Ctr. Rs."], ECF No. 115-25; Defs.' Ex. 24, Champlain Valley Medical Records ["Champlain Valley Med. Rs."], ECF No. 115-26). In June 2017, Miller was prescribed entecavir to treat his hepatitis B. (See Post-March 2017 Med. Rs. at 5, 8).

31

### 5.   Miller's Return to Custody

Miller's move to New York evidently violated the conditions of his supervised release. (See Charette Dep. at 36:22–38:17). So, in June 2017, he surrendered himself to the custody of New York state troopers. (Id. at 38:13–17). While Miller was being transported back to Maryland, he acted as if he had a seizure. (Bon Secours Med. Rs. at BSH000717). He was ultimately admitted to Bon Secours on July 7, 2017. (Id.). Miller was stable and did not display signs of distress. (Id. at BSH000724). Dr. Atnafu, in his role as the admitting physician at Bon Secours, drafted Miller's discharge summary, including the following note:

> PATIENT NEEDS URGENT CASE CONFERENCE AS HE WILL ALLEDGED [sic] SEIZURE OF BLEEDING AND WILL END UP IN er SOON AND FREQUENTLY. NEEDS MULTIDISCIPLINARY APPROACH TO HIS CARE INCLUDING GI, NEUROLOGIST, PSYCHIATRIST AND HEMATOLOGIST. OTHER TREATMENT AND FOLLOW UP AS BELLOW [sic][.]

(Id. at BSH000727). Dr. Atnafu later emphasized that Miller needed an outpatient gastrointestinal follow-up evaluation "ASAP." (Id. at BSH000730). Miller was discharged from Bon Secours on July 9, 2017. (Id.).

Miller remained in prison from that day until his final release on mandatory supervision on June 22, 2018. (Inmate Traffic Hist. at 1). Miller never encountered the individual defendants during his final period of incarceration. During this time, Wexford kept Miller on entecavir to treat his hepatitis B. (Defs.' Ex. 46, DPSCS Medical Records July 2017–June 2018 ["DPSCS Med. Rs. July 2017–June 2018"] at DPSCS001829–31, ECF No. 115-48). Miller spent the rest of his sentence in and out of hospitals, while

reverting to malingering and threatening behavior. (See, e.g., Wexford Med. Rs. at DPSCS001835–41, DPSCS001935–37, DPSCS002022–23, DPSCS002419).

After his release in June 2019, Miller spent the rest of his life in and out of hospitals for complications related to his liver disease and hepatitis B. He died on August 14, 2019. (Defs.' Ex. 45 ["Death Certificate"], ECF No. 115-47).

## B. **Procedural History**

Miller filed a Complaint in this Court on January 3, 2019. (Compl., ECF No. 1). After Miller's death in August 2019, Angela Charette—Miller's sister and the personal representative of his estate—was substituted as the plaintiff. (Order Granting Mot. to Substitute Party, ECF No. 41). Charette filed a Second Amended Complaint, which Defendants sought to dismiss under Fed. R. Civ. P. 12(b)(6). (Mot. to Am. Compl., ECF No. 47; Mot. Dismiss Second Am. Compl., ECF No. 57).[14] Although the Court dismissed some of Charette's claims, several claims survived into discovery. (Mem., ECF No. 72; Order, ECF 73).[15] After discovery, Charette moved to file a Third Amended Complaint.

---

[14] Before his death, Miller moved to file a First Amended Complaint. (Mot. to Am. Compl., ECF No. 33). The Court granted the motion to amend the same day Charette was substituted as the plaintiff. (Order, ECF No. 37).

[15] In short, the Court dismissed Charette's claims for violations of the Maryland Declaration of Rights and her claim of intentional infliction of emotional distress. The Court also dismissed all medical malpractice claims against Dr. Keshaun Temesgen, Dr. Melaku Ayalew, and Dr. Kenneth Lee, and dismissed the HBV-related medical malpractice claims against the other defendants. Additionally, the Court dismissed the Eighth Amendment claim against Wexford and any Eighth Amendment claims premised on supervisory or coconspirator liability against the remaining defendants. Finally, the Court dismissed the Fourteenth Amendment claim against Wexford. (Mem. at 26, ECF No. 72). Because the Court granted Charette's motion for reconsideration based on a change of

(Mot. to File Third Am. Compl., ECF No. 85). She also noted a change in intervening Fourth Circuit law required the Court to reconsider its prior ruling dismissing various state-law claims. (Mot. Recons., ECF No. 101). The Court granted in part and denied in part Charette's motion for leave to file a Third Amended Complaint; at the same time, the Court granted Charette's motion for reconsideration. (Mem., ECF No. 111; Order, ECF No. 112).

In sum, Charette has two remaining causes of action subject to Defendants' Motion for Summary Judgment: (1) medical malpractice claims against all Defendants (Count I); (2) Eighth Amendment direct liability claims, brought under 42 U.S.C. § 1983, against all Defendants except Wexford (Count II).

Charette opposed Defendants' Motion for Summary Judgment and filed her own Cross-Motion for Partial Summary Judgment on March 6, 2023. (Pl.'s Opp'n Summ. J. & Cross-Mot. Supp. Summ. J. ["Pl.'s Opp'n"], ECF No. 123).[16]

Defendants opposed Charette's Cross-Motion for Partial Summary Judgment and replied in support of their Motion for Summary Judgment on April 5, 2023. (Defs.' Opp'n Summ. J. & Reply Supp. Summ. J. ["Defs.' Reply"], ECF No. 134).

---

intervening law, as discussed below, Charette's medical malpractice claims were reinstated.

[16] On March 8, 2023, the Court granted Charette's request to file an updated version of her Opposition and Cross-Motion for Summary Judgment. (Pl. Mot. for Leave, ECF No. 125; Order Granting Mot. for Leave, ECF No. 128). The Clerk's Office docketed Charette's updated Opposition and Cross-Motion for Summary Judgment as a separate ECF entry that same day. (ECF No. 129).

34

Finally, Charette replied in support of her Cross-Motion for Partial Summary Judgment on April 19, 2023. (Errata Notice, ECF No. 136; Pl.'s Reply Supp. Summ. J. ["Pl.'s Reply"], ECF No. 136-1).

## II. DISCUSSION

### A.  Standard of Review

In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the nonmovant, drawing all justifiable inferences in that party's favor. Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (quoting Scott v. Harris, 550 U.S. 372, 380 (2007)); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–59 (1970)). Summary judgment is proper when the movant demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a), (c)(1)(A). Significantly, a party must be able to present the materials it cites in "a form that would be admissible in evidence," Fed.R.Civ.P. 56(c)(2), and supporting affidavits and declarations "must be made on personal knowledge" and "set out facts that would be admissible in evidence," Fed.R.Civ.P. 56(c)(4).

Once a motion for summary judgment is properly made and supported, the burden shifts to the nonmovant to identify evidence showing there is genuine dispute of material fact. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986). The nonmovant cannot create a genuine dispute of material fact "through mere speculation

35

or the building of one inference upon another." Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) (citation omitted).

A "material fact" is one that might affect the outcome of a party's case. Anderson, 477 U.S. at 248; see also JKC Holding Co. v. Wash. Sports Ventures, Inc., 264 F.3d 459, 465 (4th Cir. 2001) (citing Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001)). Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. A "genuine" dispute concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. Id. If the nonmovant has failed to make a sufficient showing on an essential element of her case where she has the burden of proof, "there can be 'no genuine [dispute] as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986) (quoting Anderson, 477 U.S. at 247).

Where the parties have filed cross-motions for summary judgment, the Court must consider each motion "separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003) (quoting Philip Morris Inc. v. Harshbarger, 122 F.3d 58, 62 n.4 (1st Cir. 1997)).

36

**B. <u>Analysis</u>**

This dispute asks whether the medical care Miller received in prison was so inadequate that it constituted medical malpractice under Maryland law or cruel and unusual punishment under the U.S. Constitution. Charette's theory of liability is summarized as follows. Miller was repeatedly hospitalized for life-threatening esophageal bleeds. When returning to Defendants' care, Miller's hospital discharge paperwork in nearly every instance recommended that he have outpatient follow-ups with gastroenterologist. (<u>See</u> Pl.'s Ex. A ["Compiled Discharge Paperwork"], ECF No. 127-1). A gastroenterologist, according to Charette's experts, would have performed outpatient EGDs to look for and band new esophageal varices, reducing the risk of variceal bleeding and hospitalization. (Pl.'s Opp'n at 27–29, 30–31). Because Defendants never referred Miller to any such specialist, he only received the care he truly needed when he was hospitalized. (<u>Id.</u> at 29–30). Separately, Charette contends Defendants should have treated Miller's chronic hepatitis B infection with antiviral medication. (<u>Id.</u> at 33).

If a Defendant's conduct fell below the standard of care owed to him, that Defendant may be liable for medical malpractice (Count I). But if a Defendant failed to refer Miller based on a deliberate indifference to his end-stage liver disease, they may be liable for violating the Eighth Amendment to the U.S. Constitution (Count II). The Court will address each of Charette's claims in turn.

**1.   Statute of Limitations**

Before reaching the merits, the Court first addresses the threshold issue of whether Charette's claims are barred by the relevant statutes of limitations. Charette's claims are

subject to two statutes of limitations, both of which provide a three-year limitations period. The statute of limitations for her medical malpractice claim (Count I) is Md. Code Ann., Cts. & Jud. Proc. § 5-109(a), which requires a plaintiff to file an action within five years of the date of injury or within three years of discovering the injury. Under the three-year "discovery rule," a plaintiff's claim "accrues when the plaintiff knows or reasonably should have known of the wrong." Brown v. Neuberger, Quinn, Gielen, Rubin & Gibber, P.A., 731 F.Supp.2d 443, 449 (D.Md. 2010), aff'd, 495 F.App'x 350 (4th Cir. 2012) (citing Lumsden v. Design Tech Builders, Inc., 749 A.2d 796, 801 (Md. 2000)).

As for Charette's Eighth Amendment claim under Section 1983 (Count II), the Court applies "the statute of limitations for personal injuries of the state in which the alleged violations occurred." See DePaola v. Clarke, 884 F.3d 481, 486 (4th Cir. 2018). A plaintiff in Maryland must bring a personal injury action within three years of the date the cause of action accrues. Owens v. Balt. City State's Att'ys Off., 767 F.3d 379, 388 (4th Cir. 2014) (citing Md. Code Ann., Cts. & Jud. Proc. § 5-101). And a claim under Section 1983 "accrues when a plaintiff becomes aware or has reason to know of the harm inflicted." DePaola, 884 F.3d at 486). Put differently, "the clock begins to run" when "the plaintiff has actual knowledge of his claim or when he has constructive knowledge of his claim— e.g., by the knowledge of the fact of injury and who caused it—to make reasonable inquiry and that inquiry would reveal the existence of a colorable claim." Thorn v. Jefferson-Pilot Life Ins. Co., 445 F.3d 311, 320 (4th Cir. 2006) (quoting Nasim v. Warden, Md. House of

Corr., 64 F.3d 951, 955 (4th Cir. 1995) (en banc)) (internal brackets and quotation marks omitted).[17] So, a three-year limitations period applies to both of Charette's claims.

Defendants argue Charette's claims based on Miller's lack of hepatitis B treatment are time-barred against seven Defendants: Nurse Alenda, Dr. Atnafu, Dr. Barnes, Nurse Deressa, PA Momoh, Dr. Onabajo, and Nurse Pope. (Defs.' Mot. 84–86). These seven Defendants were not involved with Miller's care after November 9, 2016, at the latest. Yet neither Miller nor Charette's pleadings mentioned hepatitis B until November 12, 2019, when Charette moved for leave to file a Second Amended Complaint. And because Miller both knew he had hepatitis B and that he was not receiving antiviral treatments, Defendants contend Miller's claims began accruing the day each Defendant treated Miller for the final time. (Id. at 89). So, counting backwards three years from the day Charette moved to file her Second Amended Complaint, Defendants suggest the only timely hepatitis B-related claims are those that accrued after November 12, 2016. (Id.). With none of the seven Defendants treating Miller after November 9, 2016, those Defendants assert summary judgment is appropriate as to the hepatitis B-related claims against them. (Id.).

The Court agrees with Defendants. Although Miller knew he had hepatitis B as early as 2007 (Wexford Med. Rs. at DPSCS000038), the mere fact that Miller contracted

---

[17] Even where state law "supplies the length of the limitations period, federal law determines when the clock begins to run against that period, or, phrased technically, when the cause of action 'accrues.'" Thorn, 445 F.3d at 320 (citing Nasim, 64 F.3d at 955). That said, "Maryland law is largely consistent with federal law," so both federal and Maryland cases are relevant to accrual issues. Roberts v. Wexford Health Sources, Inc., No. ELH-20-340, 2022 WL 2971949, at *11 (D.Md. July 26, 2022).

hepatitis B is not at issue. Charette identifies the relevant injury as the deterioration of Miller's liver, accelerated by his lack of antiviral treatments for hepatitis B. Miller, of course, knew his liver was in critical condition while he was incarcerated; he was hospitalized for that very issue many times. Miller could have made a reasonable inquiry into whether Defendants were appropriately treating his liver disease considering his history of hepatitis B. See Thorn, 445 F.3d at 320; Brown, 731 F.Supp.2d at 449. Charette asserts that such an inquiry would have been futile because Defendants mistakenly believed Miller had hepatitis C, not hepatitis B. But that argument ignores the dozens of medical professionals Miller saw outside of prison, any one of which could have counseled Miller about the interaction between his prior hepatitis B infection and end stage liver disease.

Charette's point that Miller may have thought he had an acute, rather than chronic, hepatitis B infection is well taken. If true, then perhaps Miller did not know enough facts to make a "reasonable inquiry" that would have "reveal[ed] the existence of a colorable claim." See Thorn, 445 F.3d at 320. But Charette's argument suffers from a procedural problem. Although the running of the limitations period is an affirmative defense that Defendants would have the burden of proving at trial, a party invoking the discovery rule "bears the burden of proving the discovery rule applies." Quillin v. C.B. Fleet Holding Co., 328 F.App'x 195, 201 (4th Cir. 2009). Here, Charette provides no evidence supporting her assertion that Miller, despite testing positive for the virus multiple times, believed he had an acute hepatis B infection, rather than a chronic one. Miller cannot testify as to his state of mind and no medical records support Charette's distinction. And to the extent Charette suggests Miller had acute hepatis B that eventually became chronic, that proposition is

immaterial. After all, a "cause of action accrues even though the full extent of the injury is not then known or predictable." Wallace v. Kato, 549 U.S. 384, 391 (2007) (quoting 1 Calvin W. Corman, Limitation of Actions § 7.4.1 (1991)).

Because there is no genuine factual dispute that Miller knew he had hepatitis B, he is charged with the "knowledge that would have resulted from a reasonable inquiry" into his treatment regimen. See Quillin, 328 F.App'x at 202. Summary judgment is thus appropriate as to Charette's hepatitis B-related claims against the seven Defendants—Nurse Alenda, Dr. Atnafu, Dr. Barnes, Nurse Deressa, PA Momoh, Dr. Onabajo, and Nurse Pope—whose last encounter with Miller was beyond the three-year limitations period.

Separately, Defendants assert they are entitled to summary judgment on the claim that they failed to provide Miller with treatment for hepatitis C. (Defs.' Mot. at 83). They note that Miller was "not infected with hepatitis C during the time relevant to this action." (Id.). Charette does not seek to hold Defendants liable under such a theory, so she does not oppose this part of Defendants' Motion. Accordingly, the Court will grant Defendants' Motion for Summary Judgment as to any claim related to a failure to treat Miller's hepatitis C.

### 2.    Medical Malpractice (Count I)

Maryland law characterizes "'any medical malpractice tort' as a 'traditional negligence claim.'" Armacost v. Davis, 200 A.3d 859, 872 (Md. 2019) (quoting Dehn v. Edgecombe, 865 A.2d 603, 610 (Md. 2005)). "Thus, 'the general principles which ordinarily govern in negligence cases also apply in medical malpractice claims.'" Id. (quoting Shilkret v. Annapolis Emergency Hosp. Ass'n, 349 A.2d 245, 247 (Md. 1975)).

Accordingly, to prevail on a medical malpractice claim, a plaintiff must establish: "'(1) the defendant's duty based on an applicable standard of care, (2) a breach of that duty, (3) that the breach caused the injury claimed, and (4) damages.'" Frankel v. Deane, 281 A.3d 692, 703 (Md. 2022) (quoting Am. Radiology Servs., LLC v. Reiss, 236 A.3d 518, 531 (Md. 2020)).

Defendants contend summary judgment is appropriate for two reasons. First, they assert Charette cannot produce admissible evidence showing the standard of care owed by each Defendant. (See Defs.' Mot. at 135–36). Second, Defendants argue Charette cannot produce admissible evidence showing that Miller suffered an injury from Defendants' inaction. (Id. at 86–94). The Court takes each issue in turn.

### a. Standard of Care

Maryland law recognizes that physicians generally have "a duty to use that degree of care and skill which is expected of a reasonably competent practitioner in the same class to which he belongs, acting in the same or similar circumstances." Armacost, 200 A.3d at 873 (quoting Shilkret, 349 A.2d at 253). This duty applies to care given and care withheld. Dingle v. Belin, 749 A.2d 157, 164 (Md. 2000). When analyzing the applicable standard of care, the trier of fact must account for "advances in the profession, availability of facilities, specialization or general practice, proximity of specialists and special facilities, together with all other relevant considerations." Ford v. United States, 165 F.Supp.3d 400, 423 (D.Md. 2016) (quoting Shilkret, 349 A.2d at 253). "Because the duty of care owed by a professional is based on the special expertise of the professional, its contours may not be a matter of common knowledge." Armacost, 200 A.3d at 872. So, plaintiffs generally must

provide "expert testimony about what a reasonably competent similar practitioner would do in the same circumstances." Id. at 873.

The parties do not dispute that Defendants owed Miller a duty. Instead, their dispute turns on the applicable "standard of care" imposed by that duty. Defendants contend Charette's experts never analyzed the circumstances in which each Defendant treated Miller. Because her experts cannot speak to the "granular details of any particular Defendant's involvement in Miller's care," Defendants assert Charette cannot meet her burden as to the standard of care and breach elements. (Defs.' Mot. at 135).

Here, Charette's experts have proffered sufficiently specific testimony for a jury's consideration. To start, Defendants overstate Charette's burden. To prove her medical malpractice claim, Charette need only "present expert testimony to establish breach of the standard of care and causation." See Frankel v. Deane, 281 A.3d 692, 703 (Md. 2022) (quoting Stickley v. Chisholm, 765 A.2d 662 (Md.App. 2001)) (internal brackets omitted). Charette has done just that. She has three experts prepared to testify that each Defendant breached the standard of care. Dr. Soni, for example, will testify that the standard of care for "[m]edical professionals involved in acute and chronic disease management" includes a duty to "recognize obvious signs of decompensated liver disease and arrange referrals to . . . [a] specialist who can manage [the patient's care] longitudinally." (Pl.'s Ex. O, Sophia M. Soni, M.D., Suppl. Expert Rep. ["Dr. Soni Suppl. Rep."] at 33, ECF No. 127-

15).[18] And after reviewing more than a decade of medical records detailing Defendants'

treatment of Miller, Dr. Soni intends to testify that:

> [T]he actions of Bernard Alenda, NP, Gedion Atnafu, MD, Zowie Barnes,
> MD, Wondaye Deressa, RNP, Robert Giangrandi, PA, Priscilla Momoh, PA-
> C, Ayoku Oketunji, MD, Bolaji Onabajo, MD, Titilayo Otunga, NP, Jennifer
> Pope, NP, and the onsite medical director with respect to Mr. Robert
> Williams [i.e., Mr. Michael Miller] failed to meet the standard of care. This
> failure resulted in repeat hospitalizations, emergent endoscopies and
> increased morbidity from chronic liver disease.

(Id.).[19]

Charette's next expert, Dr. Herrington, even contextualizes his proffered standard

of care to correctional medical providers. (Dr. Herrington Rep. at 7–8; see also Pl.'s Ex. O,

Sophia M. Soni, M.D., Certificate ["Dr. Soni Certificate"] at 30, ECF No. 127-15 ["These

named health care professionals each provided care to Mr. [Miller] in a setting that would

require review of the medical record, monitoring and treatment of chronic conditions and

generation and follow-up of referrals and did not meet their duties in that level of care."]).

And, according to Dr. Zhou, the applicable standard of care required Defendants to test "all

patients with cirrhosis for HBV as a potential contributing cause," particularly when a

patient "was previously diagnosed with HCV." (Pl.'s Ex. O, Kali Zhou, M.D., Expert Rep.

["Dr. Zhou Rep."] at 18, ECF No. 127-15). Taken together, the proffered testimony is

---

[18] Citations to page numbers in ECF No. 127-15 refer to the pagination assigned by
the Court's Case Management/Electronic Case Files ("CM/ECF") system.

[19] Neither party discusses Wexford's liability for medical malpractice beyond its
role as an employer of the individual Defendants. Presumably, Wexford is liable for the
conduct of the other Defendants under a theory of respondeat superior. See Bost v.
Wexford Health Sources, Inc., No. ELH-15-3278, 2018 WL 3539819, at *56–57 (D.Md.
July 23, 2018).

specific enough to inform a jury of the degree of care that would be expected of a "reasonably competent practitioner" involved in chronic and disease management. See Armacost, 200 A.3d at 873 (citing Shilkret, 349 A.2d at 253).

Defendants make much of Charette's experts declining to testify about particular encounters each Defendant had with Miller. For example, they assert Charette's experts have not discussed "what specifically Wondaye Deressa, NP should have done under the circumstances of his encounter with Miller on November 28, 2015." (Defs.' Mot. at 136). But it appears Charette's experts are prepared to opine on Miller's discrete encounters with specific Defendants. (See Pl.'s Ex. M, Ryan D. Herrington, M.D., Dep. Tr. ["Dr. Herrington Dep."] at 95:14–18, ECF No. 127-13 ["I don't have a—like, a photographic memory, and I can't pull up in my head, you know, Dr. Oketunafu's encounter in February of 2017. You're welcome to show me that document, but I would—and I can opine on it . . . ."]) (emphasis added).[20] Besides, "[a]n expert opining on a 'standard of care' is not necessarily required to specifically outline that standard, especially in an action such as this one where 'standard of care' holds a more amorphous definition." Karn v. PTS of Am.,

---

[20] Charette's experts occasionally illustrate breaches of the standard of care by using hypothetical examples. For instance, Dr. Herrington testified that each Defendant breached the standard of care by failing to follow each hospital's recommendation to refer Miller for a GI follow-up—even if some Defendants did not treat Miller until months after he returned from the hospital. (See Dr. Herrington Dep. at 95:19–96:8). That is, Dr. Herrington suggests if another provider came "three months later, the standard of care would still require that those [referral] recommendations be [] followed." (Id. at 96:2–4). Charette has not erred in using this circumstantial testimony to explain how specific Defendants breached the standard of care. Indeed, Maryland law permits experts to testify based on circumstantial facts relayed "through the use of hypothetical questions." See Frankel, 281 A.3d at 703 (quoting Sippio v. State, 714 A.2d 864, 874 (Md. 1998)).

LLC, 590 F.Supp.3d 780, 802 (D.Md. 2022) (finding an expert's opinion specific enough to support a prisoner's negligence claim under Maryland law). By describing the appropriate "steps or guidelines" Defendants should have followed, Charette's experts have provided "an acceptable way of defining the relevant professional standard of care under Maryland law." See Friendship Heights Assocs. v. Vlastimil Koubek, A.I.A., 785 F.2d 1154, 1162 (4th Cir. 1986) (citing Crockett v. Crothers, 285 A.2d 612 (Md. 1972)).

To the extent Defendants still believe Charette's expert testimony is too vague, summary judgment is not the appropriate remedy. After all, "the traditional means of testing standard of care testimony is cross-examination." Karn, F.Supp.3d at 802. If Charette's experts "later fail to adequately define or describe the relevant standard of care, opposing counsel is free to explore that weakness in the testimony." See Friendship Heights, 785 F.2d at 1162. The jury, of course, may then "choose to discount the testimony." Id. Accordingly, Defendants' request for summary judgment as to the standard of care element will be denied.

### b. Causation

"Departure from the standard of care does not, in and of itself, warrant a finding of medical malpractice: it is the plaintiff's burden to show that such want of skill or care directly caused the injury." Ford v. United States, 165 F.Supp.3d 400, 425 (D.Md. 2016) (citing Lane v. Calvert, 138 A.2d 902, 905 (Md. 1960)). To show proximate causation, "the plaintiff must prove the defendant's breach of duty was more likely than not (i.e., probably) the cause of the injury." Hurley v. United States, 923 F.2d 1091, 1094 (4th Cir. 1991). This cannot be established based solely on speculation or conjecture. Baulsir v. Sugar, 293 A.2d

253, 255 (Md. 1972) (noting that a "plaintiff has not met [her] burden if [s]he presents merely a scintilla of evidence where the [finder of fact] must resort to surmise and conjecture to declare [her] right to recover").

Charette provides two theories of causation, each of which the Defendants challenge.

### i.   Hepatitis B Treatment

First, Charette contends Defendants' failure to treat Miller's hepatitis B "put him at higher risk for complications from further decompensation of cirrhosis." (See Dr. Zhou Rep. at 20). Although the standard of care required Defendants to "test all patients with cirrhosis for HBV as a potential contributing cause," Miller was tested so infrequently that Defendants went years without realizing Miller had hepatitis B. (Id. at 18). If Miller received antiviral treatments once he was diagnosed with cirrhosis in 2012, Dr. Zhou believes Miller would have seen "an even greater benefit in stabilization or improvement of his liver function which would have further decreased the morbidity of his liver disease over the years and prevented his ultimate mortality." (Id. at 20).

But Charette's hepatitis B theory still suffers from a statute of limitations problem. (See supra Section II.B.1). Because Defendants can only be held liable for hepatitis B-related claims accruing after November 9, 2016, Charette has a narrow window to identify some legally cognizable injury from Miller's lack of antiviral treatments. No evidence suggests Miller suffered an injury due to his lack of antiviral treatments between November 2016 and June 2017, when Miller finally received antiviral therapy outside of prison. Dr. Zhou is the only expert Charette designated to testify as to Miller's lack of hepatitis B

treatment. But her report only analyzes the potential benefits of antiviral therapy if Miller had started a regimen in 2015. (See Dr. Zhou Rep. at 20).

At any rate, as of November 11, 2015, Miller tested positive for hepatitis B surface antigen but did not have detectable hepatitis B viral DNA in his blood. (See Garcia Lab'y Results at GARCIA000011–16). These results point to Miller having a chronic, inactive hepatitis B infection without ongoing viral replication. (See Dr. Zhou Rep. at 19). And because antiviral medication merely aims to stop viral replication of hepatitis B, (Dr. Zhou Dep. at 51:18–52:10), Miller would not have benefited from the treatment during this time. (See Pl.'s Ex. K, Coleman Smith, M.D., Expert Rep. ["Dr. Smith Rep."] at 93, ECF No. 127-11).[21]

To Dr. Zhou's credit, it may be that antiviral therapy could "decrease rebleeding after an episode of acute variceal bleeding." (See Dr. Zhou Rep. at 20). But Dr. Zhou could not quantify how Miller would have experienced any such benefit, even if he had started treatment in the fall of 2015. (See Dr. Zhou Dep. at 191:9–192:2). Indeed, Charette identifies no admissible evidence connecting Miller's lack of antiviral treatment to further decompensation of his liver. Charette, at best, may rely on the fact that eleven days after Miller was released from prison, on April 4, 2017, he finally had a detectable hepatitis B viral load. Yet Dr. Zhou testified that the quantity of the virus itself does not correlate with damage to liver tissue. (Id. at 67:1–21). And throughout that period, Miller had stable ALT

---

[21] Citations to page numbers in ECF No. 127-11 refer to the pagination assigned by the Court's Case Management/Electronic Case Files ("CM/ECF") system.

levels. (See, e.g., Champlain Valley Med. Rs. at CVPH000328, CVPH000368). Because no evidence establishes proximate causation beyond "surmise and conjecture," see Baulsir, 293 at A.2d 255, Charette has not satisfied her burden of demonstrating a triable issue as to her hepatitis B theory. Accordingly, the Court will grant Defendants' Motion for Summary Judgment as to the non-time barred hepatitis B-related claims due to lack of causation.

### ii.  Referral to Specialist

Charette's other theory of causation turns on Defendants' failure to refer Miller to a specialist, such as a gastroenterologist, to manage his end-stage liver disease. A reasonable jury could conclude Defendants' failure to refer Miller to a specialist caused him to suffer a legally cognizable injury.

With a gastroenterologist proactively managing his liver care, Miller would have received regular outpatient EGDs to monitor and band any new esophageal varices. (See Dr. Zhou Dep. at 148:2–18). Charette's experts maintain that Miller needed to have an outpatient endoscopy within two to four weeks to band any new varices, with the process repeated every two to four weeks until no varices remained. (Id. at 148:10–18; see also Dr. Soni Suppl. Rep. at 33). And because accessing varices requires "specialized interventions such as [EGDs] which [are] not available in correctional facilities," Miller could only receive this type of care in an outpatient setting. (Dr. Herrington Rep. at 7). Miller, according to Charette's experts, should have consistently seen a liver specialist once he was diagnosed with decompensated cirrhosis and variceal bleeding in 2012. (Dr. Zhou Rep. at 21). But Miller never received any such referral while in Defendants' care between

September 2015 and March 2017, despite several hospital providers explicitly noting Miller's need for one. As a result, Miller received EGDs only after being rushed to the hospital time and time again.

Defendants assert Miller suffered only two episodes of bleeding esophageal varices between September 2015 and March 2017—one on March 13, 2016, the other on March 7, 2017. (See, e.g., Bon Secours Hosp. Rs. at BSH000201–03; BWMC Rs. at BWMCSUB000153–54). And in the time between those two confirmed bleeding events, Defendants note Miller received EGDs on an emergency basis, none of which explicitly found that Miller's varices were actively bleeding. On that basis, Defendants conclude Miller faked some of the alleged bleeding episodes.

Neither of Defendants' arguments are persuasive. To start, the EGDs Miller received in emergency rooms occurred at time intervals beyond those recommended by the standard of care. (See Dr. Zhou Rep. at 21). That is, Miller went months before having a visit with a gastroenterologist, a stark contrast to the one-to-two-week intervals recommended by Charette's experts and even the physicians who treated Miller in various emergency rooms. As to the point that Miller experienced "only two" esophageal bleeds in their care, Defendants ignore that even one such event involving "conscious pain and suffering" may be a cognizable injury. See Greenstein v. Meister, 368 A.2d 451, 461 (Md. 1977). That, of course, still invites the question of whether Charette can show at least one bleed was caused by Miller's lack of prophylactic banding. But Charette's experts can properly support such a claim, (see Dr. Soni Suppl. Rep. at 33), so that factual question must be resolved by a jury, not the Court.

Finally, Charette's claim may survive even if the Court credited Defendants' proposition that "repeat endoscopies would not prevent all episodes of bleeding, they would only reduce the risk and frequency of the bleeds." (Defs.' Mot. at 92). An increase in the frequency of esophageal bleeds is a standalone, cognizable injury. Miller's medical records suggest he experienced unnecessary pain and suffering as he was ferried between emergency rooms for reactive treatment of his esophageal bleeding. (See Dr. Herrington Rep. at 7). By not providing Miller with proactive monitoring and banding, Defendants essentially accepted—rather than mitigated—the probability that Miller would continue to suffer from bleeding events. And as discussed by Charette's experts, "each referral for emergency care constituted additional cumulative risk for Mr. Miller" (Dr. Herrington Rep. at 7), best exhibited by his contraction of a bacterial peritonitis infection during a hospital visit in April 2016 and his contraction of a paraspinal abscess in November 2016. (See Pl.'s Ex. O, Sophia M. Soni, M.D., Expert Certificate ["Dr. Soni Certificate"] at 31, ECF No. 127-15; see also BWMC Rs. at BWMCSUB001289).

In sum, a reasonable jury could conclude Defendants' failure to refer Miller to a gastroenterologist increased his risk of further gastrointestinal bleeding.

### 3.     Eighth Amendment Violations (Count II)

A "prison official's deliberate indifference to an inmate's serious medical needs constitutes cruel and unusual punishment under the Eighth Amendment." Gordon v. Schilling, 937 F.3d 348, 356 (4th Cir. 2019) (citing Jackson v. Lightsey, 775 F.3d 170, 178

(4th Cir. 2014)).[22] A deliberate indifference claim has both an objective and subjective component. Id. "That is, the plaintiff must demonstrate that the defendant prison official acted with 'deliberate indifference' (the subjective component) to the plaintiff's 'serious medical needs' (the objective component)." Id. (citing Estelle v. Gamble, 429 U.S. 97, 104 (1976)).

A medical condition is serious enough to satisfy the objective component if it has "been diagnosed by a physician as mandating treatment or is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Id. (citing Scinto v. Stansberry, 841 F.3d 219, 225 (4th Cir. 2016)). The Defendants do not dispute that cirrhosis and end-stage liver disease constitute serious medical conditions. Instead, the parties debate whether Charette can satisfy the subjective component of her Eighth Amendment claim.

The subjective component has two subparts: "a plaintiff must show the prison official (1) had actual knowledge of the risk of harm to the inmate and (2) recognized that his actions were insufficient to mitigate the risk of harm to the inmate arising from his medical needs." Pfaller v. Amonette, 55 F.4th 436, 445 (4th Cir. 2022) (citing Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008)) (internal quotation marks omitted). While mere negligence is not enough, id. (citing De'lonta v. Angelone, 330 F.3d 630, 634 (4th Cir. 2003)), evidence of an official's "actual purposive intent" is not required, id. (citing De'lonta v. Johnson, 708 F.3d 520, 525 (4th Cir. 2013)). "Instead, deliberate indifference

_____

[22] The Court previously dismissed all claims against Wexford under 42 U.S.C. § 1983 and did not permit Charette to include a new § 1983 claim against Wexford in her Third Amended Complaint.

is most akin to criminal-law recklessness." Id. A plaintiff need not provide direct evidence of the defendant's knowledge; circumstantial evidence—such as proof the defendant "knew of a substantial risk from the very fact that the risk was obvious"—will suffice. Gordon, 937 F.3d at 357 (citing Scinto, 841 F.3d at 226). But "so long as the official who knew of a substantial risk to inmate health or safety 'responded reasonably to the risk,' they cannot be found liable under the Eighth Amendment, 'even if the harm ultimately was not averted.'" Pfaller, 55 F.4th at 445 (citing Farmer v. Brennan, 511 U.S. 825, 844 (1994)). Indeed, an inmate's mere disagreement with medical providers about the proper course of treatment does not support an Eighth Amendment cause of action. See Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985).

Finally, Charette must also show Defendants' deliberate indifference injured Miller. See 42 U.S.C. § 1983 (affording recovery only to a "party injured"); see also Malley v. Briggs, 475 U.S. 335, 345 n.7 (1986) (recognizing a causation element in § 1983 claims).[23]

### a. Defendants Entitled to Summary Judgment

#### i. Dr. Lee, Nurse Pope, Nurse Deressa, PA Giangradi, PA Mosmoh, and Nurse Otunuga

The Court begins with Charette's least supported claims. In Charette's words, six Defendants—Dr. Lee, Nurse Pope, Nurse Deressa, PA Giangrandi, PA Momoh, and Nurse Otunuga—"have not explicitly acknowledged [Miller's] need for a referral or [his] risk of

---

[23] The Court has already concluded Charette cannot show Defendants' failure to treat Miller's hepatitis B caused a legally cognizable injury. (See supra Section II.B.2.b.i.). Accordingly, the Court will address only Charette's theory of liability based on Defendants' failure to refer Miller to a gastrointestinal specialist.

death." (Pl.'s Reply at 12). So, Charette relies on a general theory of liability against these six Defendants. The Defendants, according to Charette, articulated a standard of care that would excuse them from "making a referral to treat [Miller's] liver disease [if] another more life-threatening symptom, such as a paraspinal abscess, required their attention." (Id. at 3). And by failing to refer Miller to a gastroenterologist during encounters where his liver disease was the most pressing medical issue, Charette suggests Defendants are liable because they breached their self-defined standard of care. (Id. at 12). The Court disagrees with Charette's premise and her conclusion.[24] As for the identified six Defendants, Charette's proof of deliberate indifference remains far too generalized.

Assume, for a moment, each of these six Defendants breached the applicable standard of care by failing to review Miller's records, which would have revealed he needed to see a gastroenterologist as an outpatient. (See Soni Certificate at 30). That may help Charette show negligence, but mere negligence cannot satisfy the subjective component of an Eighth Amendment claim. See Pfaller, 55 F.4th at 445. Indeed, "a deviation from the accepted standard of care, standing alone . . . is insufficient to clear the

---

[24] The Court disagrees with Charette's premise that Defendants somehow articulated a particular standard of care. Charette sources this "concession" to the following statement in Defendants' Reply:

> The standard of care is going to be different for an infirmary physician attempting to treat a patient's paraspinal abscess when the patient repeatedly pulls out his PICC line because he is unhappy that he is not being given narcotics is obviously going to be different than the standard of care owed by a nurse practitioner who sees a patient for the first time who complains of black stool.

(Defs.' Reply at 15). Here, Defendants' position does not define any specific standard of care. Rather, Defendants argue the inverse—that is, the applicable standard of care changes when different medical professionals face distinct circumstances.

'high bar' of a constitutional claim." Jackson, 775 F.3d at 179 (quoting Iko, 535 F.3d at 241). At least two federal appellate courts have noted "the mere loss . . . of . . . medical records does not rise to the requisite level of deliberate indifference." Montgomery v. Pinchak, 294 F.3d 492, 500 (3d Cir. 2002); see also Leavitt v. Corr. Med. Servs., Inc., 645 F.3d 484, 498 (1st Cir. 2011) ("To survive summary judgment, [a plaintiff] must present enough evidence for a factfinder to conclude [the defendant] ignored the viral load report, either intentionally or recklessly, not in the tort law sense but in the appreciably stricter criminal-law sense, requiring actual knowledge of impending harm, easily preventable.") (internal punctuation and citations omitted). Charette has no evidence implying these six Defendants reviewed Miller's medical records or otherwise knew about the many requests for Miller to see a gastroenterologist as an outpatient.

Instead, Charette simply lists times when these six medical providers should have known Miller needed to see a specialist. (Pl.'s Reply at 12–14). But no evidence suggests these six Defendants recognized Miller might be harmed if he did not see a gastroenterologist for outpatient care. See Pfaller, 55 F.4th at 445; see also Jackson, 775 F.3d at 178 ("[I]t is not enough that the defendant should have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction."). The bottom-line is that Charette has no evidence that each of these six Defendants "actually knew about [Miller's] serious medical condition and the risks of failing to treat him." See Langford v. Joyner, 62 F.4th 122, 125 (4th Cir. 2023) (affirming dismissal of Eighth Amendment claim because the plaintiff did not identify "how each individual Defendant" violated his rights).

Accordingly, Dr. Lee, Nurse Pope, Nurse Deressa, PA Giangrandi, PA Momoh, and Nurse Otunuga are entitled to summary judgment as to Charette's Eighth Amendment claim.

### ii. Nurse Alenda

Next, Charette purports to offer "clear-cut" evidence of Nurse Alenda's deliberate indifference, (Pl.'s Reply at 9), but the record does not support her assertion. Charette has not explained how any specific conduct by Nurse Alenda meets the standard for deliberate indifference. She instead relies on testimony from Nurse Alenda stating he would "definitely defer" to a hepatologist or a gastroenterologist on issues related to hepatitis and liver disease. (See Pl.'s Opp'n at 25) (citing Pl.'s Ex. H, Bernard Alenda, NP, Dep. Tr. ["Alenda Dep."] at 140:25–141:13, ECF No. 127-6). This statement, according to Charette, constitutes an "admission" in which Nurse Alenda acknowledges "that Miller should have been seen by a specialist." (Pl.'s Opp'n at 25). But Nurse Alenda's testimony simply reflects the uncontroversial notion that a nurse practitioner will defer to a specialist as to medical issues in the specialist's area of expertise. Charette unreasonably interprets Nurse Alenda's statement that he "would definitely defer" to a specialist, as Nurse Alenda admitting he "should have referred Miller to a specialist." This rhetorical slight-of-hand cannot carry Charette's burden on summary judgment.

Charrette briefly argues that Nurse Alenda's deliberate indifference may be inferred from his position as "the medical provider who document[ed] the recommendations from the discharge summaries into Wexford's medical records." (Pl.'s Reply at 9). Presumably, Charette is referring to the times when Miller returned to the prison with explicit

instructions that he needed a follow-up with a gastroenterologist. Nurse Alenda, when assigned to processing Miller's intake, was responsible for entering any offsite referral requests listed on Miller's discharge paperwork. (See Oketunji Dep. 30:4–12).

The first of these encounters was on March 13, 2016, when Miller was sent to the emergency room after a nurse saw him vomiting blood. (Wexford Med. Rs. at DPSCS001155). During his hospital stay, Dr. Abdi—a gastroenterologist—performed an EGD on Miller and banded his Grade 3 esophageal varices. (Bon Secours Hosp. Rs. at BSH000201–03). Dr. Abdi recommended that Miller receive another banding ligation procedure in one week. (Id.). Nurse Alenda helped process Miller's intake upon his return to the prison on March 15, 2016. (Wexford Med. Rs. at DPSCS001156). Recognizing that Miller needed a follow-up, Nurse Alenda noted the "[m]edical records [department] will have to send a copy of the dictated discharge report to the onsite medical director for follow[-]up consults to be generated." (Id.). A follow-up one week later would have happened on March 22, 2016, yet no such follow-up occurred.

This peculiar situation does not rise to the level of deliberate indifference. No evidence suggests Nurse Alenda intentionally or recklessly failed to submit Miller's referral. In fact, Miller's medical records suggest the referral was ordered on March 16, 2016. (Id. at DPSCS001157). The only reasonable inference is that some other administrative process, perhaps related to the medical records department, derailed Miller's referral. That Miller's follow-up never took place is concerning. But "there is no evidence that this omission was anything more than an unfortunate scheduling glitch." See Leavitt,

645 F.3d at 502 (affirming grant of summary judgment to a medical provider who ordered a follow-up appointment that never ultimately occurred).

Even Nurse Alenda's most questionable conduct fails to meet the "very high standard" of deliberate indifference. See Grayson v. Peed, 195 F.3d 692, 695 (4th Cir. 1999). On April 9, 2016, Miller started vomiting blood again. (Wexford Med. Rs. at DPSCS001156). After learning of Miller's condition, Nurse Alenda arranged for him to stay in the infirmary for observation. (Id.). When Miller vomited blood two days later, he was sent to the hospital. (Id. at DPSCS001169; BWMC Rs. at BWMCSUB000949). There, he received an EGD from gastroenterologist Dr. Blum, who observed and banded new esophageal varices. (BWMC Rs. at BWMCSUB000966–67). Miller's discharge summary, again, noted that Miller "needs to follow up with gastroenterology as [an outpatient]." (See Jan. to May 2016 Med. Rs. at BWMCSUB000955–96). And Nurse Alenda, again, processed Miller's return to the prison. (Wexford Med. Rs. at DPSCS001169). But that time, Nurse Alenda's notes omitted any reference to Miller's required follow-up with a gastroenterologist. (Id.).

Charette cannot rely on this encounter, however, because she has no evidence connecting this oversight to any sort of intentional or reckless act. See Thompson v. Potomac Elec. Power Co., 312 F.3d 645, 649 (4th Cir. 2002) (conclusory allegations, or "a mere scintilla of evidence," cannot defeat summary judgment). Nurse Alenda himself testified that he believed Miller saw a gastroenterologist in a non-emergency setting; in fact, he thought it was "impossible" that Miller never saw such a specialist. (Alenda Dep. 111:10–21). Of course, a moving party's self-serving assertions of their intent carry little

weight at the summary judgment stage. But Nurse Alenda's testimony is supported by contemporaneously recorded medical records. That is, when Nurse Alenda processed Miller's intake on later occasions, he would generally order Miller's referrals as instructed. (See, e.g., Wexford Med. Rs. at DPSCS001185–86, DPSCS001298–99, DPSCS001311–13, DPSCS001320). So, it would be unreasonable to infer that Nurse Alenda's failure to note Miller's need for a referral in April 2016 was for a hidden, deliberate purpose rather than mere negligence.

Accordingly, the Court will grant Nurse Alenda summary judgment as to Charette's claim for deliberate indifference.

### iii.  Dr. Barnes

Dr. Barnes, too, is entitled to summary judgment. Although Dr. Barnes acknowledged that gastrointestinal bleeding could lead to death, (see Pl.'s Ex. D, Zowie Barnes, M.D., Dep. Tr. ["Barnes Dep."] at 27:8–19, ECF No. 127-4), that only satisfies part of the test for deliberate indifference. See Pfaller, 55 F.4th at 445 (describing two-part test for the subjective component of a deliberate indifference claim). Charette has no evidence suggesting Dr. Barnes knew her "actions were insufficient to mitigate" Miller's risk of harm. See id. Charette presumes that Dr. Barnes knew Miller needed a referral because Dr. Barnes encountered Miller on October 7, 2015, (Wexford Med. Rs. at DPSCS001021), shortly after Dr. Abdi noted that Miller needed a follow-up with a specialist and further band ligation by September 15, 2015, (Bon Secours Hosp. Rs. at BSH00057–58).

Again, Charette assumes Dr. Barnes knew about Dr. Abdi's recommendation and declined to act on it. Charette is not entitled to such an inference for two reasons. First, mere access to information is not enough to show on summary judgment that a defendant, in fact, used that information in their decision making. See Danser v. Stansberry, 772 F.3d 340, 348 n.10 (4th Cir. 2014). Second, Charette lacks even generalized evidence to permit the court to draw such an inference. For example, Charette provides no testimony from Barnes about how often she reviewed her patients' medical records before treating them. See, e.g., Leavitt, 645 F.3d at 499 (highlighting defendant's testimony that he "had never neglected to review any other patient report").

To the extent Dr. Barnes failed to sufficiently review Miller's medical records, Charette may have a negligence claim. But as to Charette's Eighth Amendment claim, Dr. Barnes is entitled to summary judgment.

### iv.  Dr. Onabajo

Charette's claim against Dr. Onabajo fails for the same reason. Charette relies on Dr. Onabajo's testimony that he would "generally defer to a gastroenterologist's opinion on a general patient's cirrhosis." (Pls.' Ex. J, Bolaji Onabajo, M.D., Dep. Tr. ["Onabajo Dep."] at 133:7–12, ECF No. 127-8). That a primary care physician like Dr. Onabajo would generally defer to a specialist in their area of expertise is understandable. Nowhere does Dr. Onabajo convey he would or should have referred Miller to a gastroenterologist for outpatient treatment. Again, Charette fails to show Dr. Onabajo knew Miller needed to see a gastroenterologist for follow-ups. Although Dr. Onabajo may have known Miller needed to see a specialist for hepatitis B and C, the Court has already ruled these claims cannot

succeed due to the statute of limitations or a lack of proof as to causation. (See supra Section II.B.2.b.i.). Furthermore, Dr. Onabajo did enter referral requests for Miller to see an infectious disease specialist or a hematology specialist. (See, e.g., Wexford Med. Rs. at DPSCS001383–86, October 2016 Med. Rs. at NRDCOR000607). Although these referrals were ultimately rejected, the fact that Dr. Onabajo requested them at all cuts against an inference that he acted with deliberate indifference.

Accordingly, the Court will grant summary judgment to Dr. Onabajo as to Charette's Eighth Amendment claim.

### v. Dr. Oketunji

Dr. Oketunji is entitled to summary judgment as to Charette's deliberate indifference claim. Charette identifies no evidence that Dr. Oketunji subjectively knew Miller needed to be referred to a gastroenterologist for outpatient care. In fact, Dr. Oketunji testified to opposite effect; he insisted that he knew nothing about Miller's consultation requests. (See Dr. Oketunji Dep. at 86:31–87:5). Charette attempts to satisfy her burden by asserting that Dr. Oketunji "acknowledge[d] the particular province of the gastroenterologist" when he testified that "any decision by the GI is up to the gastroenterologist." (Pl.'s Reply at 6). This, of course, still misinterprets a doctor saying he would defer to a specialist as that doctor saying he should have referred Miller to a specialist. Dr. Oketunji opines on the former, not the latter.

Indeed, Dr. Oketunji testimony merely indicates that he would refer a patient to a gastroenterologist if he saw they were actively bleeding or vomiting blood. (See Dr. Oketunji Dep. at 50:30–32). But this hypothetical scenario is not probative of what Dr.

Oketunji subjectively believed while he was treating Miller. The reasonableness of Dr. Oketunji's actions must be judged through the lens of what he believed at the time. See Lightsey, 775 F.3d at 179. The benefit of hindsight cannot conjure a dispute of fact. Besides, Charette's interpretation of Dr. Oketnuji's testimony is particularly inapt because no encounter between Miller and Dr. Oketunji involved an active bleeding scenario.

Accordingly, Dr. Oketunji is entitled to summary judgment as to Charette's claim for deliberate indifference.

### b.  Defendants Not Entitled to Summary Judgment

Three Defendants—Dr. Atnafu, Dr. Ayalew, and Dr. Temesgen—are not entitled to summary judgment because a reasonable jury could conclude they were deliberately indifferent to Miller's serious medical needs. Three generally applicable observations apply to the Court's analysis of these Defendants.

First, the Court has already held that Charette has identified triable issues of general causation and injury based on Defendants' failure to refer Miller to a gastrointestinal specialist for outpatient care. (See supra Section II.B.2.b.ii.). So, the Court's analysis focuses mainly on whether Defendants knew their conduct was insufficient to address Miller's serious medical needs.

Second, Defendants argue the Court could "easily" dispose of the deliberate indifference claim because Charette "cannot present any admissible expert testimony to the effect that any individual defendant was deliberately indifferent to Miller's medical needs on any particular occasion." (Defs.' Mot. at 101). The Court disagrees. To start, the Court has already explained how Charette's expert testimony is specific enough to connect

Defendants' conduct to Miller's injuries. (See supra Section II.B.2.a.). Besides, deliberate indifference claims largely turn on a defendant's subjective intent, so it is unclear what sort of expert testimony Defendants insist would be helpful.[25] In any event, the Fourth Circuit has held plaintiffs need not present expert testimony to establish a deliberate indifference claim. See Scinto, 841 F.3d at 230 ("There is no requirement, however, that a plaintiff alleging deliberate indifference present expert testimony to support his allegations of serious injury or substantial risk of serious injury."). That holding, of course, forecloses Defendants' assertion that Charette's expert testimony is insufficiently specific.

Third, the Court's analysis focuses only on the care Defendants did—or did not—provide to treat Miller's objectively serious medical needs; that is, his end-stage liver disease, cirrhosis, and esophageal varices. Nearly a hundred pages of Defendants' briefing narrate, in granular detail, years of care provided to Miller. Adequately tending to some aspects of Miller's health cannot excuse inadequate attention to Miller's most pressing medical conditions. Indeed, the Fourth Circuit has "rejected the notion that simply because medical staff have provided an inmate with 'some treatment' that 'they have necessarily provided [the inmate] with constitutionally adequate treatment.'" Stevens v. Holler, 68 F.4th 921, 933 (4th Cir. 2023) (citing Johnson, 708 F.3d at 526).

---

[25] The Federal Rules of Evidence go so far as to prohibit this type of testimony in criminal cases. See Fed.R.Evid. 704(b) ("In a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone.").

With those general concerns raised, the Court will evaluate the liability of each Defendant in turn.

### i. Dr. Atnafu

Charette has identified a triable claim for deliberate indifference against Dr. Atnafu. Dr. Atnafu was an independent contractor for Wexford at the time relevant to this dispute. (Dr. Atnafu Dep. at 10:12–16, 11:15–16). In his role, Dr. Atnafu helped determine where inmates would receive the best care, whether that was the prison infirmary, a community hospital like Bon Secours, an advanced center, or a tertiary center. (Id. at 9:3–10). The goal was to send patients "directly" to the place of care to avoid "going back and forth from institution [to] institution." (Id. at 9:16–19). And by acting as a liaison between the prison and hospitals in the area, Dr. Atnafu helped ensure prison medical providers were ready to care for inmates returning from the hospital. (Id. at 8:13–10:2). Along with his contract-based services for Wexford, Dr. Atnafu practiced at Bon Secours Hospital, where he provided infectious disease consultations and served as a hospitalist in the prison unit. (Id. at 11:14–19).

Charette may put the question of Dr. Atnafu's deliberate indifference to a jury. To start, a reasonable jury could conclude Dr. Atnafu "had actual knowledge of the risk of harm" to Miller. See Pfaller, 55 F.4th at 445. Prison medical providers consulted Dr. Atnafu about Miller's emergency medical conditions several times; some even involved Dr. Atnafu recommending Miller's immediate hospitalization. (See, e.g., Wexford Med. Rs. at DPSCS001155, DPSCS001182–84, DPSCS001460–62, DPSCS001818–19). To that end, Dr. Atnafu was not just "exposed to information concerning the risk[s]" Miller faced; Dr.

Atnafu's strategic involvement in Miller's care suggests he "must have known about" Miller's life threatening conditions. See Scinto, 841 F.3d at 226 (citing Parrish ex rel. Lee v. Cleveland, 372 F.3d 294, 303 (4th Cir. 2004)). Again, Dr. Atnafu helped prison medical staff respond to Miller's complaints of vomiting blood at least seven times in just one year. (See Wexford Med. Rs. at DPSCS001196–98, DPSCS001311–13). True, Dr. Atnafu knew about Miller's malingering habits. In at least one emergency call, however, prison staff reported to Dr. Atnafu that they had personally witnessed Miller vomiting blood. (See id. at DPSCS001155). So, Dr. Atnafu knew Miller had not faked every condition requiring hospitalization.

Whether Dr. Atnafu recognized his actions were insufficient to mitigate Miller's risk of harm turns on a dispute of material fact. See Pfaller, 55 F.4th at 445. Dr. Atnafu himself recommended Miller for follow-up appointments with gastroenterologist Dr. Abdi. (See Bon Secours Hosp. Rs. at BSH000229). Fourth Circuit law on this issue is well-settled: a "[f]ailure to provide the level of care that a treating physician himself believes is necessary" presents a triable claim of deliberate indifference. Miltier v. Beorn, 896 F.2d 848, 853 (4th Cir. 1990), overruled in part on other grounds by Farmer, 511 U.S. at 114.[26] In Miltier v. Beorn, 896 F.2d at 853, for example, the Fourth Circuit reversed a district

---

[26] "Miltier predates the Supreme Court's decision in Farmer, which established the requisite subjective mental state for a deliberate indifference claim. But the substantive principle we borrow from Miltier—that a doctor's failure to provide care that he himself deems necessary to treat an inmate's serious medical condition may constitute deliberate indifference—survives Farmer." Jackson v. Lightsey, 775 F.3d 170, 179 (4th Cir. 2014) (citing Miltier, 896 F.2d at 852).

court's grant of summary judgment for two prison doctors. One doctor recommended that an inmate, who ultimately died in prison of a heart attack, be transferred to a cardiac unit but failed to follow up on this recommendation. Id. Another doctor then approved the referral, but he too failed to follow up and confirm that the transfer had occurred. Id. The court held that the inmate's deliberate indifference claims could survive summary judgment because the doctors failed to provide the treatment they both recognized was necessary. Id.

The Fourth Circuit reaffirmed this principle in Jackson v. Lightsey, 775 F.3d 170, 179 (4th Cir. 2014), where a prison doctor told an inmate with a chronic heart condition "that he would order additional tests and treatments, including an electrocardiogram, heart rate monitoring, and a special diet." Id. at 174. But several months later, the doctor had not entered the necessary orders, causing the inmate to suffer extreme pain. Id. The Fourth Circuit held the plaintiff sufficiently pled a deliberate indifference claim against the doctor. Id. at 179. In so holding, the court noted the plaintiff had "no quarrel with [the doctor's] medical judgment or recommendations," but merely wanted "exactly the testing and treatment that [the doctor had] prescribed." Id. This Court routinely applies these precedents in denying motions for summary judgment under similar circumstances. See, e.g., Brown v. Wexford Health Sources, Inc., No. JKB-17-1212, 2020 WL 1984905, at *8 (D.Md. Apr. 27, 2020); Campbell v. Getachew, No. GLR-19-1173, 2020 WL 5747177, at *13 (D.Md. Sept. 25, 2020).

Here, Dr. Atnafu recognized the seriousness of Miller's conditions, even going so far as to say those with a decompensating liver have "the most miserable life you can

imagine in the world." (Dr. Atnafu Dep. at 29:9–11). And just like the doctors in <u>Jackson</u> and <u>Miltier</u>, Dr. Atnafu recommended Miller for a type of care that was never ultimately provided. (<u>See</u> Bon Secours Hosp. Rs. at BSH000229). In fact, Dr. Atnafu seems to have known about other requests for Miller to see a gastroenterologist for a follow-up. (Dr. Atnafu Dep. at 29:9–11). That is, Dr. Atnafu admits Miller's specialists, like "every specialist," would "always" request further follow-ups. (<u>Id.</u> at 29:9–11). But in response to each recommendation, Dr. Atnafu ultimately failed to ensure Miller received non-emergent care from a gastroenterologist. This, too, supports an inference of indifference. <u>See</u> <u>Stevens</u>, 68 F.4th at 933 (quoting <u>Cooper v. Dyke</u>, 814 F.2d 941 (4th Cir. 1987)) ("[G]overnment officials who ignore indications that a prisoner's . . . initial medical treatment was inadequate can be liable for deliberate indifference to medical needs.").

During Miller's hospitalization at Bon Secours, Dr. Temesgen—Wexford's Regional Medical Director—would have daily conversations about Miller's care with Dr. Atnafu as the in-house "hospitalist." (<u>See</u> Dr. Temesgen Dep. at 34:20–35:18). During these conferences, Dr. Temesgen would ask Dr. Atnafu if patients like Miller could simply "see the GI specialist while [they] [were] still in the hospital," rather than separately scheduling those patients' pending outpatient appointments. (<u>Id.</u> at 35:4–9). The justification, according to Dr. Temesgen, was to "cut [Wexford's] risk." (<u>Id.</u> at 35:10–11). These conversations suggest Dr. Atnafu knew Miller needed to see a gastroenterologist but chose to treat Miller while he was hospitalized rather than permitting regular follow-ups for preventive care as an outpatient.

The Court concludes Charette has raised a genuine issue of material fact as to whether Dr. Atnafu knew Miller needed to see a gastroenterologist for non-emergency follow-ups but declined to do anything to materialize those visits. A reasonable jury could conclude this constitutes deliberate indifference. Accordingly, Defendants' Motion for Summary Judgment as to Dr. Atnafu's deliberate indifference will be denied.

### ii. Dr. Ayalew

Next, Charette has presented a triable claim as to Dr. Ayalew's deliberate indifference. Dr. Ayalew was familiar with Miller's end-stage liver disease. (Wexford Med. Rs. at DPSCS000872). But whether Dr. Ayalew knew his conduct was insufficient to treat Miller is a closer question. Still, Charette has furnished enough evidence for a reasonable jury to conclude Dr. Ayalew deliberately disregarded Miller serious medical needs.

In September 2015, Dr. Ayalew reviewed paperwork from Dr. Gebremariam, one of Miller's discharging physicians, who recommended that Miller receive outpatient follow-ups with a gastroenterologist like Dr. Abdi. (See Bon Secours Hosp. Rs. at BSH000052). The note also said, "no acute intervention was recommended at this time." (Id., emphasis added). But in copying that information to Wexford's records, Dr. Ayalew never referred Miller to a gastroenterologist. In fact, Dr. Ayalew rewrote the provision in the note regarding "acute" intervention, as "NO ACTUAL INTERVENTION WAS RECOMMENDED." (Wexford Med. Rs. at DPSCS000872, emphasis in original).

These circumstances, on their own, may only rise to the level of medical negligence; misinterpreting a physician's notes seldom establishes a constitutional violation. But Dr.

Ayalew testified that, at the time he met Miller, he knew a gastroenterologist had recommended him for outpatient follow-ups. (Pl.'s Ex. C, Melaku Ayalew, M.D., Dep. Tr. ["Dr. Ayalew Dep."] at 22:21–23:4, ECF No. 127-3). Furthermore, Dr. Ayalew acknowledged Miller's condition needed to be treated in two ways: beta blockers and band ligation from a gastrointestinal specialist. (Id. at 20:12–20:22). Construed in a light most favorable to Charette, Dr. Ayalew's testimony suggests he failed "to provide the level of care that [Dr. Ayalew] himself believe[d] [was] necessary." See Miltier, 896 F.2d at 853. Indeed, Dr. Ayalew recognized the special expertise a gastroenterologist holds on issues of esophageal bleeding; to that end, Dr. Ayalew testified that such a treatment decision was "up to the gastroenterologist." (See Dr. Ayalew Dep. at 22:2–22:13). While it is unclear whether Dr. Ayalew believed providing one of the two treatments would sufficiently address Miller's health concerns, the ambiguity in his testimony at least generates a dispute of material fact as to his deliberate indifference. See Heyer v. U.S. Bureau of Prisons, 849 F.3d 202, 211 (4th Cir. 2017) (quoting Johnson, 708 F.3d at 526) ("[T]he mere fact that prison officials provide some treatment does not mean they have provided 'constitutionally adequate treatment.'").

Furthermore, Dr. Ayalew had multiple opportunities to refer Miller for outpatient follow-ups with a gastroenterologist. Each interaction between Dr. Ayalew and Miller came after Dr. Ayalew reviewed Dr. Gebremariam recommendation for outpatient gastroenterology care. Still, Dr. Ayalew never referred Miller despite his recurrent hospitalizations, which should have provided Dr. Ayalew with "indications that [Miller's] . . . initial medical treatment was inadequate." See Stevens, 68 F.4th at 933. All

the while, Dr. Ayalew referred Miller for other types of specialist care—such as an infectious disease specialist to evaluate Miller's hepatitis. (See, e.g., Jan. to May 2016 Med. Rs. at WEX.RRPD.000538, NRDCOR000454, NRDCOR000468). So, Dr. Ayalew evidently had the authority to refer Miller for gastroenterology appointments, he simply failed to exercise it. These circumstances, viewed in a light most favorable to Charette, establish a triable deliberate indifference claim. See Pfaller, 55 F.4th at 450 (citing Scinto, 841 F.3d at 232). ("[T]he fact alone that [a doctor] failed to refer [the plaintiff] for further testing when he demonstrated signs of an increasingly serious medical condition 'raises an inference [of] deliberate indifference.'").

Accordingly, the Court will deny Defendants' Motion for Summary Judgment as to Charette's claim for deliberate indifference against Dr. Ayalew.

### iii.  Dr. Temesgen

Charette's deliberate indifference claim against Dr. Temesgen survives summary judgment. Dr. Temesgen essentially admits he had actual knowledge of Miller's serious medical needs given the sheer number of times he was hospitalized. See Pfaller, 55 F.4th at 445. Dr. Temesgen knew Miller went to the hospital more than 17 times while incarcerated at Jessup. (See Dr. Temesgen Dep. 32:14–33:4). And Dr. Temesgen understood that Miller faced a substantial risk of harm—even death—from these acute gastrointestinal bleeding episodes. See id. at 34:11–18.

A reasonable jury could find that Dr. Temesgen disregarded this substantial risk of harm by failing to refer Miller to a gastroenterologist for outpatient care. It appears Dr. Temesgen categorically sought to avoid outpatient gastrointestinal follow-ups for inmates.

70

Dr. Temesgen acknowledges that after a banding procedure, a gastroenterologist will sometimes recommend a follow-up banding in a non-emergency setting. (Id. at 33:21–34:1). But rather than schedule these pending outpatient appointments, Dr. Temesgen would ask the hospitalist, Dr. Ayalew, if patients like Miller could simply "see the GI specialist while [they] [were] still in the hospital." (Id. at 35:4–9). Dr. Temesgen believed his approach would "cut [Wexford's] risk." (Id. at 35:10–11). As a result, Miller only saw a gastroenterologist when he was hospitalized.

To grant Dr. Temesgen's request for summary judgment, the Court would have to conclude it is reasonable, as a matter of law, for prison officials to provide care from a specialist only during an inmate's hospital stay. The Court declines to do so. Indeed, "it is inconsistent with the Eighth Amendment for a prison official to withhold treatment from an inmate who suffers from a serious, chronic disease until the inmate's condition significantly deteriorates." Gordon, 937 F.3d at 359 (citations omitted); see also Smith v. Smith, 589 F.3d 736, 739 (4th Cir. 2009) (explaining that delay in treatment can contravene Eighth Amendment).

Perhaps Miller was hospitalized so often that it was reasonable to have a hospital's in-house gastroenterologist perform the necessary consultations. Pfaller, 55 F.4th at 445 (explaining a prison official does not violate the Eighth Amendment if they "responded reasonably" to potential health risks). But there is a factual dispute between the parties'

experts on this question.[27] Ultimately, a reasonable jury could conclude it was medically necessary for Miller to have outpatient endoscopies every two to four weeks rather than the months he waited to receive such care between emergency hospital visits. Cf. United States v. Clawson, 650 F.3d 530, 538 (4th Cir. 2011) (quoting Bowring v. Godwin, 551 F.2d 44, 47–48 (4th Cir. 1977)) (explaining "the essential test is one of medical necessity" but noting that the right to treatment is "limited to that which may be provided upon a reasonable cost and time basis").

If anything, Dr. Temesgen's preference for limiting gastroenterology follow-ups to those performed during an inmate's emergency hospital stay suggests a decision "predicated on administrative convenience rather than medical judgment." See Gordon, 937 F.3d at 361 (citations omitted). The ease of cabining specialist treatment to hospital visits would be particularly alluring because the interventions Miller needed, such as preventive EGDs, are unavailable in most prisons. (See Dr. Herrington Rep. at 7). And given that Dr. Temesgen generally defers to appropriate and evidence-based recommendations from gastroenterologists, one must ask why Dr. Temesgen declined to follow the medical advice of nearly every gastroenterologist who treated Miller during his incarceration. (Dr. Temesgen Dep. at 25:19–23). In any event, Dr. Temesgen's apparent

---

[27] Charette's experts maintain that Miller needed to have an outpatient endoscopy within two to four weeks to band any new varices, with the process repeated every two to four weeks until no varices remained. (Dr. Zhou Dep. at 148:10–18; see also Dr. Soni Suppl. Rep. at 33). Defendants' experts opine that Miller "was going to develop further varices, regardless of what EGD surveillance schedule was implemented or what medication management was prescribed for the condition." (See, e.g., Pl.'s Ex. K, Kevin Ferentz, M.D., Expert Rep. ["Dr. Ferentz Rep."] at 73, ECF No. 127-11).

failure to "seriously consider[]" the recommendations for Miller's outpatient treatment supports an inference of deliberate indifference. See Gordon, 937 F.3d at 358 ("Rather than seriously considering [the plaintiff's] requests for HCV treatment and endeavoring to discover why he was not receiving it, Schilling—as the Health Services Director— repeatedly passed the buck.").

Drawing all reasonable inferences in Charette's favor, a reasonable jury could conclude Dr. Temesgen was deliberately indifferent to Miller's serious medical needs. In sum, the Court will deny Dr. Temesgen's request for summary judgment as to Charette's Eighth Amendment claim.

### c.  Charette's Cross-Motion for Partial Summary Judgment as to Defendants' State of Mind

The Court will deny Charette's Cross-Motion for Partial Summary Judgment. Charette has failed to show that she is entitled to judgment as a matter of law with respect to the state of mind of Dr. Lee, Nurse Pope, Nurse Deressa, PA Giangrandi, PA Momoh, Nurse Otunuga, NP Alenda, Dr. Barnes, Dr. Onabajo, and Dr. Oketunji. (See supra Section II.B.3.a.).

Disputes of material fact warrant denying Charette's Cross-Motion as to the remaining Defendants. Dr. Atnafu, for example, testified that specialists always request "further follow-up, whether it's needed or not." (See Dr. Atnafu Dep. at 88:24–89:3). On that basis, Dr. Atnafu raises a dispute about whether he subjectively believed Miller's referral was medically necessary.

Whether Dr. Ayalew had the requisite state of mind to constitute deliberate indifference rests on a similar dispute of material fact. Although Dr. Ayalew knew Miller's recommended treatment involved "beta blockers and [a] follow-up with the gastroenterologist as an outpatient," (Dr. Ayalew Dep. at 22:23–23:4), there remains a dispute over whether Dr. Ayalew subjectively believed beta blockers would provide sufficient prophylactic treatment, (id. at 20:17–22).

Finally, Dr. Temesgen raises a factual dispute about whether he subjectively believed Miller needed outpatient treatment from a gastroenterologist. (See Dr. Temesgen Dep. at 35:4–11). That question will be for a jury, not the Court, to decide.

In sum, the Court will deny Charette's Cross-Motion for Partial Summary Judgment.

### III.      CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part Defendants' Motion for Summary Judgment (ECF No. 115) and deny Charette's Cross-Motion for Partial Summary Judgment (ECF No. 129). A separate Order follows.

Entered this 11th day of September, 2023.


_____/s/_____
George L. Russell, III
United States District Judge